UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-60117-LEIBOWITZ

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

SANJAY SINGH,

    Defendant.
_____/

**MR. SINGH'S RESPONSE IN OPPOSITION TO MOTION FOR REMAND**

The defendant, Sanjay Singh, by and through undersigned counsel, hereby submits his response in opposition to the government's motion for remand [ECF No. 245] and states in support the following.

Following an adjudication of guilt, the Court may permit a defendant to be released or to remain on bond while awaiting sentencing if the Court finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released. 18 U.S.C. § 3143. The facts here support such a finding, and Mr. Singh urges the Court to permit him to remain on bond pending his sentencing hearing with certain modifications proposed below.

**I.    Mr. Singh does not pose a danger to the safety of any other person or to the community**

In its motion, the government contends that Mr. Singh poses a risk of danger to the community, in part, because the offenses of which he was convicted involved

1

deception, because of representations concerning his finances following his arrest, and because of an incident that occurred last November at the Budgetel Hotel at which he was then employed. As explained below, Mr. Singh's conduct over the course of the 17 months he has been on bond indicate that he poses no danger to the community, and Mr. Singh urges the Court to reject the government's petition on this basis.

First, the fact of Mr. Singh's conviction for wire fraud does not indicate that he poses a danger to the community if allowed to remain on bond while awaiting sentencing. There is nothing in the record to demonstrate that Mr. Singh continued to engage in the type of conduct that was the subject of the charges against him, namely, making false representations to potential investors to induce them to invest, following his arrest.

Moreover, Mr. Singh's representations to the Court regarding his finances do not support a finding of dangerousness. The government points to funds that were transferred to his sister in the initial days after his arrest. These transfers were to cover legal fees, as Mr. Singh did initially have private counsel in the parallel SEC matter and temporary private counsel in this criminal matter.  Ultimately, he could not afford permanent private counsel in this matter, at which time the Federal Public Defender was appointed to represent him; he is also proceeding *pro se* in the SEC matter. Upon further inquiry by the Court, Mr. Singh was found partially indigent in this criminal case by Chief Judge Altonaga and has since been making best efforts to comply with his partial indigency payments. [ECF No. 42]. Nothing about Mr. Singh's

representations to the Court regarding his finances indicates that he poses a danger to the community, and this Court has already taken his financial status into account in ordering partial indigency payments.

Finally, the incident at the Budgetel Hotel last November also does not support a finding that Mr. Singh poses a danger to the community. Last November, while on bond, Mr. Singh obtained employment as a hotel clerk. While working at the hotel, he received a scam phone call which he believed was genuine; as a result, he deposited money into an online account, per the instructions on the phone call. Mr. Singh was fired as a result of this incident. While the incident was surely unfortunate and may indicate a lapse in Mr. Singh's judgment, there is nothing to indicate that he acted in bad faith or personally benefitted from it in any way, much less that he poses a danger to the community or to any individual. No charges were ever filed as a result, There is simply nothing about this incident—which occurred over a year ago—that indicates that Mr. Singh poses a threat to the community or to any individual.

II.     **Mr. Singh does not pose a risk of flight**

There is ample evidence in the record to support a finding by clear and convincing evidence that Mr. Singh is not likely to flee, and he urges the Court to so find.

First, and most importantly, Mr. Singh is strongly connected to this community, because his wife, their young daughter, and his adult son all live here in South Florida. Following his arrest, Mr. Singh was released on a $1 million personal surety bond, which was co-signed by his sister who lives in the U.S., Rajini Singh,

and his close friend, Irshad Begg. The willingness of his sister and friend to put their names and finances on the line for Mr. Singh, are strong indications of his connection to the community and low risk of flight.

The bulk of the government's motion is focused on funds Mr. Singh sent to family and business entities in India during the period of the alleged offense conduct. Specifically, the government highlights approximately $500,000 sent to Mr. Singh's family and approximately $5.8 million that was sent to the business entity Black Lion over the course of almost three years. As explained below, Mr. Singh does not have access to any of these funds today. Accordingly, the fact that such transfers were made in the past does not increase Mr. Singh's propensity to leave the jurisdiction.

First, transfers of funds Mr. Singh made for family support over the years were just that. These funds were spent to help support Mr. Singh's elderly mother, brother, and five sisters who live in India. Additionally, Mr. Singh's wife and daughter stayed in India for several months-long periods during the relevant timeframe, including for a period of six months during 2020 and another month in 2021. The monies transferred to family members' bank accounts between 2020 and 2023 were sent for the purpose of supporting Mr. Singh's family, and that is how they were used. Mr. Singh, accordingly, does not have access to these funds, as they were spent over the course of the past four years.

Likewise, Mr. Singh does not have access to the funds that were transferred to Black Lion. The money transferred to Black Lion constituted payments for legitimate business expenses. As such, Mr. Singh has no access to these funds. The government

4

contends in its motion that Black Lion's "major role" was "the creation of trailers, which weren't functional for most of Royal Bengal Logistics' existence." [ECF No. 245]. This is flatly mistaken. There was testimony at trial, supported by documentary evidence, that for years, Black Lion provided RBL with various services, including billing and invoicing, round-the-clock driver monitoring and support, and the development and maintenance of custom software and a mobile application. Attached hereto as Exhibit A are letters of engagement between RBL and Black Lion for those services; attached hereto as Exhibit B are representative samples of invoices for those services. These were introduced at trial as Defense Exhibits J-8 and J-29, J-10 through J-13, and J-15 through J-21.

In addition to these back-office services, Black Lion was also involved in the research, development, and manufacturing of the trailers that were the subject of testimony at trial. Black Lion footed the bill for the cost to ship those trailer component parts from India to the United States—an additional significant expense that RBL reimbursed. Representative invoices for the manufacture and shipping of the trailers is attached hereto as Exhibit C.

Finally, Black Lion was involved in RBL's acquisition of a 50% stake in a regional airline in India called FlyBig, which did business as Big Charter. There was some testimony at trial concerning this acquisition, including that of Paul Lopez, who testified that he learned during the course of his receivership that RBL was acquiring a stake in an Indian airline. Under the terms of the agreement, RBL paid a total of more than $3 million to Big Charter for its interest in FlyBig during May and June

of 2023. These payments were also discussed during the cross examination of Mr. Kapila, in the context of whether the payments to FlyBig, through Black Lion, were properly characterized as capital expenses or operating expenses.

These payments were made through Black Lion. Accordingly, approximately half of the funds RBL sent to Black Lion over the years of their business relationship were then transferred to Big Charter for the acquisition of an interest in FlyBig. Following the initiation of the criminal and civil proceedings against Mr. Singh and RBL, Black Lion has initiated legal proceedings in India against Big Charter to try to recover the funds paid in May and June of 2023. To date, those efforts have been unsuccessful, and Big Charter has retained the funds in question.

In sum, the funds that were transferred from RBL to Black Lion over the course of the period in question were for business expenses. These funds went to pay for years of back-office services, staff salaries, and expenses related to the construction and shipment of trailers. More than half of these funds were transferred to another entity for the purchase of an airline. The bottom line is that these are not funds available to Mr. Singh and do not tilt the balance in weighing whether he poses a risk of flight.

Mr. Singh does not have access to funds in India. He also lacks access to funds here in the United States. Since his release on bond, his wife has been working to support the family, bringing home a modest salary of less than $3,000 per month. His adult son has been helping to make ends meet. These efforts have not been enough, though, to pay the bills, as evidenced by the fact that Mr. Singh's home is in

6

foreclosure proceedings. He and his family are barely scraping by; he does not have access to funds that would permit him to flee the jurisdiction.

Finally, that Mr. Singh previously worked as a commercial pilot in no way increases his risk of flight. While Mr. Singh has a pilot's license, he has no access to airplanes. He does not, nor has he ever, owned a plane. Because he has no access to airplanes, the fact of his once having worked as a pilot is irrelevant to the risk of flight analysis.

Mr. Singh has appeared as required for every court proceeding over the past year and a half. He has not been even minutes late to any hearing or trial day. He will continue to do so. He urges this Court to find by clear and convincing evidence that he does not pose a risk of flight.

### III.  Proposed modifications to the terms of Mr. Singh's bond

Following the return of the verdict on November 6, 2024, the Court invited defense counsel to propose enhanced conditions of Mr. Singh's bond in order to permit him to remain out of custody pending sentencing. For the past 17 months, the terms of Mr. Singh's bond included participation in the location monitoring program, with a GPS ankle monitor and a requirement that he remain in the Southern District of Florida. [ECF No. 10]. He has complied with those conditions. To provide greater assurance to the Court of Mr. Singh's commitment to appear as required, he proposes the Court modify the location monitoring condition to include home detention, which would require him to remain at home at all times other than for medical

7

appointments, attorney visits or court-ordered obligations, court appearances, or other activities as pre-approved by the supervising officer.

Mr. Singh also proposes that his bond be modified to include the requirement that his adult son act as a third-party custodian. His son, Suryansh Anand, is 25 years old and works as a freelance software engineer, mostly working from home. He lives close to Mr. Singh and could work from Mr. Singh's home during the day. He is willing to serve in this capacity.

## CONCLUSION

Mr. Singh has appeared as required for all proceedings in this matter. He has maintained contact with the Probation Office and remained within the district. He respectfully requests this Court permit him to remain on bond, with the modifications proposed above, while he awaits imposition of sentence by this Court.

Respectfully Submitted,

HECTOR DOPICO
FEDERAL PUBLIC DEFENDER

By: */s/ Abigail Becker*
Abigail Becker
Assistant Federal Public Defender
Florida Bar No.: 72284
150 W. Flagler Street, Suite 1700
Miami, Florida 33130
Tel: (305) 530-7000
E-mail: abigail_becker@fd.org

By: */s/ Victor Van Dyke*
Victor Van Dyke
Assistant Federal Public Defender

Florida Special A No.: A5503021  
150 W. Flagler Street, Suite 1700  
Miami, Florida 33130-1556  
Tel: (305) 530-7000  
E-mail: victor_vandyke @fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on **November 8, 2024,** I electronically filed this pleading with the Clerk of Court using CM/ECF. Service on all counsel of record is being made via Notices of Electronic Filing generated by CM/ECF.

<i>s/ Abigail Becker</i>