UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-60117-CR-LEIBOWITZ

UNITED STATES OF AMERICA,

    Plaintiff,
v.

SANJAY SINGH,

    Defendant.
_____/

## SENTENCING MEMORANDUM

Mr. Singh comes before this Court for sentencing, having been found guilty of conspiracy to commit wire fraud, wire fraud, and money laundering. (DE 237). Mr. Singh respectfully submits this memorandum in support of his request for a sentence substantially below the advisory Guidelines range. Mr. Singh also requests the Court consider the letter of support from his wife, Sheetal Singh, attached as an exhibit hereto.

## INTRODUCTION

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). In this case, the mechanical addition of loss amount and "specific offense characteristics" yields an advisory Guidelines sentence of life imprisonment, cabined only by a cumulative

statutory maximum penalty of 150 years—the equivalent of life imprisonment. *See* Presentence Investigation Report ("PSI") ¶ 123. A sentence within the Guidelines for Mr. Singh—a first-time, non-violent offender—would be a gross miscarriage of justice. In this case, the sentence recommended by the Guidelines is flawed for the following reasons:

- The advisory Guidelines that apply have no empirical basis and call for the Court to impose overlapping and cumulative upward adjustments.
- Based upon similar cases involving economic crimes, a sentence within the advisory Guideline range will create great disparity.
- Because of his age, education, marital status, lack of drug abuse, Criminal History Category, and nature of his offense, Mr. Singh poses a very low risk of reoffending.

Fifteen years after the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). The Guidelines are no longer "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Guidelines "merely" provide a "starting point" for the Court's sentencing considerations. *Id.; United States v. Matchett*, 802 F.3d 1185, 1194 (11th Cir. 2015). The Court is to impose its sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Gall,* 552 U.S. at 49. The Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range."

*Id*. at 47. As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." Terry Carter, *Rakoff's stance on the SEC draws fire, praise—and change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

This is especially true in economic crime cases such as this one, where the Guidelines range is determined by escalating loss enhancements pursuant to U.S. Sentencing Guideline § 2B1.1, and overlapping cumulative upward adjustments, an increasingly criticized approach that results in draconian advisory Guidelines in high loss amount cases like this one. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); *see also United States v. Parris*, 573 F. Supp. 2d 745, 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes . . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life."). The Supreme Court and Eleventh Circuit's decisions have significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines, and in this case, the Court should

exercise its broad discretion and impose a sentence substantially below the recommended Guideline range.

## I.     Problems with § 2B1.1

Prior to the establishment of the Sentencing Guidelines, federal judges had unfettered discretion to impose sentence up to the applicable statutory maximum penalty, without the need to consider any specific factors in determining an appropriate sentence. One result of this fully discretionary sentencing scheme was grave disparities in sentences imposed for similarly situated defendants.

The Sentencing Reform Act of 1984 aimed to address the issue of unwarranted sentencing disparities. *See Mistretta v. United States*, 488 U.S. 361, 366 (1989) (one aim of the Sentencing Reform Act of 1984 was to reduce the "great variation among sentences imposed by different judges upon similarly situated offenders"). The Act specified factors to be considered by a sentencing court and created the United States Sentencing Commission, which it endowed with the authority to promulgate Sentencing Guidelines. 18 U.S.C. § 3553(a); 28 U.S.C. § 994. The Commission collected sentencing data from tens of thousands of federal criminal cases and ascertained the average sentences imposed, as well as the length of terms actually served. U.S. Sent'g Comm'n, *1987 Supplementary Report on the Initial Sentencing Guidelines and Policy Statements*, at 16-18 (1987); 28 U.S.C. § 994(m).

The Commission followed an empirical approach, grounded in pre-Guidelines averages, in drafting most initial offense Guidelines, but deviated from this practice when it established the initial Guideline ranges for fraud cases, which was set forth

at § 2F1.1 and later moved to § 2B1.1. James E. Felman, *The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes*, 23 Fed. Sent'g Rep. 138, 138 (Dec. 2010). Rather than follow pre-Guidelines sentencing practice, the Commission specifically chose to increase the penalties for "white collar" economic crimes. *Id.*; *see also 1987 Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* at 18. This choice produced a loss table for fraud cases that was not rooted in empirical data and that required sentences greater than the average sentences imposed in the average pre-Guidelines fraud cases.

A series of subsequent amendments to the fraud Guideline have amplified this problem. In 1989, the fraud Guideline was amended to add additional levels of loss amount, each with an increase in the corresponding enhancement. U.S. Sent'g Guidelines Manual app. C at C.88 (U.S. Sent'g Comm'n 1989). In 2001, the Commission merged the Guidelines for fraud, theft, embezzlement, and property destruction into a new § 2B1.1. This Guideline contained a much harsher loss amount table, applying a two-level enhancement for each loss bracket, instead of the prior one-level enhancement per bracket, and increased the enhancements even further for losses greater than $400,000. U.S. Sent'g Guidelines Manual app. C at 55-63, 65 (U.S. Sent'g Comm'n 2001). Each amendment to the fraud Guideline was made without any empirical basis and "reflect[s] an ever more draconian approach to white collar crime." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. Oct. 24, 2012) (criticizing the Guidelines' lack of empirical underpinning and imposing below-Guidelines sentence in securities fraud case). The cumulative effect of these

amendments is a set of advisory Guideline ranges that are *orders of magnitude greater* than the initial ranges established by the Commission that were themselves flawed insofar as they lacked an underpinning in empirical data. *Id.*

The Sentencing Guidelines, at their inception, were mandatory. Following the landmark case *United States v. Booker*, 543 U.S. 220 (2005), the Guideline regime, of course, became advisory. Following *Booker*, the Supreme Court has repeatedly affirmed a sentencing court's discretion to impose a sentence below the Guideline range, particularly when the Guideline in question is not rooted in empirical data. *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). Despite the advisory nature of the Guidelines following *Booker*, they still must be calculated and considered in every case. Indeed, the highest court has emphasized the Guidelines' continued importance as a uniform "starting point and initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The district court may not, however, presume that the Guideline range is reasonable. *Id.* at 50.

The Guidelines in this case are not reasonable.

The Guideline calculation in this case, as in most fraud cases, is driven primarily by the calculation of loss amount. Indeed, the PSI assesses a *26-level* enhancement for loss amount. PSI ¶ 55. As discussed above, the loss amount figures in § 2B1.1 were flawed from their inception, since, unlike most other Guidelines, they were not grounded in historical sentencing data. That foundational flaw was amplified through subsequent adjustments to the table, which, likewise, were not

grounded in empirical data. But that is not the only problem with the ever-escalating loss amount figures in § 2B1.1.

The Guidelines' approach to economic crimes under § 2B1.1 relies on loss amount as a proxy for the seriousness of the offense and the defendant's relative culpability. *See United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014) (citing U.S. Sent'g Guidelines Manual § 2B1.1 cmt. background). The notion of loss amount as an appropriate proxy for the severity of the offense and the culpability of the defendant is itself flawed for a number of reasons.

First, loss amount is necessarily difficult to ascertain in complicated financial cases such as this one, resulting in loss amount figures that do not accurately reflect culpability. Indeed, the Guidelines anticipate the difficulty of ascertaining loss amount and, accordingly, allow the sentencing court to rely on estimations. U.S. Sent'g Manual § 2B1.1 cmt. app. n.3(B) (U.S. Sent'g Comm'n 2024); *see United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) ("A reasonable estimate of the loss amount is appropriate because 'often the amount of loss caused by fraud is difficult to determine accurately.'"). While certainly understandable in complex cases, this allowance for approximation belies the inadequacy of loss amount as an accurate proxy for culpability and the severity of the offense.

Additionally, the Guidelines' reliance on loss amount as a proxy for the seriousness of the offense is rooted in the assumption that a larger loss amount reflects a higher level of sophistication of the scheme, a greater number of victims, a higher amount of personal gain, and a greater abuse of power by the defendant. These

factors, however, are already amply accounted for in other enhancements under § 2B1.1 and elsewhere in the Guidelines.

As legal scholars have noted, these independent enhancements are "closely correlated" both with each other and with greater loss amounts. *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *6 (Feb. 2008). "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Id.* "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide . . . . Any case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting." *Id.* at *7. *See also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud,* 28 Cardozo L. Rev. 1611, 1648- 49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation.").

In this case, for example, the PSI assesses a 6-level enhancement for substantial financial hardship to 25 or more victims, a 2-level enhancement for the

use of sophisticated means, and a 4-level role enhancement for acting as a leader or organizer. (PSI ¶¶ 55, 58). The base offense level is further enhanced by one additional level, from 6 to 7, because the offense of conviction has a statutory maximum of 20 years or more—yet another enhancement to reflect the seriousness of the offense. (PSI ¶ 55). Together, these enhancements add up to 13 additional offense levels. Because these enhancements reflect the same considerations of culpability and seriousness accounted for in the loss amount, they constitute unfair double counting. And when combined with the 26-level enhancement for loss amount, the Guidelines recommend an unreasonably extreme sentence of life imprisonment.

The Commission has recognized this problem of "factor creep" – as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing* 137 (2004) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf) (last accessed May 23, 2025). Despite this recognition, § 2B1.1 remains unchanged.

In sum, § 2B1.1 is inherently flawed. The loss amount figures that drive much of the offense-level computation are not based on empirical data. And together with the cumulative and overlapping specific offense enhancements, they double count for many of the same measures of culpability and seriousness of the offense. The result of this suite of enhancements for a corporate officer involved in a multi-million-dollar

fraud is a recommended sentence of life—an extreme sentence reserved for the worst of the worst. A sentence that is not reasonable in this case.

## II.   A Sentence Substantially Below the Advisory Guidelines is Needed to Avoid Unwarranted Disparities

Since the Sentencing Commission has not corrected the problem of multiple overlapping enhancements in § 2B1.1—and indeed has exacerbated the problem—a number of sentencing courts have recognized that a departure or variance is warranted to avoid it. *See, e.g.*, *Adelson*, 441 F. Supp. 2d at 510 (guidelines in fraud cases have "so run amok that they are patently absurd on their face," and describing enhancement for "250 victims or more," along with others, as "represent[ing], instead, the kind of 'piling-on' of points for which the guidelines have frequently been criticized"), *Parris*, 573 F. Supp. 2d 745, 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes . . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense").

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). Additionally, the court should avoid unwarranted similarities in sentencing among defendants who are not similarly situated, *see Gall,* 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"). The Guidelines in this case call for a sentence far in excess of the sentences imposed on defendants who are not similarly situated with Mr. Singh, insofar as the other defendants were convicted of some of the largest fraud schemes

in American history, schemes that wreaked catastrophic losses on major corporations and that resulted in the financial ruin of many thousands of employees and investors.

In *United States v. Ebbers*, for example, Bernard Ebbers, the CEO of WorldCom, received a sentence of 25 years for his participation in one of the largest corporate fraud schemes ever, with a loss amount exceeding $1 billion. *See United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006). Ebbers and others manipulated WorldCom's finances over a period of years to shore up its stock price—not only to create a false impression of financial health for WorldCom's investors, but also because Ebbers's personal wealth was dependent on WorldCom's share price. *Id.* at 113-17. The revelation of the fraud scheme ultimately led to the bankruptcy of WorldCom, then one of the largest telecommunications companies in the United States, and resulted in the layoffs of tens of thousands of employees. *Id.* at 117. Ebbers was convicted at trial and sentenced to 25 years.

John and Timothy Rigas were responsible for another landmark fraud case. *See United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007). The father and son team led Adelphia Communications Corp., another huge telecommunications company. The Rigases were charged with various counts of securities fraud, wire fraud, and bank fraud, based on years of false statements to lenders and in public filings concerning the company's debts, earnings, and the size of its customer base. *Id.* at 215-18. The Rigas family looted Adelphia's coffers to the tune of hundreds of millions of dollars to fund their lavish lifestyle. *Id.* at 218. After the revelation of the fraud, Adelphia declared bankruptcy, wiping out all shareholder value. While the district court was

only required to find that loss exceeded the highest level of the loss amount table at that time ($100 million), which it did, prosecutors estimated that investors lost in excess of *$55 billion. United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009); see also *United States v. Rigas*, Case No. 02-CR-1236 (DE 428) (S.D.N.Y. June 24, 2008). The Rigases were convicted at trial. The district court initially sentenced John Rigas to 15 years and Timothy Rigas to 20 years; on remand, following success on appeal with respect to one count, the district court imposed sentences of 12 and 17 years, respectively for father and son. *Rigas*, 583 F.3d at 112-13.

E. Kirk Shelton, the vice chairman of Cendant Corporation, was another high-profile corporate officer convicted in a massive fraud scheme. *United States v. Shelton*, Case No. 02-CR-264 (D. Conn.). Cendant, a publicly traded company, provided a variety of business services in the real estate and travel industries; Shelton falsely reported Cendant's financial results for about a decade. He proceeded to trial and was convicted of multiple counts of conspiracy to commit fraud, mail fraud, wire fraud, securities fraud and making false statements to the Securities Exchange Commission. *Shelton*, Case No. 02-CR-264 (DE 1635) (D. Conn. August 4, 2005). The sentencing court was only called upon to find that the loss attributable to Shelton's fraud exceeded $80,000,000, the top loss bracket in the applicable 1997 Guidelines. But the government estimated the true loss amount to be greater than *$8 billion* and noted, "By any measure – the seriousness and pervasiveness of the illegal conduct, the amount of investor losses, the impact on the victims of the offense, and the impact on the public markets – Shelton's conduct stands almost unparalleled

among 'white collar' offenses." (DE 1604 at 9, 67-68). Shelton was sentenced to 120 months' imprisonment. *Shelton*, Case No. 3:02-CR-264 (DE 1637) (D. Conn. Aug. 12, 2005).

To be sure, these represent a small handful of fraud cases with factual dissimilarities from that of Mr. Singh. They were, however, some of the largest fraud cases ever prosecuted in this country in terms of loss amount, with loss figures that are *orders of magnitude* higher than what is involved in this case. They caused financial ruin to many investors and devastated tens of thousands of innocent employees. They were also cases that drew massive media attention, and thus, the sentences imposed in those cases carried far greater potential to have a general deterrent effect than less well-publicized cases, like this one. And in each of those cases, the defendant received a sentence far below what the Guidelines recommend in this case.

While the cases discussed above may be outliers with respect to the loss amounts, the below-Guidelines sentences those courts imposed were not. In fiscal year 2023, sentences below the Guidelines range were imposed in 59.7 percent of all fraud cases; of those, 14.8 percent were government-sponsored as a result of substantial assistance or early disposition, and approximately 45 percent were the result of a non-government-sponsored departure or variance. *See* U.S. Sent'g Comm'n, *2023 Sourcebook of Federal Sentencing Statistics*, tbl. 31 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table31.pdf) (last accessed May 23, 2025).

The Judiciary Sentencing Information (JSIN) tool, developed and made available by the Sentencing Commission, provides additional information about national sentencing trends in cases applying § 2B1.1. JSIN provides cumulative data, based on five years of sentencing outcomes for offenders sentenced under the same primary Guidelines. Using the JSIN tool reveals that, during the last five fiscal years, thirty-one defendants were sentenced who were similarly situated to Mr. Singh. U.S. Sent'g Comm'n, *Judiciary Sentencing Information* (available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard) (last accessed May 23, 2025). These defendants had a Final Offense Level of 43 and a Criminal History Category I, and did not receive a § 5K1.1 motion for substantial assistance. For those defendants, the average length of imprisonment was 158 months, and the median length of imprisonment imposed was 138 months. *Id.*

In considering the issue of disparity, the Court should also take into account that the government *only* prosecuted Mr. Singh. The government did not bring charges against Bruce Guillaume or Ricardi Celicourt, who, in the government's view, carried out much of the fraud scheme by exploiting their connections with many in the Haitian American community and personally benefitted in the form of bonuses totaling hundreds of thousands of dollars. *See, e.g.*, Govt. Trial Exs. 17-2, 17-3.

Finally, a comparison to sentencing data for other crimes also demonstrates that a sentence lower than the advisory Guideline range is reasonable. For fiscal year 2023, the median sentence imposed for murder was 285 months; for sexual abuse was

213 months; and for kidnapping was 199 months. U.S. Sent'g Comm'n, *Interactive Sourcebook of Federal Sentencing Statistics* (2023) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table13.pdf) (last accessed May 23, 2025).

In this case, the Guidelines recommend an unreasonably extreme sentence of life imprisonment, cabined only by the 150 years of cumulative statutory maximum penalties. A sentence anywhere near the Guidelines' recommendation would create a severe and unwarranted disparity and should not be imposed.

### III.  Mr. Singh Poses a Very Low Risk of Recidivism

Because of the nature of his offenses of conviction, the damage done to his reputation, his age—both at the time of sentencing and at the likely time of his release—as well as a number of other characteristics, Mr. Singh poses a very low risk of recidivism. *See, e.g., United States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008) (affirming 54-month downward variance in part because of low risk of recidivism). Mr. Singh is nearly 46 years old, in Criminal History Category I, attended some college, has been employed throughout his adult life, has been married for more than ten years, and has no history of drug abuse. Combined with the nature of his offenses, studies demonstrate these factors lead to the conclusion that Mr. Singh poses a very low risk of recidivism.

As to the nature of the instant offenses, "white-collar" offenders generally are considered low risk by the Sentencing Commission and pose very little risk of reoffending. U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines*, at 13 (available at

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf) (last accessed on May 21, 2025).

Statistical data from two large studies commissioned by the Sentencing Commission also show that "[r]ecidivism rates decline relatively consistently as age increases." *Id*. at 12; *see also* U.S. Sentencing Commission, *Recidivism of Federal Offenders Released in 2010*, at 24 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf) (last accessed on May 21, 2025). The earlier of these studies conducted a granular assessment, measuring recidivism rates for offenders of various demographic groups (e.g., race/ethnicity, gender, education level, etc.) and separated the results by Criminal History Category. *Measuring Recidivism*, Exhibits 9-12. That study indicates that a defendant between the age of 41 and 50 in Criminal History Category I has only a 6.9 percent likelihood of recidivating. *Id*., Exhibit 9 at 28. Beyond his age, a number of other characteristics make recidivism highly unlikely, including Mr. Singh's level of education and lack of illicit drug use. *See id.* at 12-13.

For all male offenders in Criminal History Category I, the recidivism rate is 15.2 percent. For those between the age of 41 and 50 at the time of sentencing, however, the rate in Category I is only 6.9 percent. For those who have attended some college, the rate in Category I is 13.9 percent; for those who have been employed, the rate is 12.7 percent; and for those who were ever married, the rate is 9.8 percent. For

those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those like Mr. Singh who are educated, have been employed, have been married, are drug free and between the age of 41 and 50, the recidivism rate is certainly much lower. *See Measuring Recidivism*, Exh. 9, at 28; Exh. 10, at 29.

For all Category I defendants convicted of fraud, the recidivism rate is just 9.3 percent, the lowest of any offense category, which is 45 percent below the rate for all fraud offenders. *Id.*, Exh. 11, at 30. Finally, offenders like Mr. Singh with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *Id.* at 13-14. Recidivism studies therefore show that those in Mr. Singh's circumstance, those in middle age and who find themselves in Criminal History Category I with zero criminal history points, have an especially low rate of recidivism.

Mr. Singh has been personally and financially devastated as a result of his conduct. There is no reason to believe that a sentence within the advisory guideline range is necessary to prevent him from committing further crimes. "The Commission did not find a strong correlation between the severity of the offender's federal offense conduct, as determined under the sentencing guidelines, and future recidivism. Under the guidelines, the seriousness of an offender's federal crime is measured by a final offense level score ranging from one to 43. There is not a strong correspondence between final offense level and recidivism." *See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at p.20 (March 2016)

(available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf) (last accessed May 21, 2025).

## CONCLUSION

A sentence within the advisory guideline range would be far "greater than necessary" to serve the purposes of punishment. We respectfully request the Court to consider the foregoing in fashioning a just and appropriate sentence.

Respectfully Submitted,

HECTOR A. DOPICO
FEDERAL PUBLIC DEFENDER

By: /s/ Abigail Becker
Assistant Federal Public Defender
Florida Bar No.: 72284
Abigail_Becker@fd.org

 /s/ Victor Van Dyke
Assistant Federal Public Defender
Florida Special A No.: A5503021
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 530-7000
Victor_Vandyke@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on **May 26, 2025**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ *Abigail Becker*