UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-601170-CR-LEIBOWITZ

UNITED STATES OF AMERICA

v.

SANJAY SIGNH,

        **Defendant.**
_____/

## UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM

The United States of America respectfully submits this sentencing memorandum for the Court's consideration. Sanjay Singh spearheaded a fraud *Ponzi* scheme, through which he raised approximately $158 million in victim funds and he and his inner circle personally profited more than $13 million dollars. Govt. Trial Exs. 119-24 and 119-32. Further, Singh pillaged Royal Bengal Logistics' bank accounts and the investors funds therein gambling it away in the stock market. Singh exposed approximately $40 million dollars in investor funds to his amateur gambling on mostly meme stocks, ultimately losing over $12 million of investor funds. Singh did this over a four-year period as he watched Royal Bengal Logistics slip further and further into debt, all the while lying to investors about the profitability of the business. During this time, Singh also pitched his investors new investment opportunities and businesses. Based on all of this, this Court should sentence Defendant Sanjay Singh to 300 months' imprisonment to punish him for his significant criminal misconduct, protect the public from further crimes, and deter others from committing similar economic crimes. The evidence overwhelmingly shows that Singh was the leader/organizer of a *Ponzi* scheme that defrauded almost 2000 victims, a large majority of them being working class Haitian south Florida residents. The court-appointed Receiver estimates the

actual loss amount close to $100 million. Singh controlled all aspects of the fraud scheme including, most importantly, all the many bank accounts that received the victims' money. Finally, when Singh realized that the exposure of his fraud was imminent, he attempted to shift ownership and responsibility of the company to his general counsel, Elizabeth Hueber, so that she could ultimately be left to steer the sinking ship. Govt. Trial Ex. 26-15; Exhibit 1.

## SENTENCING PRINCIPLES

## 18 U.S.C. § 3553(a)

After *United States v. Booker*, 543 U.S. 220 (2005), a sentencing court need only consider the factors in 18 U.S.C. § 3553(a) and determine a reasonable sentence. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005). We address the relevant factors below. While the Court must consider all the relevant factors, it "need only acknowledge that it considered [them], and need not discuss each of these factors in either the sentencing hearing or in the sentencing order." *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007). The Court may give greater weight to some factors than others. *See United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009).

## Punishment for White-Collar Criminals

The Eleventh Circuit has said "economic and fraud-based crimes" are "more rational, cool, and calculated than sudden crimes of passion or opportunity," and thus "prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the legislative history of Section 3553 shows Congress recognized "the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]" *Martin*, 455 F.3d at 1240 (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Eleventh Circuit also observed that

"[d]efendants in white collar crimes **often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment**." *Martin*, 455 F.3d at 1240 (emphasis added).

    A.    **The nature and circumstances of the offenses. See 18 U.S.C. § 3553(a)(1).**

Singh ran a four-year-long *Ponzi* scheme where he caused $158 million dollars of victim funds to be transferred to his businesses' bank accounts. The Defendant knew no bounds when it came to recruiting victims for this scheme, recruiting heavily in the Haitian community, and specifically targeting Haitian churches in South Florida and even one in Massachusetts. The Defendant and his cohorts used the cover of the church as a mechanism to quell any concerns about the fraudulent nature of their businesses, even receiving checks where the funds were drawn straight from church bank accounts. Govt. Trial Exs. 105, 105-1, 105-2, 106, and 111. Further, the Defendant and his representatives routinely lied about the profitability of the businesses to make victims comfortable with their investments and encourage subsequent investments. And there should be no question about the Defendant's knowledge of the failure of his businesses and the businesses' inability to turn a profit because he was on every single one of the bank accounts and wielded individual control over the accounts.

At trial, the Court heard that the Defendant controlled Royal Bengal Logistics and his other side enterprises with an iron fist, hiring, suspending, and firing employees at a whim and keeping complete control over the bank accounts. This Court heard testimony about Singh engaging in parking lot arguments with employees and even suspending his own wife, one of the few people with access to the Royal Bengal Logistics bank accounts.

Additionally, Singh's frequent and substantial transfers into and out of the stock market demonstrate his true fraudulent nature and his overall disregard for the victims' funds and the

wellbeing of the actual businesses he purported to be trying to make profitable. One example not introduced at trial, but discovered by law enforcement, comes from former Royal Bengal employee Ricardo Guttierez and his bank records. Guttierez said that Singh once offered to help teach him how to trade stocks and stated that he would give him access to money to do so. Exhibit 2 (highlighted). From August 2021 to June 2022, Singh used Royal Bengal Logistics accounts ending in 4380 and 6001 to transfer $773,500 to Guttierez's bank account, then his TD Ameritrade trading account. Govt. Trial Exs. 20-1 and 20-2; Exhibit 3. Money was moved into and out of this trading account for approximately 9 months, with stock trading taking place in between. The stock trading resulted in a loss of $156,309. *Id*. The remainder of the money was transferred back to the Royal Bengal accounts. This is further evidence that this Court should reject any argument that Singh was merely a struggling businessman attempting to do everything in his power to make a profit to properly compensate his investors. Singh was clearly using the Royal Bengal accounts as his personal piggy banks, operating with a complete disregard for the people he fraudulently claimed to be making millionaires.

At trial, the Government presented evidence of the Defendant's fraudulent intent and carelessness as it relates to the victims' funds in the form of evidence demonstrating the various lies he told investors about the success of Royal Bengal. For example, the Government introduced trial exhibit 1-19 where Sanjay Singh texted his investors the following:

> [2/9/23, 8:32:25 AM] Sanjay Singh Truck: Good Morning : We are exited to report that in the Year of 2022 RBL Transacted (98Million) Little bit Shy of (98Million) 100 Million Dollars. 330% Investor Growth from Year 2021. In 2022 We have paid Short Term interest to our Investors 3.5 Million Dollars (ONLY INTEREST)

Royal Bengal Logistics never generated revenue anywhere near that amount of money. And this was only one example of the fraudulent representations presented at trial that Singh made directly to the investors. The Government also introduced a zoom video, Govt. Trial Ex. 15-12, where

Singh falsely claimed that he turned 16.5 million into $21 million in profits for investors over a three-year period from January 2020 to January 2023. Singh went on to say that the business was not running "as a scheme or by luck" and that it was "not a scam." In that same video, he introduced the recently hired retired North Miami Beach Police Chief, Richard Rand, to comfort potential investors and assure them that Royal Bengal was not a scam. And finally, in Govt. trial exhibit 15-31, Singh lied to investors at the 2023 banquet telling them that Royal Bengal "did 97 million dollars of business." All these lies are demonstrative of the nature of this Defendant's crime and his personal characteristics. Singh was willing to lie with impunity to continue his scheme and fuel his desire to gamble the victims' money in the stock market.

Lastly, Singh sunk thousands of dollars into the production of "Driving the American Dream" and had the video posted on Amazon's Prime Video platform for all the world to see so that he could continue to promote his "profitable" business. Govt. Trial Ex. 15-22. The Defendant promoted this video all while secretly knowing of the business' failures and being warned that some of the lofty representations made in the video could constitute fraud. Govt. Trial Ex. 26-9; Exhibit 4.  This Defendant's conduct rises to a distinct level of malice, that is that he spent money to promote the business and went into churches to recruit blue collar workers to invest their hard-earned wages in a business that he knew was failing from the beginning all so that he could gamble the money in the stock market.

And how do we know that Singh knew his business was failing from the very beginning? Govt. Trial Ex. 115-8 shows that on January 17, 2020, Singh engaged in an email exchange with a lender where he acknowledged that his business was failing. The email exchange in pertinent part read as follows:

Lender:

> "Your actions constitute FRAUD and a breach of your Personal Guarantee of Performance."
>
> Response by Singh:
>
> "I am not sure how to explain you but the Bussiness [sic] is struggling to keep up. I am trying to fix it but something or the other is escalating the problems just like this.. if you guys just stay calm I will be able to revert the Bussiness [sic] to a better position.
>
> I cannot offer you more explanation. If you take any further step or action it may just shut down the Bussiness [sic] and there will be no other future invoices to pay you by. Right now we are just limping through each day.
>
> Please cooperate and standby.. I will revert to you when circumstances comes [sic] to normal. It should become normal in the coming days/or few weeks if you let me just run the Bussiness [sic] and not indulge me in any other legal action or processing's [sic].

From that date, the business never corrected course, and it continued to fail. Singh knew this because he had control over all the bank accounts. Additionally, for much of the business' existence, he contracted with the accounting firm, Forrest Robinson, allowing him to see financial statements for the business throughout the years.

All the above evidence underscores the despicable nature and circumstances of the Defendant's offense. However, the best evidence of the seriousness of this offense is the impact it had on the victims. As their trial testimony and impact statements show, they were devastated by this fraud. As such, a 300-month sentence is appropriate.

    **B. The history and characteristics of the Defendant. <u>See</u> 18 U.S.C. § 3553(a)(1).**

While the Defendant does not have a criminal history, the Defendant's actions in this case and his post-arrest conduct should adequately inform this Court of his true character.

For example, the characteristics of this Defendant were clearly on display in his May 3, 2024, messages with Murvat Musa. In those messages, Singh states that he is going to "crush" the Government, that the Government "lied about everything," and even attempts discuss continuing to lease a smaller portion of the land in Lubbock. Exhibits 5 through 13. These messages when

juxtaposed against the evidence now in the record demonstrating that the Defendant knew that his business was failing, establish that at best he was unwilling to accept responsibility for his actions post-indictment, and at worst he was seeking to continue his fraud.

Singh's true character was again put on display when he lied to the Court about how much money he had to contribute to the cost of his own defense. As covered in DE 245, the Government's Motion to Remand, Singh represented to the Court that he was indigent while transferring money through different stock trading accounts all after his arrest for his role in this multi-million-dollar *Ponzi* scheme.

And finally, Singh's character was on display when he was terminated from his Court mandated post-indictment employment at a Motel because he stole from the cash register. As the Government also covered in DE 245, Singh left his place of employment with cash from the register in the early morning hours of his solo shift, leaving the business unattended and allegedly depositing the money into a crypto ATM. Signh made up a story claiming to be defrauded, but even the owner of the Motel did not believe his story. Singh returned the money, but never returned to work. And again, Singh engaged in this conduct while on supervision with a mandatory condition that he maintain employment. Singh's penchant for fraud is clear separate and apart from the fraud scheme he stands convicted of in this case. As such, the 300-month sentence requested by the Government is appropriate.

### C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; general deterrence; and specific deterrence. See 18 U.S.C. § 3553(a)(2)(A), (B), (C).

The Eleventh Circuit has explicitly emphasized the significance of "general deterrence . . . in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308-09 (11th Cir. 2014); *see also, e.g.*, *United States v. Kuhlman*, 711 F.3d 1321, 1328–29 (11th

Cir. 2013) (vacating, as substantively unreasonable, sentence of time served, which represented a 57-month downward variance, for defendant responsible for $3 million health care fraud scheme, noting that "[s]uch a sentence fails to achieve an important goal of sentencing in a white-collar crime prosecution: the need for general deterrence," and that "[w]e are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence."), *cert. denied*, 134 S. Ct. 140, 187 L. Ed. 2d 38 (2013). Although Singh has no criminal history, estimates suggest that more than seventy percent of fraud offenders, which includes the vast majority of white-collar offenders, have little or no criminal history. *See* Selected Sentencing, Guideline Application, and Demographic Information for § 2B1.1 Offenders, Fiscal Year 2012, U.S. SENT'G COMM'N (Sept. 18, 2013).

This suggests a particular need to deter those in the community who lead otherwise law-abiding lives, but, like Singh, chose to commit fraud for years, without getting caught. Moreover, courts have also found that, in the context of white-collar crime, positive employment history is no mitigating factor, particularly where, as here, the employment history enabled and/or served as the vehicle for the offenses of conviction. *See, e.g.*, *United States v. Whitehead*, 559 F.3d 918, 921 (9th Cir. 2009) (Gould, K., dissenting from denial of rehearing *en banc*) ("We can hardly be surprised if a white-collar criminal has a good employment history – otherwise, he or she would likely not be in a position to commit the crime.").

The Government has already cited "the critical deterrent value of imprisoning serious white-collar criminals[.]" *Martin*, 455 F.3d at 1240 (citation omitted; emphasis added). The Defendant's outright defiance and dishonesty throughout this case show that he is a potential recidivist. As previously stated, even after Defendant was indicted, he was still shamelessly reaching out to Murvat Musa about continuing his failing businesses. Additionally, this Court saw

8

how Singh treated victims such as Pasha Williams in his e-mails with her, Government's trial exhibits 7-1 through 7-8. He treated them with total disdain when they dared question his businesses and his flawed business practices. Additionally, the fact that the Defendant's crimes were motivated by greed and arrogance make him particular danger for recidivism.

      The Defendant's argument that the fraud Guidelines double-count by applying enhancements already factored into the loss amount because loss amount operates under the assumption that a larger loss amount reflects a higher level of sophistication of scheme, greater number of victims, higher amount of personal gain, and a greater abuse of power by the defendant is without merit. The Defendant does not cite legislative intent or case law for this proposition. Additionally, those arguments are simply not relevant in this case where the high loss amount, the number and type of victims, the financial hardship they experienced, and the sophistication of the scheme are all independent factors with little to no overlapping characteristics. The loss amount is well over $100 million, and that fact does not independently speak to the sophistication of the scheme or hardship placed on the victims. The scheme could have been simple, and the victims could have been wealthy, here however, that was not the case. The scheme was complex with multiple businesses, business accounts, lots of bank transfer, and various investment proposals spanning over five years. Additionally, the victims were largely working class and many of them experienced catastrophic loss due to the Defendant's actions. This Court should properly consider all these factors and associated the guideline enhancements independently and sentence the Defendant accordingly.

      A long sentence in this case will send a strong message, not only to the victims of this offense, but to the many would-be *Ponzi* schemers who intend to use South Florida as a base of operations.

**D. The need to avoid unwarranted disparities with similarly situated offenders:**

A guidelines sentence is necessary to avoid unwarranted disparities with defendants who have committed crimes of similar scope. The Defendant directed the Court to a small handful of out of district cases, however, the Government respectfully requests the Court to consider the following cases:

- *United States v. Johanna Garcia*, No. 23-CR-20350-MARTINEZ (S.D. FL. 2024) (sentencing defendant to 20 years imprisonment for pleading guilty to defrauding thousands of victims in a *Ponzi* scheme resulting in a loss amount of almost $90 million).

- *United States v. Robert Shapiro*, No. 19-CR-20178-ALTONAGA (S.D. FL. 2019) (sentencing defendant to 20 years imprisonment for defrauding thousands of victims in *Ponzi* scheme, and an additional consecutive 5 years' imprisonment for tax evasion).

- *United States v. Edwin Fujinaga*, No. 2:15-cr-00198-GMN-NJK (D. Nev. June 17, 2019) (D.E. 338) (following trial, sentencing defendant to 50 years' imprisonment for his role in spearheading a fraud and $1.12 billion *Ponzi* scheme, which involved approximately 10,000 Japanese victims).

- *United States v. Norman Schmidt*, 594 F.3d 1270, 1272 (10th Cir. 2010) (sentence of 330 months for defendant who orchestrated *Ponzi* scheme with investor losses of approximately $40 million deemed reasonable; defendant was sentenced post-trial).

- *United States v. Arthur Lamar Adams*, No. 3:18-cr-00088-CWR-LRA (S.D. Miss. Nov. 8, 2018) (D.E. 21) (sentencing organizer and leader of approximately $165 million Ponzi scheme, involving approximately 200-300 investor victims, to 27 years' (325 months' imprisonment) following entry of guilty plea).

- *United States v. Kevin Merrill*, No. 1:18-cr-00465-RDB-1 (D. Md. Oct. 11, 2019) (D.E. 146) (sentencing organizer/leader of estimated $396 million *Ponzi* and fraud scheme to 22 years' (240 months') imprisonment, following entry of plea agreement; defendant's wife was also involved, and unlike here, she was also charged and convicted).

- *United States v. Antonio Carlos De Godoy Buzaneli*, No. 0:17-cr-00284-MJD-HB (D. Minn. Apr. 10, 2019) (D.E. 132) (following guilty plea, sentencing defendant, who was also a South Florida man, and who spearheaded an approximately $150 million *Ponzi* and investment fraud scheme involving Brazilian factoring, to 20 years' (240 months') imprisonment, and to pay restitution of approximately $51 million).

- *United States v. Raymond Montoya*, No. 18-10225-GAO (D. Mass. Mar. 25, 2019) (D.E. 44-46) (sentencing defendant who spearheaded $38 million Ponzi scheme to 175 months' imprisonment following guilty plea, where guidelines range was 210-262 months).

- *United States v. Lee Loomis*, No. 12-cr-00315-JAM (E.D. Cal. Oct. 5, 2018) (D.E. 699) (following guilty plea, sentencing defendant who spearheaded approximately $10 million *Ponzi* scheme to 12 years' (144 months') imprisonment, in case involving approximately 183 investor victims).

In formulating its sentencing recommendation, the United States has also considered sentences imposed in the following white collar cases in this District, some of which involved less serious conduct, in terms of duration and victim impact, as compared to the conduct at issue here:

- *United States v. Leonard Bogdan*, No. 05-14090-CR-Martinez (S.D. Fla.) (sentence of 360 months involving investment fraud with approximately 191 victims and loss of approximately $11.5 million).

- *United States v. Darryl Burke*, No. 13-20616-CR-Cohn (S.D. Fla.) (sentence of 360 months in connection with bank fraud involving more than $7 million in losses for numerous fraudulent mortgages).

- *United States v. Domenico Rabuffo*, No. 14-20008-CR-Moore (S.D. Fla.) (sentence of 327 months in connection with bank fraud involving more than $27 million in losses for numerous fraudulent mortgages and approximately 50 victims).

- *United States v. Monte Grow*, No. 16-CR-20893-FAM (S.D. Fla.) (sentence of 262 months for pharmacy fraud involving $39 million loss to Medicare).

- *United States v. Serge Francois*, No. 16-20399-CR-Gayles (S.D. Fla.) (sentence of 204 months for owner of pharmacy involving $30 million fraud loss).

- *United States v. Jose Carlos Morales*, No. 12-20644-CR-Lenard (S.D. Fla.) (sentence of 144 months for owner of pharmacy who pleaded guilty to health care fraud involving a loss of $23 million).

- *United States v. Scott Rothstein*, No. 09-60331-CR-Cohn (S.D. Fla.) (imposing post-plea (and post-cooperation) sentence of 600 months for wealthy attorney who orchestrated $1.2 billion Ponzi scheme involving bogus settlement agreements for over four years).
- *United States v. Raoul Doekhie, et al.*, No. 18-20919-CR-Altman (S.D. Fla.) (imposing post-trial sentence of 220 months on three business partners who cheated U.S. manufacturers out of infant formula, eye-care products, and other FDA-regulated items worth more than $100 million).

Here, the Court need not be concerned with sentencing disparities between this Defendant and potential coconspirators because none of the potential coconspirators had access to the information that the Defendant had access to regarding the business. Singh was the only one with access to the business' loans, monthly revenue, bank account balances and transfers, and debt. Finally, here the victims were mostly unsophisticated investors, setting this case apart from many other investment frauds, and the victims numbered in the thousands.

## **CONCLUSION**

For the foregoing reasons, the Court should sentence the Defendant to 300 months' imprisonment in accordance with the advisory guidelines range, and to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:   */s/ Robert F. Moore*
Robert F. Moore
Assistant United States Attorney
Court ID No. A5502488
United States Attorney's Office
99 NE 4th Street
Miami, Florida 33132
Tel: (305) 961-9411
Email: Robert.Moore@usdoj.gov

*/s/ Roger Cruz*
Roger Cruz
Assistant United States Attorney
Florida Bar No. 1008370
United States Attorney's Office
99 NE 4th Street
Miami, Florida 33132
Tel: (305) 961-9411
Email: Roger.cruz@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                                                                                       By:    */s/ Robert F. Moore*
                                                                                                Robert F. Moore