```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                     FORT LAUDERDALE DIVISION
                      CASE NO. 23-CR-60117


UNITED STATES OF AMERICA,            Fort Lauderdale, Florida

                                     November 4, 2024

         vs.
                                     9:13 AM to 6:30 PM

SANJAY SINGH,                        Volume XII

              Defendant.             Pages 1 to 273
_____

                     TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE DAVID S. LEIBOWITZ
                   UNITED STATES DISTRICT JUDGE

APPEARANCES:


FOR THE GOVERNMENT:          Roger Cruz, Esquire
                             Robert Moore, Esquire
                             United States Attorney's office
                             99 Northeast 4th Street
                             Miami, Florida 33132

FOR THE DEFENDANT:           Abigail Becker, Esquire
                             Victor Van Dyke, Esquire
                             Federal Public Defender's
                             Office
                             150 West Flagler Suite 1700
                             Miami, Florida 33130


STENOGRAPHICALLY REPORTED BY:

                             PATRICIA BAILEY-ENTIN, FPR, RPR
                             Official Court Reporter before:
                             The Honorable David S. Leibowitz
                             United States District Court
                             U.S. Federal Courthouse
                             299 East Broward Boulevard
                             Fort Lauderdale, Florida 33301
```

```
 1                         I N D E X

 2    WITNESS:                                         PAGE:

 3                      SONEET KAPILA
      DIRECT EXAMINATION BY MR. CRUZ:                    26
 4    CROSS-EXAMINATION BY MR. VAN DYKE:                 90
      REDIRECT EXAMINATION BY MR. CRUZ:                 195
 5    RECROSS-EXAMINATION BY MR. VAN DYKE:              208

 6                      KARA COOPER
      DIRECT EXAMINATION BY MR. MOORE:                  210
 7
                     CHRISTOPHER APAGWU
 8    DIRECT EXAMINATION BY MR. MOORE:                  231
      CROSS-EXAMINATION BY MS. BECKER:                  240
 9    REDIRECT EXAMINATION BY MR. MOORE:                247

10                     CAITLIN APAGWU
      DIRECT EXAMINATION BY MR. MOORE:                  248
11

12

13                         -   -   -

14                       E X H I B I T S

15    NUMBER                DESCRIPTION           PAGE

16    GOVERNMENT'S NO. 8,      DOCUMENTS               213
      8-1
17
      GOVERNMENT'S NO. 8-2,    DOCUMENTS               217
18    8-3, 8-5, 8-10

19    GOVERNMENT'S NO. 8-7     DOCUMENT                217

20    GOVERNMENT'S NO. 11,     DOCUMENTS               235
      11-1, 11-2, 11-3,
21    11-4, 11-5, AND 11-7

22    GOVERNMENT'S NO. 12,     DOCUMENTS               253
      12-1, 12-2, 12-3,
23    12-4, AND 12-5.

24

25
```

```
 1   GOVERNMENT'S NO. 29,      DOCUMENTS                40
     30, 31, 32, 33, 34,
 2   35, 36, 37, 38, 39,
     40, 41, 42, 43, 44,
 3   50, 51, 52, 53, 54,
     55, 56, 57, 58, 81,
 4   102, AND 45

 5   GOVERNMENT'S NO.          DOCUMENTS                41
     119-21, 119-22,
 6   119-23, 119-24

 7   GOVERNMENT'S NO.          DOCUMENTS                41
     119-28, 119-29,
 8   119-30, 119-31,
     119-32, 119-33 AND
 9   119-61, DOCUMENTS,

10   GOVERNMENT'S NO. 119-4    DOCUMENT                215

11   GOVERNMENT'S NO. 119-9    DOCUMENT                260

12   GOVERNMENT'S NO. 123,     DOCUMENTS                89
     125, 143-1, 143-2,
13   143-3, 143-4, 61, 62,
     84, 85, 87, 88, 99,
14   100

15
     DEFENDANT'S NO. O-6       DOCUMENT                246
16

17

18

19

20

21

22

23

24

25
```

```
 1                 (CALL TO THE ORDER OF THE COURT.)

 2               THE COURTROOM DEPUTY:  Calling the matter of United

 3     States v. Sanjay Singh.  Case Number 23-cr-60117.  Counsel,

 4     please announce your appearances for the record, beginning with

 5     the Government.

 6               MR. MOORE:  Robert Moore on behalf of the Government.

 7     Good morning, Your Honor.

 8               THE COURT:  Good morning, sir.

 9               MR. VAN DYKE:  Good morning, Your Honor.  Abigail

10     Becker and Victor Van Dyke from the federal defenders for

11     Sanjay Singh who is present.

12               THE COURT:  Good morning, everybody.  Please be seated.

13               Anything we need to do this morning in particular?

14               MR. VAN DYKE:  I have one issue, Your Honor.  I'm not

15     sure if the Government has anything.

16               THE COURT:  Got it.

17               MR. MOORE:  On this occasion, we can go last.  I don't

18     think that ours are...

19               THE COURT:  Fire away, Mr. Van Dyke.

20               MR. VAN DYKE:  Thank you, Your Honor.  So in the spirit

21     of Your Honor's ruling that both sides should have equal access

22     to the receiver and the accountant, over the weekend yesterday,

23     I emailed Mr. Tatelbaum a portion of my cross-examination with

24     three discrete kind of calculations that I would like

25     Mr. Kapila to be prepared to testify to.
```

1    One of them involves -- and I can go through them with

2  the exhibits.  One of the line items on Government

3  Exhibit 11924 -- there are three line items at the bottom.  One

4  of them is Barathi Chidambaram's Amex card; the second one

5  directly to Cingar Transports; and the third one directly to

6  Barathi.

7    Based on my analysis, a number of the payments in the

8  bottom two line items were earmarked and correspond to payments

9  made directly to the Amex.  I emailed Mr. Tatelbaum yesterday.

10  He clarified that 11924 was only meant to capture ingoing and

11  outgoing funds from the bank account so that the exhibit itself

12  would not change.

13    I asked just that Mr. Kapila be prepared to confirm

14  that some of the payments on the bottom two lines also

15  correspond to payments made for the Amex, and I sent the Amex

16  statement as well.  That's the kind of Bucket Number 1.  Bucket

17  Number 2 --

18    THE COURT:  Before you get to Number 2, you don't have

19  any objection to any of that?  You just are apprising the Court

20  that Mr. Kapila's testimony in that area is kind of cabined; is

21  that right?

22    MR. VAN DYKE:  Well, if I could list the three and then

23  explain what the issue is.

24    THE COURT:  Sure.  Sorry.

25    MR. VAN DYKE:  The second one is the first line item on

1    11924 -- and I can pull it up for the Court in a moment --

2    relates to transfers to and from RBL to Mr. Singh's account.

3    3.9 million of that was lost to trades.  Again, the exhibit

4    itself is not intended to represent that.  I don't think that

5    the exhibit is inaccurate.  I just ask that Mr. Kapila be

6    prepared to confirm that 3.9 million did not end up in

7    Mr. Singh's pocket, but that was lost via trades.

8           The third one is also a line item on 11924 related to

9    the North American Aerospace account.  The reason I'm raising

10   this -- and 512,400 of those losses are attributed to trades

11   that North American Aerospace made through a funded Robinhood

12   account.

13          The issue is I am prepared to go through the hundreds

14   and hundreds of pages of exhibits with Mr. Kapila.  It will

15   take hours.  I will have to give him a calculator to add it up.

16   It is my understanding that Mr. Kapila will not be prepared to

17   confirm those numbers on the stand.

18          I would very much prefer not to completely lose the

19   jury during the course of my cross-examination.  I shared the

20   numbers, the calculations, and the supporting documentations

21   with Mr. Tatelbaum.  So I just wanted to raise this for the

22   Court.

23          THE COURT:  Yeah.  So I guess it would be helpful to

24   know, Mr. Moore, if you can -- last week, we thought that today

25   was going to be three witnesses and then Kapila going last.  Is

1   that still the case?

2          MR. MOORE:  It's not, Your Honor.  We were advised that

3   Mr. Kapila does have some prearranged court -- I think it's a

4   settlement in Tampa tomorrow; so he wouldn't be available.  So

5   he has to go first.

6          THE COURT:  Okay.  So then I think the way to do this,

7   if I'm understanding the defense and if -- and this is a big

8   "if," Mr. Kapila could be given the time to crunch the numbers

9   and agree with the defense, and that he has to be given

10  sufficient time to do so.  But if that could be done, it seems

11  to me that -- and you're right to raise it, Mr. Van Dyke, and I

12  thank you for raising it -- the way I would propose it -- and I

13  will hear from the Government, of course -- but we will do

14  Kapila without it.  We'll give him time to crunch it, and if he

15  agrees, there will be a fact stipulation that will come into

16  evidence, agreed by all sides.

17         Now, here's the good news.  I think the good news is

18  that if the defense intends to put on a case, which it is not

19  obligated to do, it has five or six witnesses in its defense

20  case, and that means that Mr. Kapila will have a day or two

21  beyond his testimony to crunch these numbers and verify them.

22  I think that's the good news.

23         I think that other than that, what is also implicit in

24  Mr. Van Dyke's rising is that he has preserved this.  And so in

25  the interest of efficiency, he's basically signaling to the

```
 1    Court that if he doesn't get into this with Kapila today, he's

 2    not waiving it.  He has the right to recall him, theoretically,

 3    and I'll grant that right because he has raised it.

 4         So, Mr. Moore, what do you think about all of that?

 5         MR. MOORE:  Well, Judge, I defer right now to

 6    Mr. Tatelbaum, who I know has spoken to Mr. Kapila about this

 7    specific issue, and I think that there is a little bit more to

 8    the issue that he would like to shed some light.

 9         MR. TATELBAUM:  Tatelbaum to the rescue.

10         THE COURT:  Good morning, sir.

11         MR. TATELBAUM:  I would like to address Mr. Van Dyke's

12    last point first.

13         THE COURT:  Yes.

14         MR. TATELBAUM:  And if I may, because I'm not an

15    accountant, I have had some training, but at 9:06 p.m. last

16    night, Mr. Van Dyke wrote to me and in the -- attaching two

17    things.  And it says, Given that he, that's Mr. Kapila, is

18    already going to be testifying to those losses in the context

19    of the other exhibits, I did not think it would be that much

20    for him -- to ask of him to simply confirm the total amount of

21    losses in two of the trading accounts during the course of my

22    cross-examination, particularly given that I have provided the

23    numbers and calculations with you ahead of time.  I will be

24    raising this with the Court tomorrow.

25         Your Honor, the exhibits that Mr. Van Dyke attached are
```

 1    Mr. Singh's personal accounts.  The receivers had no access to

 2    them.  We have no authority to get them during the course of

 3    the receivership, and we never gave them to Mr. Kapila and his

 4    company to analyze.  So I'm not here to say what the defense

 5    can do, the prosecution can do, but as far as Mr. Kapila --

 6    they have done no work on anything that is with respect to

 7    other than RBL.  On NAA, North America Aerospace, the Court can

 8    take judicial notice of the fact that before you got the case,

 9    the receivers were subsequently appointed on motion as

10    receivers.

11         When we followed the provisions of the order, seeking

12    information about the business, Mr. Singh took the Fifth

13    Amendment, which he had the right to do.  So while we have

14    subpoenaed some records, the Kapila organization has not done a

15    lot of work on North America Aerospace because there's no one

16    to talk to and nowhere to get verification.

17         So what I would like to say is I think on --

18    Mr. Van Dyke will agree that on the earlier emails during the

19    day, I responded back after talking to the Kapila team

20    throughout the afternoon yesterday with everything, and that

21    the only remaining issue deals with these securities

22    calculations.  But if they deal with anything other than RBL, I

23    advise the Court that it was not part of the engagement and

24    they didn't do it.

25         THE COURT:  Well, that's fine.  And that's why my big

```
 1    if was the number two point that I made, which is Mr. Kapila
 2    has to look at what Mr. Van Dyke is asking him to do, and he
 3    has to agree that he can do it, and that he agrees that it is
 4    within his ambit of his charge, that he, therefore, can crunch
 5    the numbers, as Mr. Van Dyke suggests, and agree with Mr. Van
 6    Dyke.
 7          Portions of that may not be true.  To be really candid
 8    with the defense, I wish we would have done this at the voir
 9    dire and at least sprung it on Mr. Kapila so he would have had
10    some time beyond this press.
11          But I think the thing that this really points to is
12    since Mr. Kapila is going to be first today, I think that as
13    soon as he gets here, you know, Mr. Van Dyke will need to spell
14    out -- and, obviously, before the jury comes out, I think
15    Mr. Van Dyke is going to need to spell out exactly what he
16    wants Mr. Kapila to do on the record.  We don't need Mr. Kapila
17    to be back in the witness box and under oath.  He can proffer
18    through Mr. Tatelbaum, but we're going to know once and for all
19    if Mr. Van Dyke, with Mr. Kapila here and Mr. Tatelbaum here,
20    if Mr. Van Dyke stands up and goes, "I'm going to need him to
21    take these six records and I'm going to need him to take these
22    four other records and I think that's within his ambit, his
23    charge, and I need them to crunch them for me and come up with
24    3.9 million lost in trades, 512k lost in trades," the first
25    question -- once that's stated very specifically, the question
```

```
 1    is, can Mr. Kapila do that?  Is it within his charge?

 2         If it's not, it's game over.  Right?  Because he's not

 3    crunching records that are not within his charge.  The defense,

 4    if they wish, can call their own witness to crunch his own

 5    records.  So that's the first thing.  And I think Mr. Tatelbaum

 6    said it very cogently, but I think there's a disagreement.

 7    I see Mr. Van Dyke bobbing his head up and down, that he thinks

 8    there are crunches of numbers within Mr. Kapila's charge; that

 9    he's simply asking him to take some time to do so that it can

10    be either be testified to or stipulated.

11         And since because of the timing, it may not be able to

12    be testified to, it may have to be stipulated.  That's what I

13    hear.  And I think Mr. Van Dyke agrees with that.

14         MR. VAN DYKE:  I do.  If I just may add -- I was

15    kicking myself yesterday for not raising this in voir dire.

16    The reason I didn't -- if I could have the HDMI, Madam Deputy,

17    it's my understanding that the Government does intend to

18    introduce exhibits that included the crunching of the activity

19    in the trading accounts.  I'm looking at Government

20    Exhibit 110.  It crumpled in my bag.  I apologize.  And I can

21    just show very briefly how -- so the numbers that -- and again,

22    Mr. Tatelbaum, and I appreciate it, said they didn't do any

23    analysis on the brokerage accounts.  That's what was in the

24    email yesterday.  The total funds lost from trading activities,

25    this 12.7 million, that encompasses the loss from RBL's
```

```
1   TD Ameritrade, Mr. Singh's TD Ameritrade, and NAA's Robinhood

2   account.  And all I'm ask for is breaking that up.  Now, I'm

3   not --

4          THE COURT:  I'll be honest with you.  Let me stop you

5   there.  The fact that you, on cross, can already disentangle

6   that, even if he can't give you right now within the 12.7,

7   there is 3.9 over here and there's 5.12 over here, first of

8   all, you can get a good way there --

9          MR. VAN DYKE:  Absolutely.

10         THE COURT:  -- with him on cross.  So then the only

11  thing you're really asking is, frankly, for some of your own

12  math to be done from records that he will testify about.  As a

13  judge I used to know a long time ago would say, "Query whether

14  you really need Mr. Kapila for that."

15         MR. VAN DYKE:  For the 3.9 million, I don't think I do.

16  It's the year-end summaries of the TD Ameritrade.  The

17  Robinhood 512,400 will require me going through 36 separate

18  documents.  The 1.7 million Amex will require me going through

19  59 individual entries from the bank reconstruction, and then

20  the corresponding 59 individual entries to the Amex card.

21         I think it would take me hours.  I would very much

22  appreciate if we can get our numbers guy together with

23  Mr. Kapila to show my work on this.  But I do intend to do the

24  3.9 million regardless of any stipulation, and then if we can

25  do a stipulation later on, I would have no objection on that.
```

```
 1            THE COURT:  So on the other two then, I guess I would

 2    ask the question -- because he's a human being and it's not

 3    fair to make someone produce two numbers in a criminal case

 4    under pressure.  I guess the question is are these in a format

 5    that are digital and, therefore, can be summed quite quickly?

 6    Because if they're not, I don't think it's fair to ask anyone

 7    to do that other than your witness.

 8            But if you're saying that these are all in kind of

 9    spreadsheets that can be summed, I hear you.  We have an

10    excellent accountant for the receiver that can maybe do it

11    faster, and I'll explore that.

12            But what's your sense of that?  About the nature of the

13    underlying records?

14            MR. VAN DYKE:  So the Amex statements and the Robinhood

15    statements are just normal corporate records.  It's not a

16    spreadsheet.  So I can point to the line items and correspond

17    them to the bank reconstruction and say, you know, on this day

18    it was a $59 payment, and then it goes directly to Amex from

19    the Cingar account.  You can see one in one record and one in

20    the other.

21            I've actually already done that, and I shared that with

22    Mr. Tatelbaum yesterday.

23            THE COURT:  Are the Robinhood records the personal

24    records of Mr. Singh?  Because if they are, Mr. Tatelbaum is

25    saying they are not within the ambit of Mr. Kapila.
```

1          MR. VAN DYKE:  That's a much smaller number.  We would

2     be okay just kind of jettisoning that the Robinhood --

3          THE COURT:  All right.  So we're down to the 1.7.

4          MR. VAN DYKE:  And the 3.9, which I can do live.

5          THE COURT:  Right.  The 3.9 you can do, you said.

6          MR. VAN DYKE:  Yes.

7          THE COURT:  So now on the 1.7, what are we talking

8     about?  What kind of records?

9          MR. VAN DYKE:  Amex statements, monthly statements.

10         MR. TATELBAUM:  Your Honor --

11         MR. VAN DYKE:  Along with -- I apologize.  Along with

12    the bank reconstruction for the corresponding transfers.

13         THE COURT:  Okay.

14         Yes, sir, Mr. Tatelbaum.

15         MR. TATELBAUM:  May I try to give some more light to

16    that?

17         THE COURT:  Yes.

18         MR. TATELBAUM:  We tried to address this yesterday with

19    Mr. Van Dyke, and maybe it's just a disconnect in language.

20    Cingar was the B.K. person's account that was used as the

21    American Express.  RBL would make payments to American Express

22    and would make payments to Cingar.  Cingar would then pay the

23    American Express bill.

24         THE COURT:  Yes.

25         MR. CRUZ:  We have no records of what Cingar did or

didn't do.  All that Kapila and company can say is that RBL made this payment to American Express or RBL made this payment to Cingar.  What Cingar did following is outside of our purview.

And at least we understood yesterday, when we tried to respond to Mr. Van Dyke, that Mr. Kapila can talk about what he found in summarizing the American Express -- in reconciling the RBL bank account to show that the checks went to either Cingar or to American Express, but from there, it's our dead end.

THE COURT:  Okay.  So it seems to me -- and, Mr. Van Dyke, maybe you disagree -- but it seems like right now you can get a lot from the witness.

You can get that from the witness; is that right, Mr. Tatelbaum?

MR. TATELBAUM:  Yes, sir.

THE COURT:  You will be able to get that on cross.  So you get your 3.9.  You get, let's call it, the sum disentanglement of the Amex records, Cingar versus RBL vis-à-vis Amex.  You get that.  You're going to get a total figure of Amex over certain periods of time.

So it seems to me that if you now want to let's call it, close a loop, and say, yeah, but I want 1.7 of Amex that, if I understood you, didn't go in his pocket.

MR. VAN DYKE:  Right.

THE COURT:  If you want that -- I mean, right now if

1  you ask that question, my understanding is that an ethical

2  witness appointed by this Court is going to say something like,

3  "I can't say that.  I can't say that you're wrong or right."

4        To ask him, if I understand you, "Do you have the time,

5  sir, to go through hundreds of monthly Amex records to come to

6  that aggregation?" it seems to me -- and I'll hear you if you

7  think I'm missing something -- is that the defense could do a

8  lot of the aggregation work of those records and just have him

9  verify them such that a stipulation could close the loop for

10  you.

11        But if you can't do the aggregation because it is so

12  difficult with monthly Amex records, I must say I don't think

13  it is fair to Mr. Kapila to ask him and his staff to now crunch

14  those records for you.

15        MR. VAN DYKE:  No.  We have done the aggregation.  And

16  if Mr. Kapila testifies perfectly consistent with this, and

17  we're able to share the aggregation and just have the 59

18  transactions verified, that would be perfectly fine with us.

19        THE COURT:  That would could in, in a stipulation,

20  sometime in the next two days?

21        MR. VAN DYKE:  Yeah.

22        THE COURT:  And, obviously, he's going to have to

23  agree --

24        MR. VAN DYKE:  Of course.

25        THE COURT:  -- to everything Mr. Tatelbaum said, which

1    is these are records that are within my purview, all of them,

2    and I crunched them and I agree.  So I think -- here's the good

3    news.  We get more and more good news the more I listen to you,

4    Mr. Van Dyke, which is that by the end of Kapila, I think you

5    will be able to rise, and you will be able to tell the Court

6    what, if anything, is left.

7         And it sounds to me -- and you're agreeing, let the

8    record reflect -- like the combination of what you will already

9    be able to do from Kapila will leave very little.  And I

10   promise you I will hear both of you as to your "very little."

11        But I warn you, some of what you have proffered on the

12   "very little," I don't think that -- let me say it the nice

13   way.  I think some of it may be waived, and you cannot call

14   upon Mr. Kapila to close every loop with three to four hours of

15   number crunching, but let's see.  Maybe it won't be that.

16   Maybe you will be able to do most of it for them and put it in

17   front of him on his way to Tampa, and he will call you and say,

18   "I agree."

19        If he does that and he's an ethical man -- and I know

20   Mr. Tatelbaum will impress upon him what the Court has said,

21   which is equal access for all.  If he can do something like

22   that, that gives the Government and you the ability to

23   stipulate, it will be a fact stipulation to come in and be two

24   sentences long.

25        If he can't, Mr. Van Dyke, get from him what you can in

1    every way on your cross.

2          MR. VAN DYKE:  Will do.

3          THE COURT:  Okay.

4          MR. TATELBAUM:  Your Honor, may I just add?

5          Again, to be clear:  If we have to deal with the Cingar

6    or B.K. accounts, we don't have them.

7          THE COURT:  I get it.  Mr. Tatelbaum, you are going to

8    rise sometime tomorrow after Mr. Van Dyke is done today -- and

9    you will probably be here because you have been so responsive

10   to the whole case -- after you listen to everything and you

11   listen to Mr. Van Dyke, if there are pieces of it that you can

12   say that is not within his charge, that's the end of the

13   matter.

14        MR. TATELBAUM:  Thank you.

15        THE COURT:  Anything Mr. Van Dyke wants has to be

16   completely within the ambit of his charge.  And we're not going

17   to add an extra record for Mr. Kapila.  He has enough to do,

18   and Mr. Van Dyke understands that.

19        MR. VAN DYKE:  Completely, Your Honor.

20        THE COURT:  Yes, sir.  Thank you.

21        Mr. Moore, yours is going to be really small compared

22   to this; right?

23        MR. MOORE:  Yes, Your Honor.  Just two things.

24        The first thing being that during the testimony of

25   Paul Lopez, there was, obviously, a question asked about the

1    amount of money spent by the new manager over the portion of

2    time.  The Government would object to any questions of that

3    nature to this witness who, obviously, can only speak to his

4    knowledge of fees that -- the discounted rate that he charged.

5         THE COURT:  For the same reasons stated on the record

6    at sidebar, do you have any opposition to that, sir?

7         MR. VAN DYKE:  No.  I think Your Honor's ruling was

8    clear that further exploration of the number, given that the

9    number is in, it's like the mine-run bias and credibility

10   argument for closing.  It's not about how the money was spent

11   at all, and I do not intend to ask Mr. Kapila any questions on

12   that.

13        THE COURT:  I thank you.  And I agree with that.  It

14   also would intrude upon what the defense has asked for from the

15   whole case, which is to avoid the imprimatur of a judicially

16   approved receiver and his staff.

17        For those reasons, Mr. Moore's application is granted.

18   Mr. Van Dyke's not going to get into it, and he has preserved

19   his ability to generally suggest that the haste post-June --

20   the decision-making post-June leads to costs that are not

21   reflected in certain numbers.  That's within the mine-run.

22        Anything else, Mr. Moore?

23        MR. MOORE:  Just briefly, Your Honor.  I know that

24   there have been a number of leading objections in this case.

25   One of the things that the Government is tasked with proving is

```
 1    misrepresentations or omissions made to investors.  So the

 2    Government would ask for a little bit of leeway when asking,

 3    were you told X, were you told Y, just so that we establish

 4    some of omissions as described.

 5            THE COURT:  I hear you.  And.

 6            I saw that happen during the examination of

 7    Mr. Houston, the firefighter witness.  And I saw the other

 8    prosecutor's consternation on my sustaining of the objections

 9    as to leading.  The issue is, is that there are ways to adduce

10    that, Mr. Moore, and they have not been done with certain

11    witnesses.  With others, they have been.

12            So let me tell you very bluntly -- I don't know if the

13    Government, in their meetings with certain witnesses took

14    notes, okay, or whether an agent did, but that would be the

15    time, and it would be perfectly proper within the Federal Rules

16    of Evidence to refresh the witness on the notes, which may have

17    within them certain statements of the defendant or certain

18    things that they did not say, and that would have been

19    completely proper with the firefighter witness.  It was not

20    done.

21            All that was done was leading questions, to which there

22    were unequivocal answers by the witness saying, "That's all

23    that was said.  I don't remember anything else."  If you put

24    yourself into that kind of box with these attorneys, I'm going

25    to sustain objections that don't comply with the Federal Rules
```

1    of Evidence.

2           So what I would say to you very clearly -- and I have

3    great respect for you Mr. Moore, and I know it's not your first

4    rodeo -- "Did there come a time?  What, if anything?  And is

5    your memory exhausted, and would it help to refresh it?" that

6    is fair.

7           But this crew over to my right is correct that the

8    witnesses can't be cued so directly.  And if they run out, you

9    will use your wiles to get subject matter that you believe they

10   would testify truthfully to.

11          I didn't mean to make such a meal of that, Mr. Moore,

12   but I had great respect for that firefighter who testified.

13   There was a reason why I shut it down, and it's because the

14   defense is doing their job in that they're not going to allow

15   the Government to shove words in the witness's mouth.

16          Let me say this to you, finally, Mr. Moore.  I did a

17   lot of work over the weekend.  You are 100 percent right that

18   the wire fraud statute criminalizes material omissions, not

19   just misrepresentations.  So you are right, sir, that

20   conversations about what was said and what was left out are

21   fair game.

22          I just urge you, sir, to get it from your witnesses in

23   ways that survive totally fair objections from the defense.

24   And I'm really glad you brought it up, Mr. Moore, because I

25   will tell you that firefighter, clearly in my mind, had more to

```
 1    say, but he's got to be asked it the right way under the rules.

 2           So that's my guess.  And I wanted to say all that to

 3    you because I know why you're asking the question.  It's

 4    because of the way the wire fraud statute is structured, and

 5    it's not always so simple for them to be able to testify like a

 6    recording device as to what was said and what was not said.

 7           So I will give you every latitude permitted under the

 8    Federal Rules of Evidence to get it from your witnesses,

 9    Mr. Moore, but no more.

10           Okay?

11           MR. MOORE:  Yes, Your Honor.

12           THE COURT:  Yes, sir?

13           MR. VAN DYKE:  If I may, I don't think a better

14    characterization of the inherent prejudice of the use of

15    leading questions could have been elicited from the Government,

16    which is that they go directly to an element if leading

17    questions are used.  I also just wanted to note we have not

18    proposed a curative instruction --

19           THE COURT:  I think since my warning, I think it has

20    greatly improved.  And you will let the Court know on your

21    Rule 29 motions and in the event of any conviction on appeal,

22    whether or not the Court has sustained objections as to form

23    throughout this trial.  And I give the example of Mr. Houston.

24    I believe that those objections kept out evidence that would

25    have otherwise been able to be adduced by that witness.  For
```

1    those reasons, I'm not inclined to give an instruction because

2    I think it has improved.

3           I also note that the sustaining of those objections --

4    it is obvious to any watcher of this trial, that the jury

5    understands the differences already because this trial has gone

6    on so long.  They understand intuitively what are proper

7    questions and improper questions because, if I dare say it, the

8    Court has been rather consistent with the sustaining of leading

9    questions.  Maybe not perfect.  I'm not claiming that.  But I

10   do think that the Government has been put on its heels on

11   certain witnesses.

12          So for those reasons, I appreciate you rising because

13   I introduced it a while back, but I'm not inclined to give an

14   instruction, Mr. Van Dyke.

15          MR. VAN DYKE:  Thank you, Your Honor.

16          THE COURT:  Yes.

17          MR. TATELBAUM:  Your Honor, if I may, not being

18   familiar with the criminal rules at all, under the rule of

19   sequestration, am I able to preview with Mr. Kapila some of

20   what you said to try to streamline this?

21          THE COURT:  Any objection?

22          MR. VAN DYKE:  Could we have a proffer of what will be

23   shared?

24          MR. TATELBAUM:  Well, just that if he can do it from

25   the purview of what his engagement was for the receiver, he has

 1    to do it.  But if it is outside of the purview, he should

 2    advise the Court or Mr. Van Dyke that it is outside of it.  I

 3    just want him to understand the parameters that we're telling

 4    him to do it, if it's within the scope, but if it's not, to say

 5    so.

 6          THE COURT:  Any problem with that, Mr. Van Dyke?

 7          MR. VAN DYKE:  No problem with that.

 8          THE COURT:  No problem with that, Mr. Moore; right?

 9          MR. MOORE:  No problem.

10          THE COURT:  You may, sir.  And I appreciate you stating

11    it.  When it comes to the receiver or his staff, efficiency is

12    important, access is important, and that exception to the

13    sequestration rule is permitted.

14          MR. TATELBAUM:  And just for the Court's edification,

15    Mr. Kapila is a permanent trustee of this district and also in

16    the Middle District.  Tomorrow is a court judicial settlement

17    conference where he, as trustee, is the plaintiff.  So he must

18    be in Tampa by tomorrow morning -- and he drives over.

19          THE COURT:  Mr. Moore is very sensitive to that.  He's

20    going to be in Tampa tomorrow.  He might be talking on the

21    phone with Mr. Van Dyke, you know, and you, but he will be in

22    Tampa tomorrow.  We're going to get him on and off the stand

23    today.

24          Today is Kapila Day.  So whatever happens, we're going

25    to -- and I understand the examinations could be lengthy, but

```
 1   Kapila is all day today.  So thank you, Mr. Tatelbaum.

 2          All right.  Anything else, Mr. Moore?

 3          MR. MOORE:  Nothing from the Government, Your Honor.

 4          THE COURT:  So I got everybody's proposed jury

 5   instructions.  I have been studying those, and we'll talk about

 6   those tomorrow night.  I'll see everybody in a half hour.  It's

 7   nice to see everybody.

 8          THE COURTROOM DEPUTY:  All rise.

 9      (Off the record from 10:02 AM to 10:32 AM, after which

10      the following proceedings were had within the presence of

11      the jury:)

12          THE COURT:  Good morning, everybody.  Please be seated.

13   I want to welcome everybody back.  The Court will notice it's

14   10:32 a.m., and with everything that everyone has going on, the

15   jury once again was extremely punctual, and it's greatly

16   appreciated.

17          We're going to continue a whole day of testimony today.

18   I warn you we may run a little bit past 5:30 p.m. for very good

19   reasons.  But with that, if the Government would call its next

20   witness.

21          MR. CRUZ:  Yes, Your Honor.  Thank you.  Judge, the

22   United States calls Soneet Kapila.

23   ///

24   ///

25   ///
```

```
 1    Thereupon,

 2                         SONEET KAPILA,

 3    having been first duly sworn or affirmed, was examined and

 4    testified as follows:

 5              THE WITNESS:  I do.

 6              THE COURTROOM DEPUTY:  Please state your full name for

 7    the record and spell your last name into the microphone.

 8              THE WITNESS:  My name is Soneet R. Kapila, K-A-P-I-L-A.

 9              THE COURT:  Mr. Kapila, if you can make yourself

10    comfortable in the chair, and if you'd always make sure that

11    the microphone is close to where you speak so that you can be

12    heard.

13              Mr. Cruz, your witness.

14              MR. CRUZ:  Thank you.

15                         DIRECT EXAMINATION

16    BY MR. CRUZ:

17    Q.  Good morning, sir.

18    A.  Good morning.

19    Q.  How are you today?

20    A.  I'm well.  Thank you.

21    Q.  Tell us where you're from originally.

22    A.  I was born in Africa, lived in England, Canada, and the

23    States.

24    Q.  Excellent.

25              Where are you employed?
```

A.   I practice under the name of Kapila Mukamal CPAs, and
that's what I have been doing for many years.

Q.   What is a CPA?

A.   A CPA is a certified public accountant qualified under the
regulations of the State of Florida and under the association
of CPAs nationally, American Institute of CPAs.

Q.   You work at a place called KM for short; is that right?

A.   Yeah.  We refer to Kapila Mukamal as KM sometimes.

Q.   Just briefly, did you go to school?

A.   Well, I studied in England originally.  I went to business
school there.  I did my accounting studies there.  In Canada, I
certified myself as a Canadian chartered accountant, and then
when I came to the States, I became a certified public
accountant.  I traveled through Connecticut, first in the State
of Connecticut and then in the State of Florida.

Q.   And as a CPA, last question on this, how long have you been
practicing as a CPA, sir?

A.   I certified in the State of Florida about 1987, and I have
been practicing here ever since then as a certified public
accountant, yes.

Q.   Do you know who Paul Lopez and Jennifer Wahba are?

A.   Yes, I do.

Q.   Did there come a point in time last year where they hired
you to do something?

A.   Yes, sir.

```
 1    Q.   Let's talk about that.   Approximately when was that, sir?

 2    By the way, those are the --

 3            MR. CRUZ:   Permission to lead, Your Honor?

 4            THE COURT:   Yes.

 5    BY MR. CRUZ:

 6    Q.   Those are the new managers of RBL; is that true?

 7    A.   That is correct.

 8    Q.   Okay.   Let's talk a little bit about how you became

 9    employed by them and then we'll move on.

10        Okay?

11        Go ahead.

12    A.   Sure.

13        They called me -- I think they became the new managers

14    about June of 2023.   And I got a call from their counsel,

15    asking me if we would be able to take on representing the new

16    management in a forensic accountant capacity.   And we,

17    obviously, first run for conflicts to make sure that we don't

18    have a conflict of interest.

19    Q.   Let me stop you there.   You said "we."   Do you work alone,

20    or do you have employees?

21    A.   Okay.   When I refer to "we," as I was answering, I meant my

22    firm, Kapila Mukamal, but when the work and the project starts,

23    it's one that requires more than one person, not just myself.

24    So I do have a team of two or three people who work with me in

25    helping me do the project as we are asked to do the tasks, and
```

1    they work under my direct supervision, and we work

2    hand-in-glove together.

3    Q.   You said "forensic accountant."  We're going to put that

4    aside.  Okay?

5         Do you know what a summary witness is?

6    A.   Yes, sir.

7    Q.   Tell us what it is that you came to do for the new managers

8    in the summary capacity, sir.

9    A.   Yes, sir.  The new managers or management asked myself and

10   my firm and my team to look at the accounting transactions of

11   RBL and give them a picture of those transactions.  And while

12   the transactions themselves may be voluminous, my job requires

13   me to summarize them so that they can digest it in a more

14   simplified manner.

15        And that job means that I take the volume of data and

16   create meaningful, coherent summaries, which a person who's

17   reviewing, whether it's one or three pages, in a meaningful way

18   versus having a whole massive database and trying to make sense

19   out of it.

20   Q.   We'll get into the summaries shortly, but I would like to

21   ask you what kind of data that you just testified about goes

22   into the making of these summaries, please?

23   A.   By far and most, it is about analyzing and tracing the

24   cash, follow the cash as sometimes we call it, and creating a

25   database, what we call a reconstruction from the actual bank

```
 1   records of an entity as to where the cash was coming in and

 2   from where the sources of the cash, and then summarizing where

 3   the cash was going out, being the cash outflows, and to what

 4   particular purposes, if you will.

 5       And that is a cash-in and cash-out analysis from the actual

 6   bank records which could include bank statements.  They would

 7   include canceled checks, any other wire support information --

 8   and that's just mentioning a few -- wherever you can get

 9   corroborating information to demonstrate the purpose of a

10   transaction.

11   Q.  Did you look at any other documents in your analysis of

12   Royal Bengal Logistics to create summaries?

13   A.  Yes.  We had access to what is known as the QuickBooks

14   records of RBL, and that's their accounting ledgers, if you

15   will.  So we had online access to that.

16       Aside of that, when new management comes in, it's customary

17   for new management to take custody of all the corporate and

18   business records of an entity, which Mr. Lopez and Ms. Wahba

19   did, and that is available to us and my team.  So we would

20   be -- and we could be looking at multitudes of different

21   corporate records.  There could be a contract which helps us

22   understand a transaction.  There could be an agreement.  We

23   could do online searches for information.

24       So whatever corroborating information that helps us support

25   the purpose of a transaction, whether it's coming in or going
```

```
 1   out.  There could be what we call investor agreements of

 2   different kinds, to mention a few items that just come to my

 3   mind.

 4   Q.  You said accounting records, and you mentioned QuickBooks.

 5   I'm only going to ask you a couple questions on this.

 6        Do you recognize Government's Exhibits 119-25, 119-26 --

 7   and I know it's small print -- but 119-27?

 8        Let me zoom out.

 9        Have you seen these documents before, Mr. Kapila?

10   A.  Yes, I have.

11   Q.  Like I said, a couple questions on this, and I'll move on.

12   You said accounting and QuickBooks.

13        Why didn't you just use these internal QuickBooks to do the

14   job of being a summary for the new managers, sir?

15             MR. VAN DYKE:  Objection.  Leading.

16             THE COURT:  Overruled.

17   BY MR. CRUZ:

18   Q.  Why didn't you just use these QuickBooks to do the

19   summaries that you're about to testify about?

20   A.  The QuickBooks is a computer software where transactions

21   are recorded by management, the previous management of the

22   people who kept the records of RBL in QuickBooks.  When new

23   management comes in, they ask us to either look at them or ask

24   us what's the best way to look at or review the actual

25   transactions of cash coming in and cash going out in the most
```

1    reliable manner.

2        There is nothing that speaks to the reality of a

3    transaction than a bank transaction because the bank

4    transaction tells you where the money came in and where it went

5    out.  It's as concrete as you get versus a transaction being

6    recorded by management or by prior management.

7        So the QuickBooks differs from the fact that you can

8    actually take the actual bank records of an entity and put them

9    together and assemble them by creating a massive computer

10   database the way I described it earlier, which I refer to as

11   the reconstruction.

12   Q.  What is a reconstruction, Mr. Kapila?  That was my next

13   question.

14   A.  A reconstruction -- I may be a little repetitive.  You take

15   all of these bank records with all supporting evidence, because

16   a bank statement doesn't always tell you what the transaction

17   is.  Oftentimes, it will tell you $2,000 was disbursed or

18   $5,000 was deposited, without knowing where it came from.

19       So you need more backup support, whether it's a canceled

20   check, it could be a wire transfer, it could be a document

21   which tells you I'm giving you $5,000 and it's because of this

22   document we signed, as an example, or you could be paying your

23   vendor and a vendor invoice might help you.

24       So at the end of the day -- and typically, most forensic

25   accountants will do this, is they go behind the numbers to try

1    and find ancillary or corroborating documents which help

2    explain a transaction.  And you input all of this data from the

3    actual bank records which support into a computer database.

4    You identify the categories.  You identify the payee.  You

5    identify the payor, depending where this money is coming from,

6    and you take each transaction and give it a categorization.

7         On the payment side, it could be a gas bill to a gas

8    company.  So you categorize it as a gas expense or a motor

9    vehicle expense.  On one outgoing example, it could be a

10   printing expense.  So you categorize it as a printing expense.

11   It could be a loan repayment.  That's how you categorize it.

12        On the incoming side, it could either be revenue from an

13   actual business operation.  It could be, hypothetically, a loan

14   taken from a bank, and I'm talking illustratively, or it could

15   be, amongst other things, money coming in in some kind of

16   invested capital.

17        So one has to categorize to identify what is the precise

18   source of that information.  And the outgoing monies categorize

19   where the money is going.  It's a cash flow, what I call follow

20   the money.

21   Q.  Thank you, Mr. Kapila.

22        MR. CRUZ:  Brief leading question, Your Honor, if I

23   may?

24        THE COURT:  Yes.

25   ///

BY MR. CRUZ:

Q.   Did there come a point in time in which you obtained the bank records that you've now testified about?

A.   Yes.

Q.   Are these bank records -- did they assist you in doing your job, sir?

A.   Yes.  I mean, they are the backbone of that cash reconstruction and that's what we got from management.

Q.   Okay.  Did you look at payroll for RBL?  Bank records and payroll records?

A.   We did have the payroll records too.  They were using an outside service for that.

Q.   Doing your summaries, did you look at any other records that you haven't testified about that you can recall?

A.   Well, I mentioned or alluded to things like investment agreements and contracts, just some examples.  It's hard to be all-encompassing, Counsel, to be very honest with you, because you're talking about the business records of the entity.

Q.   Yes.  Speaking of more business records, a couple more questions.

     What are stock trading records?

A.   They would be brokerage statements.  We did have those for one -- I call it a brokerage account, yes.

Q.   And before we get to the records themselves, sir, did you have a chance to review signature cards on these bank accounts?

1    A.   We had access to those too, yes, sir.

2    Q.   Did you also identify signature cards on the trading

3    records you just testified about?

4    A.   I don't recall that offhand; so I can't specifically answer

5    that as to the signature cards.

6    Q.   In your job as the individual hired by the managers, did

7    you, at the very least, develop an understanding of the RBL

8    logistics trucking model?

9    A.   Yes, sir.

10   Q.   What purpose did that serve for your job?

11   A.   It provides an understanding of what RBL was meant to be as

12   a business enterprise.  It also provided us an understanding of

13   what kind of transactions it was engaged in.

14   Q.   And did you review all the accounts, or did you have a

15   sampling, sir?

16   A.   Oh, it's on a sampling basis.  We're looking at 1,500 or

17   1,600 investors.  We're looking at the bank reconstruction had

18   42,000 transactions, and it involved I think 15 or 17 bank

19   accounts.  So the volume of data that's being processed is

20   high.

21   Q.   We're not going to get into too much of these, but I want

22   to show you what's in evidence:  Government's Exhibit 1-7 and

23   1-15, 17-2, and 22.

24       Again, briefly, did you look at things similar to this

25   particular investment and equipment operating lease agreement?

1   Maybe not this specific one, but, Mr. Kapila, in your job, did

2   you look at some of these?

3   A.  Yes, I did.

4   Q.  What about Exhibit 1-15, short-term loan agreements?  Did

5   you come across any of these to do your summary that you're

6   about to testify about?

7   A.  Yes, I did.

8   Q.  17-2:  Wage and earnings.  And again, I'm not going to at

9   all ask you specific questions, but, sir, for your summaries,

10  did you look at the primary documents that you now testified

11  about to do the summary?

12  A.  Yes.  When needed, we did look at that for corroboration.

13  Q.  What do you mean by "corroboration"?  You've said that now

14  twice.

15  A.  As I mentioned, sometimes you go look at a document to tell

16  you -- to guide you to the purpose of a transaction.  The one

17  you showed me was basically a payroll report, if you will.  And

18  as I mentioned, they used -- by far and most a good period of

19  time, they used ADP as their payroll processer.

20  Q.  What is an insider when it comes to doing reconstruction

21  that you now testified about?

22          MR. VAN DYKE:  Objection.  702.

23          THE COURT:  Overruled.

24          He can answer.

25  ///

BY MR. CRUZ:

Q.   For the summaries that you're about to testify about -- and I'll get to them shortly, I promise -- the term "insider," help us understand what that means.

A.   Generally the term "insider" means a person or party who may have access to information, which is not publicly available to anybody or anybody.  So it's more like a restricted ability to access information about, in this case, a business entity.

Q.   What about related parties?  If you can tell us what you mean.  If you use that term, what is a "related party"?  What does that mean?

A.   A related party is a person or entity who has generally the ability to control the business decisions.  It can be a party who has the ability to cause control by having an affiliation with the entity at issue.  It could be a subsidiary.  It could be a related company commonly owned by the same owners.

It could be the family members of the key management or the key officers of a company by way of some examples, or it could be some other entity, whether it's a corporate entity or an LLC or an LLP, which transacts business under the control of people of the temporary entity.  So there are different ways to go about it.

Q.   Thank you.  Let me stop you.

What about corporate structure like CEO and vice president? How does that affect your analysis, sir?

1   A.   A CEO and/or an owner or a vice president effectively

2   become officers of the company and they would be labeled as --

3   all those categories would be labeled as parties related to the

4   enterprise.

5   Q.   Did you personally attend -- without getting into what was

6   said -- meetings with pre-new managers, CEOs and other

7   corporate individuals doing your job that you have already

8   testified about?

9   A.   Yes.

10   Q.   Now, did you come across any information regarding a new

11   CEO in or around May of 2023 for Royal Logistics?

12   A.   Yes.

13   Q.   Showing you Government's 26-15.  Do you recognize the

14   individual on Government's 26-15?

15   A.   I don't recognize the person from the picture, but I do

16   know that there was a general counsel of the company who was

17   appointed CEO around tail end of the time period just before

18   management changed.

19   Q.   The reason I bring that up is I know have Government's

20   Exhibit 101 in evidence.  Just a few questions.

21       You testified about bank records and signature cards.

22   What, if anything, is significant about signature cards for

23   corporate accounts, sir?

24   A.   Well, very simply having signatory authority on a bank

25   account gives the person the ability to transact businesses --

```
 1    transact -- to create transactions for that particular entity

 2    and control over the bank account and the cash flows, in and

 3    out.

 4    Q.   Which bank accounts did you and your team focus on in doing

 5    your summary for the charts we're going to go over soon?

 6    A.   Counsel, there were -- I don't know -- 15 or 17 or of these

 7    accountants.  Bank of America comes to mind.  There was a

 8    TD America brokerage account.  I would have to look at the

 9    list, but there are more than two or three.

10    Q.   It was a bad question on my end.  Forgive me.

11         Approximately how many bank accounts did you focus on to do

12    this summary job that you were hired to do?

13    A.   About 16 or 17.  I don't know what the volume or

14    concentration in each one, but we looked at all of those.

15    Q.   Now, showing you Exhibit 101 in evidence.  Were you able to

16    identify an individual or more than one individual that had

17    control or -- strike that.

18         Who had the main signature authority for the corporate bank

19    accounts that you just testified about?

20    A.   It was -- it was Mr. Sanjay Singh.

21    Q.   All right.  Exhibit 101.  I'll just flip through these, if

22    you recognize them.

23         What, if any, significance do these Bank of America

24    accounts have, Royal Bengal Logistics, for the job that you did

25    as the summary?
```

1    A.   It was the bank account through which a lot of cash

2    transactions were flowing, and it was amongst the bank accounts

3    that we were reconstructing.

4    Q.   As far as the bank account that you've testified about,

5    this new CEO, Ms. Elizabeth Hueber, do you recall seeing her on

6    any of the bank signature cards that you have now testified

7    about?

8    A.   I don't recall seeing her on any of the signature cards,

9    sir.

10          MR. CRUZ:  One moment, Your Honor, if I may?

11          THE COURT:  Yes.

12          MR. CRUZ:  Judge, I believe without objection, the

13   Government moves the following exhibits into evidence.

14          May I proceed?

15          THE COURT:  Please.

16          MR. CRUZ:  29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39,

17   40, 41, 42, 43, 44, 50, 51, 52, 53, 54, 55, 56, 57, 58, 81,

18   102, and 45.

19          MR. VAN DYKE:  No objection, Your Honor.

20           (Government's No. 29, 30, 31, 32, 33, 34, 35, 36, 37, 38,

21          39, 40, 41, 42, 43, 44, 50, 51, 52, 53, 54, 55, 56, 57,

22          58, 81, 102, and 45 , Documents, were received in

23          Evidence.)

24          THE COURT:  All of those exhibits are received.  You

25   may publish as you see fit, sir.

```
 1              MR. CRUZ:  Thank you, Your Honor.

 2              On that note, Judge, a few more exhibits without

 3    objection, if I'm not mistaken, please.

 4              Government's 119-21, 119-22, 119-23, 119-24,

 5    Your Honor.

 6              THE COURT:  Any objection?

 7              MR. VAN DYKE:  No objection, Your Honor.  Thank you.

 8              THE COURT:  Those four exhibits are received.  You may

 9    publish as you wish.

10         (Government's No. 119-21, 119-22, 119-23, 119-24,

11         Documents, were received in Evidence.)

12              MR. CRUZ:  119-28, 119-29, 119-30, 119-31, 119-32,

13    119-33 and 119-61.

14              THE COURT:  Any objection?

15              MR. VAN DYKE:  No objection, Your Honor.

16              THE COURT:  Those are received.  You may publish.

17              MR. CRUZ:  Thank you.

18         (Government's No. 119-28, 119-29, 119-30, 119-31, 119-32,

19         119-33 and 119-61, Documents, were received in Evidence.)

20              MR. CRUZ:  Publish with the Court's permission -- I'm

21    going to use a different one.  Forgive me.

22              May I have the ELMO again?

23    BY MR. CRUZ:

24    Q.  Mr. Kapila, when you did your bank reconstruction, did you

25    look at revenue?
```

1    A.   Yes, sir.

2    Q.   Did you also look at any other source of cash flow in?

3    A.   Yes, I did.

4    Q.   Did you prepare a summary exhibit so that we can understand

5    the difference between the two?

6    A.   Yes.

7         MR. CRUZ:   Publishing 119-28.

8    BY MR. CRUZ:

9    Q.   What are we looking at here, sir?

10   A.   This is a pie chart.  It's a demonstrative or a picture

11   showing the segmentation, if you will, of the cash inflows into

12   RBL.  And this particular exhibit shows that 90 percent, or

13   $158,626,899, came into the bank accounts of RBL from investor

14   funds.  And it shows that this is for a period from April 2020

15   to June of 2023.

16   Q.   Why did you focus on that time frame?

17   A.   That was the principle period of activity, if you will, for

18   the -- when the money was raised from investors onwards until

19   management changed in June.

20        And to finish off my answer, it also shows that the revenue

21   or the cash inflows from trucking business was $17,535,870.  So

22   if you take the two in total, the trucking revenues constitute

23   about 10 percent of the total cash inflows into the business

24   and funds raised from the investors constitute about 90 percent

25   of the total cash inflows that the company received.

1    Q.   What is the primary source, as far as documentation, did

2    you rely on to come up with this pie chart, Exhibit 119-28?

3    A.   Well, it started with the reconstruction of the 42,000-some

4    transactions that I described earlier, sir.  And that

5    culminated from a massive computer database into a summary

6    chart, which shows that from April 20th to June 23rd -- it

7    shows it in like a matrix or an Excel matrix picture -- how

8    much money was flowing in and out for on a quarterly basis.

9    And then the total of that is for trade in this pie chart as to

10   the trucking revenues and the inflow -- cash inflows.

11   Q.   As far as the trucking revenue, which trucking revenue did

12   you identify to make up the 17,535,870, sir?

13   A.   They were very few sources, if you will, because there were

14   very few direct customers who actually paid their trucking

15   revenue invoices.  And then the vast majority of it was from

16   factoring companies.  I think there was -- there were three

17   factoring companies to whom RBL had discounted or factored, as

18   we call it, their accounts receivable from customers.  And when

19   that money comes in, it comes directly from the factors after

20   they collect it.

21   Q.   Mr. Kapila, the bank records that you testified about

22   earlier, do they show the factoring money coming in as revenue,

23   sir?

24   A.   Yes, sir.

25   Q.   And did you, in fact, through your reconstruction capture

1    all of the money from the trucking, which was factored?

2    A.   I believe we did, yes.

3    Q.   And is that figure represented here on Exhibit 119-28?

4    A.   It is part of the $17,535,870.

5    Q.   How did you identify the investor funds raised that

6    represent the $158,626,899 figure on this exhibit, sir?

7    A.   The investor funds raised correlate to the programs that

8    the company was marketing, if you will, to raise money from

9    outside investors.  And it relates to the various -- I'll just

10   call them investor agreements for now, because there were, I

11   think, five kinds of products, if you will, from where they

12   were raising money in different forms, if you will.

13       And it's all that money which -- and there was a CRM.  It's

14   a customer relations management program.  There are investor

15   files, if you will, and then there's, of course, the bank

16   information, which comes together -- and with all the support

17   of those documents generally you will find that that is the

18   money raised from investors.

19           MR. VAN DYKE:  Move to strike the portion related to

20   marketing as to lack of personal knowledge.

21           THE COURT:  One moment.

22           Overruled.  He stated his bases.

23           Ladies and gentlemen, let me just give you a brief

24   instruction which you've already heard.  This witness is going

25   to testify to summaries that he has made in the context of

 1   reviewing voluminous writings that he's already testified

 2   about.  It is those underlying documents that are already in

 3   evidence that are the ultimate source of evidence, but because

 4   the Federal Rules of Evidence say that we can't spend months

 5   and months going through all that would have to be gone

 6   through, we rely under the Rule 1006 of the Federal Rules of

 7   Evidence, a witness like this to testify to summaries of work

 8   that he has done with respect to those underlying documents.

 9        He will be questioned about his review of those

10   voluminous writings, and I'm sure the defense, if they choose

11   to do so, will explore the nature of his summaries as well.

12   But that's why this witness is being treated somewhat

13   differently because he's sitting above and testifying to you

14   about his review about the content of voluminous writings that

15   we couldn't possibly review together without being here for

16   years and years.

17        So with that, the objection is overruled.  His

18   testimony will be subject to cross-examination as well.

19        Mr. Cruz.

20        MR. CRUZ:  Thank you, Your Honor.

21   BY MR. CRUZ:

22   Q.  What documents and information, if any, from the RBL

23   records you've testified about, did you use to identify an

24   individual or appropriation as an investor?

25   A.  As I was starting to say, they had what is known as the CRM

1    reports.  It's a customer relations management report, as

2    I understand it.

3    Q.   I got to stop you there.  What is that?

4    A.   It's a corporate record, if you will.  I just call it an

5    investor record.

6    Q.   Very well.

7    A.   By investor, but that's the terminology used.  And there

8    was also -- and this was something that was exported from

9    something -- and I quote this; so it's not my name, label.

10   It's something called "The less annoying CRM platform."  That

11   was a corporate document labeled as that.  And from that, you

12   can export the RBL's contact and the company's list from the

13   investors.

14       That's what was the starting point.  And then also it's not

15   uncommon in cases like this where management changes that if

16   you don't have other sources, people who may have invested

17   money, they can file claims in a case in courts and say --

18   Q.   Let me stop you there.

19       MR. VAN DYKE:  Objection.  It's 702 as to what is

20   common.

21       THE COURT:  So that is partially sustained.  The jury

22   should disregard the last sentence of his answer.  The initial

23   part of his answer as to the basis of his testimony is

24   overruled.

25   ///

1    BY MR. CRUZ:

2    Q.   We'll move on, Mr. Kapila.

3         I just want to make clear you used internal bank records.

4    What about the bank accounts themselves?  Did that help you

5    identify who was an investor?

6    A.   Yes.

7    Q.   Okay.  Just focus on the bank records now.  What

8    information did you and your team glean from the bank accounts

9    to identify which person or entity qualified as an investor?

10   Go ahead.

11   A.   Well, we start with the bank records, and we look at all

12   the deposits coming in.  And to the extent that the bank

13   records actually give you the information that John Doe put in

14   $50,000 and it's an investment, we will classify it or

15   categorize it as an investment.  If you need corroboration, we

16   will tie this into the CRM report.  And that's why they kind of

17   go together.

18        Sometimes the bank record may not give you the full

19   information.  That's the real point I'm making.  And if they

20   don't, then you look at a CRM report, which is like the -- as I

21   call it, the investor ledger type of thing from within the

22   company's records.  And you can relate it by names with

23   investors.

24   Q.   Briefly, what is a bank wire, and what is a check?  What is

25   a bank check, and how did that relate to your analysis?

```
 1   A.   A bank wire is a transaction which is done by instruction

 2   by one party to a bank, directing the bank to transfer money on

 3   behalf of that party to another receiving party.  And it's done

 4   electronically, if I can just label that in a simple word.

 5   Q.   These wires -- do they sometimes have information that

 6   helps you do your job that you've testified about?

 7   A.   Yes.

 8        MR. VAN DYKE:  Objection as to leading.

 9        THE COURT:  Sustained as to form.

10   BY MR. CRUZ:

11   Q.   What information, if any, do these wires have that you rely

12   upon, sir?

13   A.   So we rely on what I referred to earlier today, the wire

14   transfer information, or requisition if you want to call it,

15   which are bank support information.  The banks have

16   instructions given to them and they would be represented in

17   some kind of format where they can print and give it to you or

18   give it to you in an electronic form.

19   Q.   You said earlier that you came across five different

20   investment platforms.  Is that what you said?

21   A.   Yes.

22   Q.   Which one of those did you look to to determine if there

23   was revenue from April 2020 to June 2023?

24   A.   Well, they are all investor -- we classify them and

25   categorize them as investor funds, because those monies, we did
```

```
 1   not label as being revenue.  Revenue, to me, comes when you
 2   operate and run your business.  This is a trucking business
 3   where you provide what they call transportation or logistics
 4   and revenue would come from customers.
 5           MR. VAN DYKE:  Objection.  702 as to the
 6   classification.
 7           THE COURT:  Overruled.  He's explaining his
 8   distinctions of the records.
 9           You may continue, sir.
10   A.   Revenue would come from customers of the entity for
11   services provided.
12   BY MR. CRUZ:
13   Q.   Let me stop you there.  Services provided.  This
14   Exhibit 119-28 has services provided for trucking revenue.
15        What other revenue, sir, was there that you found in the
16   bank records that could be classified as revenue, not trucking
17   revenue?
18        Go ahead.
19   A.   None.
20   Q.   Did you find any other source of revenue, sir?
21   A.   No, sir.  It would be here on this pie chart if there was
22   one.
23   Q.   Showing you another chart.  Tell us what 119-29 is, please.
24   Go ahead.  Please tell us what this is.
25   A.   Oh, sorry.  Yeah.  This is a line graph chart and you will
```

1    see that it covers a time window from the second quarter of

2    2020 to the second quarter of 2023.  And the blue line

3    represents what is -- was the trucking revenue in each of those

4    quarters through that timeline.

5         The orange line represents the investor funds raised during

6    each of those quarters and on the horizontal line, and of

7    course the vertical line or the vertical axis is the dollars

8    numbers.  And it covered the entire period by quarter from

9    April 2020 to April 2023.

10        And what it shows clearly is that the investor funds line

11   starts far exceeding the trucking revenue line by millions of

12   dollars in quarters.

13   Q.   On this timeline that shows the quarters, is there any

14   quarter that you see in which the trucking revenue exceeds the

15   investor money raised?

16   A.   I don't see it exceeding.  Just to make a point, from

17   quarter -- second quarter of 2020 to about fourth quarter of

18   2020 or first quarter of 2021 because that's -- I'd call it a

19   ramp-up period.  They seem to be about on top of one another.

20   But as time went on, the trucks were not generating any more

21   revenue than shown on the blue line.  And the orange line, of

22   course, tells you where -- how money -- what money was

23   supporting RBL.  And that was the investor funds.

24   Q.   What do the numbers represent on the left, Mr. Kapila, the

25   ones that go vertically?

1    A.   Excuse me.  Can you ask again?

2    Q.   The vertical numbers over here on the left, what do these

3    represent, sir?

4    A.   Those are the -- you know, as you can see, they start with

5    $0, $5 million, 10 million, and then they increase in

6    $5 million tranches.  And they represent -- I mean, if I just

7    go to the far end of the right side, you will probably find you

8    are somewhere between 35 and $40 million on the orange spot at

9    the end on the far right.

10   Q.   You said "quarter."  What does "quarter" mean?

11   A.   Oh.  Sorry.  "Quarter" is a three-month window.  Quarter 2

12   would be April, May, June of 2023 at the far right end.  And

13   you will see that the revenue line of the blue line is between

14   zero and $5 million on that same point in time for that

15   quarter.

16   Q.   Showing you, in evidence, Government's 119-31.  What does

17   this show us, Mr. Kapila?

18        And by the way, I didn't ask you this, did you and your

19   team prepare all of these exhibits that I have now discussed so

20   far?  119-28, 119-29, and now 119-31?

21   A.   Yes.  These graphs, the graphical presentations were

22   prepared by my team and myself.

23   Q.   Thank you, sir.

24        What does 119-31 show us?

25   A.   119-31 shows the -- again a line graph for the same period

```
 1    of Quarter 2, 2020 to Quarter 2, 2023.  And this line graph

 2    shows the trucking revenue again as a blue line and on the

 3    horizontal side, and it shows the operating expenses of RBL.

 4    This is the operational expenses based on the cash

 5    reconstruction.

 6        It's important to know this is all driven by the cash flows

 7    in the orange line for the same window of time, and it

 8    demonstrates that while it starts up and what I labeled as the

 9    "ramp-up period," there comes a time when the trucking revenue

10    is what it is on the blue line and touches $2 million on the

11    high side, at the far right, while the orange line of the

12    operating expenses has a trajectory which is going upwards.

13    Q.  In a nutshell, what qualifies, in your analysis, as

14    operating expenses, sir?

15    A.  Classic examples would be fuel costs, insurance.  I don't

16    know.  There could be rent.  Just the standard business

17    operating expenses.

18    Q.  Well, this was a trucking business.  What about trucks,

19    sir?

20    A.  Trucks -- to the extent they got to pay any rent or lease,

21    et cetera, that would be an expense.  Repairs, maintenance, you

22    know, there could be those kind of categories.

23    Q.  What about salaries or other employee overhead, sir?

24    A.  Yes.  The operation -- classic expenses of operating a

25    business:  Salaries, overhead, fringe benefits, professional
```

1    fees, legal accounting.  They could all be in there.

2    Q.   Okay.  In your capacity as the accountant, sir, for the new

3    managers, did you also analyze the records that show the

4    acquisition of the trucks in the business?

5    A.   You know, there came a time when they were -- they started

6    with let's call it a few trucks or little trucks and I know

7    that they had -- I don't know, 200-plus trucks, theoretically,

8    during the window of time.

9    Q.   At the end, is that accurate?

10   A.   At the end, yes.

11   Q.   Okay.  Go ahead.

12   A.   And I'm sorry, what was your question again?  My fault.

13   Q.   Did you look at the records that dealt with the

14   acquisition?

15   A.   Yeah.  Yes, we did.  I mean, these were -- by definition,

16   if they were having 250, 290 trucks, they, quote/unquote,

17   either acquired or leased them.  It doesn't mean they always

18   bought them.  They have could have rented them, they could have

19   leased them, they could have purchased them.

20   Q.   What, if any, effect did the number of trucks have in

21   Exhibit 119-31 as far as this chart?  What effect, if any, did

22   the number of trucks used by RBL have on this chart?

23   A.   Yeah.  Well, you know, you would expect, as I mentioned, a

24   ramp-up period as you ramp up a business and you increase.  The

25   crux of the business is to get trucks and provide

```
 1    transportation to customers and on revenue.  You would expect

 2    that as you increase the volume of trucks or the number of

 3    trucks to transport, your revenue would go up in some

 4    corresponding manner to justify the growth of that particular

 5    asset which drives the revenue, the truck.

 6        But what is evident from this graph, the blue-line graph,

 7    is from Quarter 2 of 2020 to Quarter 2 of 2023, in spite of the

 8    fact that the number of trucks increased over that period of

 9    time to well over 200, the revenue seems to be trailing below

10    the $2 million mark, having started at zero.  So it doesn't

11    correlate the growth, if you want to call it, in the business

12    in that window of time.

13        MR. VAN DYKE:  Move to strike everything after "what

14    you would expect" as 702.

15        THE COURT:  Overruled.  He's explaining the underlying

16    records.

17    BY MR. CRUZ:

18    Q.  Let's move on to the next chart, sir.  Did you prepare or

19    you and your team prepare Exhibit 119-30, which is in evidence,

20    sir?

21    A.  Yes, we did.

22    Q.  Please explain to the ladies and gentlemen of the jury, as

23    best you can, what this exhibit shows us, please.

24    A.  This is another graphical presentation, and it is a

25    combination of some bar charts and a line graph.  This is a
```

1  comparison of the -- again, the trucking revenues which are the

2  blue bars over different quarters for the same window of time,

3  from the second quarter of 2020 to the second quarter of 2023.

4       The orange-colored bars are the investor funds raised in

5  each quarter.  And then the line graph, the green line, is the

6  payments made to investors during that window of time.

7       And you will see that on the front end of the ramp-up

8  period, there's barely any revenue.  And the blue bar -- bars

9  for each quarter, going all the way to the far end, are well

10  below the $5 million mark, all the way through the -- they're

11  barely at 2 million and a bit, at most.

12       But the investor funds raised, it depicts the bars showing

13  they're constantly going up in trajectory, and that as you make

14  payments to the investors as per the green line, it is clear

15  that the revenue from trucking, which is the blue bars -- being

16  well below the height of the bar from investor funds, the blue

17  bar is not sufficient to make a payment to an investor in the

18  dollar amounts, which the green line illustrates.

19       So it tends to correlate the source of money, which would

20  be used to pay investors whatever they are getting.  It was

21  coming from trucking revenue or coming from investor funds?

22  Q.  Are you able to identify a moment in time on that summary

23  chart when investor funds are used to pay investors?

24            MR. VAN DYKE:  Objection.  702.

25            THE COURT:  One moment.

```
 1              That's overruled.

 2              He can answer if he knows.

 3   BY MR. CRUZ:

 4   Q.   The chart that you prepared with your team, that's in front

 5   of you, sir, put your finger on the point in time in which new

 6   investor funds were used to pay the obligations of prior

 7   investors?

 8              MR. VAN DYKE:  Objection.  Leading.

 9              THE COURT:  Overruled.  This is in evidence.

10   BY MR. CRUZ:

11   Q.   Where is it, Mr. Kapila?  Go ahead and use either your

12   finger or a pen to help us understand on the timeline when the

13   payments to investors came from investor money.

14   A.   Well, if you focus on Quarter 1 of 2021 -- it's an arrow

15   there.  I don't know how to operate it.

16        You will see that the -- that's around the early year of

17   quarters.  You will find that the orange bar appears to be

18   higher than the blue bar around that time.  So I would say

19   right from that point on at the -- at least there wasn't enough

20   revenue to make the investor payments, which the green line

21   shows.

22        Now, if you go -- you can see all the way through

23   thereafter, the blue bar is lower than the orange bar and

24   investor payments are being made so there is not sufficient --

25   and don't forget, this is the trucking revenue without having
```

1    paid operating expenses.  So trucking revenue is also

2    absorbing -- operating revenues being absorbed by operating

3    expenses, the typical business operations.

4    Q.  Are you referring to Exhibit 119-31, as far as operating?

5    A.  Yes, sir.  So that helps us kind of bring it in context.

6    So the only way you can really pay any money to the investors

7    is by drawing on the investor funds that have been raised.

8    Q.  Did you find any contracts for the sponsorship of a trailer

9    to be manufactured during the course of your examination of

10   records?

11   A.  There was a program which was premised upon getting

12   investor funds, which would be used to build a trailer, yes

13   there was.  And I think the premise was the trailer was being

14   built outside this country, yes.

15   Q.  What funds, if any, did you come across that show the

16   purchase of the trailer parts to manufacture?

17   A.  I have not seen any purchase of trailer parts, but the

18   money raised for that is in the orange bars.  It's all

19   consolidated in the raising of the funds.

20   Q.  What revenue, if any, was generated by the creation or sale

21   of the trailers, sir?

22   A.  Well, any revenue generated would be in the blue chart.

23   There's no other dedicated revenue generated by RBL.

24   Q.  Does Exhibit 119-30 encompass all sources of funds either

25   generated or obtained according to the bank analysis that you

1   testified about?

2   A.   Yes.  All funds, which are generated either from revenues

3   or investors outside the company, yes.

4   Q.   I would like to spend a little time on just a few more of

5   those summaries, sir.

6        MR. CRUZ:  I would like to now place that exhibit, if

7   the Court would allow, the use of the computer at the counsel's

8   table.  Can you please zoom in to help us, especially me, see

9   it.

10  BY MR. CRUZ:

11  Q.   Mr. Kapila, while we're zooming in, do you recognize this

12  exhibit?

13  A.   Yes, I do.

14  Q.   Who prepared it?

15  A.   My team and I prepared this.

16  Q.   What does it show us?  Nothing right now.

17       I think we're back on.

18       Mr. Kapila, I'll ask the question with the Court's

19  permission.  Let's start with the title.

20       What does it give us in the title, sir?

21  A.   So the title states Royal Bengal Logistics, Inc., in

22  parentheses RBL.  It's the quality -- quarterly sources and

23  uses, quarterly sources and uses, and that would be of the cash

24  flows, for the period from April 1st of 2020 through June 30th

25  of 2023, and it references Notes 1 and 2 which are footnoted on

```
 1    the chart somewhere.
 2            MR. CRUZ:  The whole thing, if you can make it as big
 3    as you can.
 4    BY MR. CRUZ:
 5    Q.  Mr. Kapila, what does this summary chart tell us, sir?
 6    A.  As you can see, it's multi-columns by quarter, from
 7    Quarter 2 of 2020 quarterly through Quarter 2 of 2023, and it
 8    has a total count.  It shows you what is labeled as revenues or
 9    from operations, trucking services, and other.  And it has the
10    expenses, what I have been calling operational expenses, net.
11    That's the second segment.  It will show you the cash flow or
12    deficit from operations being what you generated in revenue
13    minus the total expenses, which are paid.
14    Q.  Help us understand the difference between gross and net.
15    I believe you have used both of those terms.
16            First, "gross" -- what is that?
17    A.  The gross revenue would be -- if you go to the top of this
18    chart, you see the --
19    Q.  You can circle it with your finger.  It won't bite.  Go
20    ahead.
21    A.  Okay.  Did that come through?  I'm not very good at this.
22    The first column -- let me try again.
23    Q.  It's white, of course.  I picked a white color.
24            Let me see if I can change the color, sir.
25            All right.  Mr. Kapila, one more time.
```

```
 1   A.   This here is the gross revenue of $221,713, using the first
 2   column illustrated here.
 3   Q.   Tell us what "net" means.  What does "net" mean when you're
 4   looking at these charts of yours, please?
 5   A.   Sometimes when you are paying anything or receiving money
 6   you offset some transaction, there's an offset, you call it
 7   net.  But the expenses here are the net expenses paid.  You
 8   will see the categories are payroll, fuel, insurance, truck
 9   trailer, equipment and it goes on.
10        You get to an expenses subtotal.  And then you get a
11   subtotal of gross revenues minus the expenses, which gives you
12   the cash flow, positive or negative, from operations.
13   Q.   I would like to focus on one quarter, if you can.
14   A.   Yes, sir.
15   Q.   If I can.
16        Can you explain to us Quarter 2, 2022, as just an example,
17   what -- first of all, what is the trucking revenue as far as
18   that quarter that I circled?
19   A.   The trucking revenue, as I mentioned earlier, would be a
20   combination of the collections from a factoring companies and
21   some small amount from -- directly from customers, sir.
22   Q.   Give us a figure, please.  How much was brought in as far
23   as trucking revenue for Quarter 1, 2022, RBL logistics?
24   A.   The number for Quarter 1, 2022, from trucking services was
25   $1,344,407.
```

1    Q.   Now, if we look at the expenses, how much in expenses were

2    added and expended for that same quarter, according to your

3    analysis, sir?

4    A.   The total expenses disbursed or expended, as you call it,

5    $2,000,711 and two hundred and -- let me start $2,711,233, sir.

6    Q.   So then what does this final figure represent here, the one

7    I just circled, that's on the blue line?  Explain to us first

8    what is that figure, and what does it tell us, please.

9    A.   That tells you in that quarter, the cash flow coming in

10   collections from revenues were $1,344,608.  And after paying

11   all the expenses of $2,711,233, they had a negative, what we

12   call a deficit, on this blue line of $1,366,625.  So they spent

13   more money than they had -- that they got from actual revenues

14   in that quarter.

15   Q.   What do the parentheticals mean, when a number is in

16   parentheses, like the one I just wrote?

17   A.   That parenthetical means that's a negative number, and we

18   call it -- on the far left column -- a deficit from operations.

19   Q.   According to your analysis of the bank records and other

20   records, when on this chart did RBL begin running a deficit in

21   its trucking business?

22   A.   Well, the very first column on the chart shows you that

23   they were running an operational deficit in their first

24   quarter.

25   Q.   What about the fourth quarter, what does that show us?

1    A.   The fourth quarter shows a quarterly positive, but you have

2    to look at it by saying what are they're doing cumulatively.

3         (Reporter requests clarification.)

4    BY MR. CRUZ:

5    Q.   And cumulatively, if you look on the total far right -- and

6    I'll move on, sir -- what is the cash flow deficit for Royal

7    Bengal Logistics from the beginning to the end?

8    A.   The cumulated deficit for that period of time, sir, shown

9    here is $26,465,579.

10        THE COURT:  Mr. Cruz, we're going to take a break for

11   the jury at this time.  I know it's not a natural resting

12   place.  We're going to give the jury a break.  We'll see you in

13   10 to 15 minutes.

14        Please be seated.

15        Mr. Kapila, if you wish, you can stretch your legs for

16   ten minutes.  We'll see you back here in about ten minutes,

17   sir.

18        THE WITNESS:  Thank you.  Unless there's something to

19   take up, I'll see you-all in ten minutes.

20        THE COURTROOM DEPUTY:  All rise.

21     (Off the record from 11:36 AM to 11:46 AM, after which

22      the following proceedings were had within the presence of

23      the jury:)

24        THE COURT:  Welcome back, everybody.  Please be seated.

25        Just because we started a bit late, don't think for a

```
 1    second that we're not going to take lunch.  It will be just a

 2    little later lunch like we did last week.

 3            In the interest of efficiency, we'll continue with our

 4    direct examination and Mr. Kapila, I remind that you're still

 5    under oath.

 6            THE WITNESS:  Yes, Your Honor.

 7            MR. CRUZ:  May I proceed, Your Honor?

 8            THE COURT:  Yes.

 9    BY MR. CRUZ:

10    Q.  Mr. Kapila, before the break I think we were in the middle

11    of talking about the exhibit that's on the screen, 119-22.

12    I would like to ask a few more follow-ups.

13        Okay?

14    A.  Yes, sir.

15    Q.  You testified about when investors' money was being used to

16    pay back investors.  Do you remember that testimony?

17    A.  Yes.

18    Q.  When did that end?  When did the actual investors' money

19    being used to pay them back end?

20    A.  It would have ended when management changed in about June

21    of 2023.

22    Q.  This phenomenon, does it have a term of art as far as using

23    the investor money to pay back investors?

24            MR. VAN DYKE:  Objection.  Relevance.

25            THE COURT:  Overruled.  He can testify if he knows.
```

BY MR. CRUZ:

Q.   Based on your personal experience, and just that, sir, your business experience, what is that term used to describe using the money of one investor to pay the other?

A.   The common terms used is Ponzi schemes.

Q.   What type of attributes, objective attributes, do Ponzi schemes have in your experience?

A.   The classic attribute or the primary attribute is an enterprise -- just an enterprise or an entity raises money from investors and finds that there are returns to be paid to those investors by raising the money, and it doesn't have the revenue to pay back returns to those prior investors, and the only way it can pay returns to the old investors is by raising new money from investors.

    So what you do is you raise new money to pay back old investors because there's no other way to pay them back.

Q.   Based on that definition, what if any Ponzi scheme did you see in your summary analysis, sir?

        MR. VAN DYKE:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. CRUZ:

Q.   Having that definition in mind, what, if anything, did you see from the bank records and other records that you analyzed at RBL?

        MR. VAN DYKE:  Objection.  Leading and 702.

```
 1            THE COURT:  No, I'll overrule that.  He can answer
 2   that.
 3   A.  As we have seen through the different exhibits where we
 4   looked at the graph charts and now we're looking at 119-22
 5   exhibit number, you find that there are operational deficits
 6   through the quarters.  And we looked at one graph chart which
 7   showed the line curves, and it is clear that the only way RBL
 8   could fund paying the investors any money back would be by
 9   using money from new investors, sir.
10   BY MR. CRUZ:
11   Q.  Thank you.
12        Back to the Exhibit 119-22 we talked about, and I'm not
13   going to ask you any more questions about the line above this
14   blue.  I would like to now just ask a few questions about the
15   items below that and then the next page and then we'll set that
16   exhibit aside.
17        Sir, what information do you have here on the title
18   non-operations, from there, all the way down here?
19   (Indicating).  Explain to us what you're looking at as far as
20   the summaries.  What does it tell us, please?
21   A.  Yes, sir.  That lower half of the chart below the cash flow
22   deficits from operations shows the money which was raised
23   from -- or which came into based on the cash reconstruction
24   from nonoperational sources.  They could be investors, they
25   could be from the principals, or money which was used to pay
```

```
 1   the non-operational disbursements, whether there were to

 2   investors or other entities.

 3       So this part shows -- which is labeled as non-operations,

 4   for example, the first one happens to be Mr. Sanjay Singh and

 5   it would show you the amount of money that was deposited that

 6   was received from Mr. Sanjay Singh, and the amount of money

 7   which was disbursed to Mr. Sanjay Singh, it happens to be the

 8   first block, if you will.

 9   Q.  This first block you've just testified, on the far right,

10   are there figures that help us understand the net as far as

11   disbursements to the individual known as Sanjay Singh?

12   A.  Yes, sir.  I mean, if you go to the far right of the chart

13   where you have circled, you will notice that the -- Mr. Sanjay

14   Singh, over the different quarters, had put in money to the

15   aggregate amount of $12,442,000.

16       So we had deposits coming in and out, reconstruction, which

17   were labeled as coming from Mr. Sanjay Singh, and then equally

18   we had disbursements being made to Mr. Sanjay Singh and they

19   aggregated for the same period of time to 16 million -- sorry.

20   $16,920,695, with a net out going to Mr. Singh of $4,478,695

21   over that window of time, April 1, 2020, to June 30, 2023, sir.

22   Q.  Is that aggregate figure that you have now testified to

23   related to the quarters that I just circled on the summary

24   chart, sir?

25   A.  Yes, sir.
```

1    Q.  And is that a total sum just to Mr. Sanjay Singh in his

2    personal name?

3    A.  Yes, sir.

4    Q.  Did you also look at other individuals under this section

5    titled "Related Parties"?  First of all, I think you've already

6    testified, so I won't ask you what that means.

7        Tell us what related parties you found and how much, sir.

8    A.  Well, as you can see under the category of Insider/Related

9    Parties, that's excluding Mr. Singh, which we showed

10   separately.

11       The total amounts disbursed to those parties was

12   $10,811,997.  And from similarly related parties and insiders,

13   money which flowed in and was deposited in RBL bank accounts

14   was $2,030,298, resulting in a net outflow from RBL of

15   $8,781,700 going out of the bank accounts of RBL net.

16    Q.  And to be clear:  After you saw the money going out, did

17   you -- strike that.

18       What did you do, if anything, after you and your team

19   accounted for the money going out of the RBL bank accounts?

20    A.  I'm not sure that that's the information we provided to the

21   new management.

22    Q.  Bad question.

23       Did you continue your analysis or did you stop once you saw

24   the money going out, sir?

25    A.  It stops there.

1    Q.   Okay.

2    A.   Yes.

3    Q.   As far as your analysis?

4    A.   Yes.

5    Q.   That's what I wanted to be clear about.

6         Next question:  Did you look at other individuals other

7    than Mr. Singh, the defendant, and the related parties as far

8    as the disbursements on this exhibit, sir, 119-22?

9    A.   Yes, sir.  As you can see, there's a category called

10   "Other" from where you can see that we received money deposited

11   into the bank accounts which could not be or we did not

12   categorize to Mr. Singh or to the insider and related parties.

13   And these sources, the incoming deposits were $1,102,119.

14        And the disbursements in that window of time under the

15   other category, which we did not classify to the items above,

16   were $5,269,184, resulting in net outflows of $4,167,065.

17   Q.   Last question or line of questioning on this

18   Exhibit 119-22.  Can you please explain to us what securities

19   activity net means on the far left of this exhibit?

20   A.   RBL had an account at TD America [sic], it's a brokerage

21   account, TD America.  And RBL funded money from its main bank

22   accounts into that brokerage account, and part of that money

23   came back into RBL over the same period of time and the account

24   was used to trade basically stocks and bonds.  So it's a

25   typical investment brokerage account type of activity.

1  Q.   And did you and your team lay hands on the TD Ameritrade

2  accounts and place that information in this chart?

3  A.   We did.

4  Q.   If we can turn to the next page of this exhibit, please.

5  Just briefly, I would like to go over some of the data here,

6  I assure you, Mr. Kapila.

7       What does this second sheet of this exhibit tell us,

8  please, briefly?

9  A.   This second sheet shows you the money which was flowing

10  into RBL based on the cash reconstruction from investors,

11  showing how much was received from investors over the period of

12  time and how much was disbursed to investors, and basically

13  that's what it summarizes in that upper half of the sheet or

14  upper window.

15  Q.   Does it also list the quarters?  In other words, the years

16  in which the money was raised, sir?

17  A.   Yes, it's done by same quarters, from Quarter 2 of 2020

18  through to -- this one is to Quarter 2 of 2023.  As we were

19  looking at before, it's the same window of time based on the

20  bank account reconstruction.

21  Q.   And as far as the amount of money raised from investors,

22  can you explain to us, did it increase or decrease according to

23  your work on this and your other charts?

24  A.   Well, as we have seen on the graph charts, the amount of

25  money raised from investors has an increasing trajectory.  In

1  fact, the graph charts are really a depiction of the numbers on

2  here.  So yes, it was increasing on a quarterly basis over the

3  period of time.

4  Q.  Please turn to the fourth sheet on Government's

5  Exhibit 119-22, a couple questions about this.  Sir, you

6  have -- what is this, please?

7  A.  This is -- I mentioned earlier today that we had looked at

8  as many as 15 or 16 bank accounts.  I may be off a number.  But

9  these are the bank accounts which form the foundation of our

10 reconstruction.

11     We reviewed, investigated the transactions in each of these

12 bank accounts to come up with the massive -- the 42,000

13 transaction-driven database and that is assembled in our

14 computer technology.  And the summaries we have been talking

15 about are the top of the pyramid, if you will, of those -- that

16 database in summary.

17 Q.  This last sheet on this exhibit that you created, are those

18 some of the same bank accounts that we went over briefly in

19 your testimony, Exhibit 101, the one with the signature cards?

20 I'm not even going to put it up.  I just wanted to make sure

21 that we're talking about the same thing.

22 A.  It would be.

23        MR. CRUZ:  Can you please put up Exhibit 119-21 which

24 is in evidence.

25 ///

BY MR. CRUZ:

Q.   Only three questions on this.  What is this and how does it relate to the prior exhibit, if any?

A.   This is for the same time window of April 1, 2020 through June 30th of 2023, a summary of all the sources and uses of cash.  So this summarizes, in a bird's-eye view, of where all the money came from, the revenues, the nonoperational expenses, the cash flow deficits from non-operational expenses, and basically the entire set of dollars that are coming in and going out, which we saw in a different summary earlier.

Q.   I don't want to be redundant, but the one on the screen, is that a summary of the other summary that we have now gone over in detail, 119-22?

A.   Yes.

Q.   One at a time.  Is this second one on the screen a summary of the more detailed summary of 119-22?

A.   Can you remind me?  I can't see from here.

        MR. CRUZ:  May I approach?

        THE COURT:  Yes.

        THE WITNESS:  Yes.  Precisely, yes.  This is a summary of that summary.

BY MR. CRUZ:

Q.   Okay.

A.   Sorry.  Thank you.

Q.   Next exhibit, please, 119-23.  I'll grab that from you,

1    Mr. Kapila, with the Court's permission.  Thank you.

2    A.  Thank you.

3    Q.  Okay.  Sir, let me ask you a simple question.

4    Approximately how many individuals or corporations did you and

5    your crew identify as investors in Royal Bengal Logistics?

6    A.  Well, this will tell you more precisely, we mentioned an

7    approximate number of $1,591.  Otherwise, I was going to say --

8    Q.  No, no, let me stop you there.

9    A.  Not dollars.  Investors.

10   Q.  Okay.  I'm going to ask you again.  Okay?  Slow down.

11   Based on your and your team's analysis, approximately how many

12   investors did you find were either individuals or corporations

13   based on your review of the documents?

14   A.  About 1,600, but rounded if you want to call it.  The

15   Footnote 1 here tells us it's -- excuse me, let me just...

16   Q.  Let me start with an easier question, Mr. Kapila.  119-23,

17   who prepared this summary chart?

18   A.  My team and myself.

19   Q.  According to your work product, can you please tell us

20   approximately how many people invested in RBL?

21   A.  1,688 investors, sir.

22   Q.  According to this summary chart that you prepared,

23   approximately how many -- how much investor funds were raised

24   from the beginning, April 2020, until June 30, 2023?

25   A.  Based on the same bank reconstruction, sir, this summarizes

1  that number to be $158,626,899 was raised from investors.

2  Q.  And you've already testified some of that money was paid

3  back to investors; is that accurate?

4  A.  Yes.

5  Q.  Does this exhibit help us understand, based on your work

6  product, approximately how much money was paid back of the

7  $158,626,899, sir?

8  A.  They paid back to investors $104,927,033 based on that

9  reconstruction of the bank records, sir.

10  Q.  And based on your team's accounting and review of the

11  documents that you have now testified about, approximately how

12  much were investor losses according to your analysis?

13  A.  Well, based on this on a straight equation, $158,626,899

14  came in.  RBL paid back $104,927,033, which leaves you an

15  investor loss, as I have shown on this sheet, of $53,699,867.

16  Q.  A couple questions about this exhibit more, and then we

17  will move on.  The investor payments, sir, you have now

18  testified that you did analyze the different products that RBL

19  offered.

20      Do you remember that testimony?

21  A.  There were different products, yes.

22  Q.  The payments to the investors based on the summary of you

23  and your team, did that encompass interest and principal?

24  A.  Well, we can dissect it because a payment is a payment and

25  it goes to an investor.  Because the way these contracts work

```
 1   was there was a principal amount, typically, you know, a
 2   principal amount, and then there was a lump sum on return on
 3   that principal, and the theory was they would pay back the
 4   total in whatever form that agreement said.  It could be
 5   monthly, non-monthly, et cetera.
 6   Q.   Okay.  So then the better question for you would be based
 7   on the number crunching.  The 53 million-plus is the money owed
 8   to investors regardless of whether it's interest or principal;
 9   is that accurate?
10   A.   Based on the bank reconstruction, very simply that's what
11   it is.  Money came in, money went back, and less money went
12   back to them.
13        MR. CRUZ:  I'll have the ELMO, Ms. Shotwell, if you
14   will allow me, with the Court's permission.  Thank you.
15        Thank you very much.
16   BY MR. CRUZ:
17   Q.   You testified earlier about transfers to and from insiders
18   and related parties.  Do you remember that testimony?
19   A.   Yes, sir.
20   Q.   Did you prepare any charts that might help us understand
21   the number crunching as you have now testified regarding those
22   individuals?
23   A.   Yes, I did.
24   Q.   Turning your attention to Exhibit 110-32, sir, do you
25   recognize what's on the screen?
```

```
 1   A.   Yes, sir.

 2   Q.   Who prepared this?

 3   A.   My team and I.

 4   Q.   What does it show us, please?

 5   A.   This shows you the transfers to and from insiders and

 6   related parties on a net basis.  So it shows you that a total

 7   of $13,260,395 went out of RBL to, in this case, five groups of

 8   related parties and/or insiders, sir.

 9   Q.   What made you choose to label these individuals as either

10   insiders or related parties, sir?

11   A.   Well, Mr. Sanjay Singh is the -- I don't know, I call it

12   the principal of RBL, and then we found -- and Ms. Sheetal

13   Singh, I understand, is Mr. Singh's wife, and the other related

14   parties to Mr. Sanjay Singh are -- there are various corporate

15   entities which are -- which he has an ownership in directly or

16   indirectly or is a director or officer of, and those are

17   considered payments or disbursements to related parties.

18   That's how that comes about.

19   Q.   Were you able to identify in your summary analysis who

20   Ricardi Celicourt was?

21   A.   Yes, sir.

22   Q.   Who was that?

23   A.   I think he was the vice president of business development,

24   if I recall it correctly sir.  He was president or vice

25   president, but I think it's vice president.
```

```
 1    Q.   And you said net -- and again, net is -- does that

 2    account -- strike that.

 3         Does net account for any money from other sources deposited

 4    in, subtracted in from all the money out?

 5         I don't know if you understand my question?

 6    A.   I don't.

 7    Q.   What is net, again, on this graph?  I'm sorry, sir, 119-32?

 8    A.   As I said earlier, this number doesn't show you the actual

 9    gross amount that went out.  It shows you the net amount

10    meaning hypothetically, Mr. Singh may have received -- I think

11    I had a better number in a chart earlier.

12         Let's say hypothetically one paid Mr. Singh $8 million and

13    he paid back 5 million, so this would show a net of 3 million

14    that -- I'm using totally illustrative numbers.  So it's a net

15    of what went out and what came back in from these -- each of

16    these respective parties, sir.

17    Q.   I wrote it here on the screen.  Is this accurate, more or

18    less, as far as your demonstrative, 8 million minus 5 million

19    would equal 3 million net?

20    A.   Yeah, illustrative numbers, yes, sir.

21    Q.   Thank you, sir.

22         Is this from April 2020 to June 2022?

23    A.   Yes, sir.

24    Q.   Showing you another demonstrative aid.

25         Who prepared 119-33, sir?
```

1    A.   This was again prepared by my team and myself, sir.

2    Q.   119-33, what does this show you us compared to the other

3    chart that I put on?

4    A.   The only difference between 119-33 and the chart preceding

5    this is what you see in the green color on the pie.  The rest

6    of the segments of the pie are identical to the pie chart.

7         We inserted in here the losses from the brokerage account

8    of TD Ameritrade, sir, which had the account number of 3647,

9    and that $8,064,541 is the net loss that was suffered by RBL

10   based on the money which was put into the TD Ameritrade account

11   and how much came back from it.  So it's the net amount that

12   basically went into a black hole.

13   Q.   So this figure, this $8 million figure, again, this is the

14   total loss in the broker account; is that accurate?

15   A.   Yes, sir.  RBL's brokerage account, yes, sir.

16   Q.   Of course.

17        You only analyzed business accounts as far as bank records

18   and trading records to be fair; right?

19   A.   Correct.

20   Q.   So then my question naturally is the actual number here on

21   this summary, 119-33, is the net loss to RBL for the trading;

22   is that true?

23   A.   That is correct.

24   Q.   What is the total net loss to RBL, according to this chart

25   and your analysis, for the trading and for the related party

1    transactions net, sir?

2    A.   It would be the aggregation of all of these numbers on the

3    different colors of pie, which add up to $21,324,936.

4    Q.   Believe it or not, Mr. Kapila, one last chart, 119-61.  Who

5    prepared this?

6    A.   My team and myself prepared this, sir.

7    Q.   Now, does this have just net information as far as money in

8    and money out, or does it have more information, Mr. Kapila?

9    A.   This has more information, sir.

10   Q.   Explain to us what we're looking at as far as the summary

11   chart or -- excuse me, pie chart of 119-61, sir.

12   A.   Yes.  The chart will show you the amount of money of RBL

13   transferred out of its bank accounts to the TD Ameritrade

14   account and the gross amount of money that went from RBL to

15   TD Ameritrade was $16,542,800.  That's the green color.

16   Q.   Please slow down.  I'm sorry, Mr. Kapila.

17        Circle with your finger the amount of money from RBL's bank

18   accounts that went into the RBL trading accounts that you have

19   testified about.

20   A.   (Indicating.)

21   Q.   And then that money went in.  What happened to that money,

22   according to your analysis, after it hit the stock trading

23   account at Ameritrade, sir?

24   A.   Well, the amount would be whatever trading activity took

25   place on the brokerage account and net of that trading

1  activity, the brokerage accounts returned eight hundred --

2  sorry, $8,444,177 back to RBL and as a result -- and you can

3  see these are small number of $34,082 -- these are like margin

4  costs within the brokerage accounts, like expenses.

5      At the end of the day, after giving $16,542,000 getting

6  back 8,444,000, the RBL loss, through this account, the amount

7  of eight hundred -- sorry, $8,064,541.  And that number is the

8  number we just looked at, at the previous chart of the money

9  which went -- which was lost as part of the total -- with the

10  insider and related parties.

11  Q.  As far as your analysis and your experience, approximately

12  how much money from RBL was risked in the trading in its

13  account?

14          MR. VAN DYKE:  Objection.  702.

15          THE COURT:  One moment.

16          That's overruled.  He can answer.

17  BY MR. CRUZ:

18  Q.  Based on your experience and your analysis of the bank

19  accounts and the trading accounts that you testified about, how

20  much was initially risked that is sent to the trading account

21  for trading?

22  A.  The money placed at risk would be $16,542,800, the amount

23  of gross transfers into the brokerage account.

24  Q.  And then what was, in fact, lost as a result of that risk?

25  A.  The amount of the loss, sir, was $8,064,541 because that

```
 1    was unrecovered, if you want to call it.

 2    Q.   And then after that, the money that wasn't lost was

 3    transferred back.  Is that accurate?

 4    A.   Yes, sir.

 5    Q.   Tell us, Mr. Kapila, within a reasonable degree of

 6    certainty, what was the source of funds that went -- the

 7    $16 million that went from the RBL account --

 8              MR. VAN DYKE:  Objection.  702.

 9              THE COURT:  One moment.

10              Overruled.

11    BY MR. CRUZ:

12    Q.   Mr. Kapila --

13              MR. CRUZ:  May I approach, Judge?

14              THE COURT:  Yes.

15    BY MR. CRUZ:

16    Q.   The source of the funds that you just testified about, what

17    was the source of the money from the RBL bank accounts that was

18    sent to be traded at Ameritrade in the form of $16,542,800?

19    A.   It would be -- the source would be the investor funds, sir.

20              MR. CRUZ:  May I have a moment, Your Honor?

21              THE COURT:  Yes.

22              MR. CRUZ:  Thank you.

23    BY MR. CRUZ:

24    Q.   When you began with the new managers, did you have the

25    opportunity to assess the cash on hand available for the
```

```
 1   benefit of the RBL trucking business operations?
 2   A.   Yes.  We did come to know what was the amount of cash that
 3   the new management was able to secure or take custody of.
 4   Q.   Do you recall approximately how much cash there was on
 5   hand?
 6   A.   You know, somehow half a million dollars rings a bell,
 7   500 and some thousand dollars, but I will stand corrected, sir.
 8   Q.   I don't want to correct you.
 9        Is there one of these summaries that can help you better
10   understand approximately how much money --
11   A.   I would like to think --
12   Q.   Sorry.  I have to finish.
13        Is there a summary chart that we have gone over that could
14   help you approximate the number of cash on hand that the new
15   managers had at the inception?
16   A.   Yes, sir.  Even the quarterly cash reconstruction would
17   tell me -- any one of those summaries as to what it was in June
18   of 2023, sir.
19             MR. CRUZ:  May I approach?
20             THE COURT:  Yes, sir.
21   BY MR. CRUZ:
22   Q.   No guessing here, Mr. Kapila.  Please let us know if your
23   memory is refreshed as far as approximately how much cash on
24   hand was there for the new managers, please?
25   A.   Well, I'm looking at Exhibit 119-22, which is titled
```

```
 1    quarterly sources and uses from April 1, 2020, to June 30th of
 2    2023, sir, and at the end of that period of time, the ending
 3    cash balance was $576,915.
 4    Q.  Thank you, sir.
 5         A few more questions, and then I will tender you, with the
 6    Court's permission.
 7              THE COURT:  Yes.
 8              MR. CRUZ:  Thank you, Your Honor.
 9    BY MR. CRUZ:
10    Q.  The bank records that are in evidence, do you recall
11    certain payments that you used as -- for the benefit of
12    insiders?
13    A.  Yes.
14    Q.  The Bank of America -- you already testified about the
15    sheet that has the list of the bank accounts, Exhibit 27, in
16    evidence.
17         Were there certain mortgage payments that you identified
18    for the benefit of related parties?
19    A.  Yes, sir.
20              MR. CRUZ:  And these are my highlights with the Court's
21    permission.
22              THE COURT:  Yes.
23              So again, ladies and gentlemen, the record is the
24    evidence; the highlights are not the evidence.  The prosecutor
25    is doing it for presentation only.
```

1          MR. CRUZ:  Thank you, Your Honor.

2    BY MR. CRUZ:

3    Q.  Do you recall whose mortgage was being paid out of the RBL

4    operating account, sir?

5    A.  Well, according to the bank record, it was Sanjay Singh.

6    Q.  Same question for the next sheet; then I'll move on.

7          Whose mortgage payment, according to the bank records, in

8    March 25th of 2020, was being used to pay the mortgage?

9    A.  Again, the reference on the bank records is Sanjay Singh.

10   Q.  Exhibit 30 in evidence, again same highlights, with the

11   Court's permission, sir, did you see any payments to other

12   individuals -- I think you testified that you know

13   Ms. Sheetal Singh is the defendant's wife.

14         Did you see any wires going out to her, sir?

15   A.  Well, the document that you're showing me right now, it

16   seems like a bank document, shows payment of $25,000 to

17   Sheetal Singh.

18   Q.  Were there also other wires that you looked at,

19   Government's Exhibit 27 -- again, you already testified about

20   the related entities or individuals in September of 2020.

21         Did you see any wires to individuals going out that related

22   to Mr. Singh?

23   A.  Yeah.  The document --

24         MR. VAN DYKE:  Objection as to leading.

25         THE COURT:  The record speaks for itself; so I'll

 1   sustain the objection.

 2   BY MR. CRUZ:

 3   Q.   What does this show us, sir?

 4   A.   This record is a bank statement transaction which shows

 5   $15,000 being paid for the benefit or -- yeah, for the benefit

 6   of someone called Uday Singh.

 7   Q.   What does the description of the wire say?

 8   A.   It says here "POP, family support" and there's other

 9   verbiage there, but that's the answer of the label.

10   Q.   Same question, and then I'll move on:  Can you read from

11   this wire transmittal description, November 30, 2020?  Does it

12   also say family support and is it a $15,000 wire going out of

13   the same account?

14   A.   This is the same amount, 15,000, again for the benefit of

15   Uday Singh with the same label.

16   Q.   Again, outgoing wires, sir.  Did you see any other wires

17   for other accounts that may be considered brokerage accounts in

18   your analysis?

19           MR. VAN DYKE:  Objection.  Leading.

20           THE COURT:  Overruled.

21   A.   Can you ask that again, please?

22   BY MR. CRUZ:

23   Q.   Were there other wires or money being transferred out to

24   other brokerages that weren't TD Ameritrade, sir?

25   A.    I didn't find any other brokerage accounts for RBL, sir.

```
 1   Q.   Do you know what --

 2   A.   I don't remember them.   Yeah.

 3   Q.   Do you know what Morgan Stanley is?

 4   A.   Oh, yeah, sure.

 5   Q.   Exhibit 29 in evidence.   The individual, Sanjay Singh, and

 6   again --

 7         MR. VAN DYKE:   I'll object to further questions as to

 8   lack of personal knowledge given his previous answer.

 9         THE COURT:   Overruled.   He's testified to his knowledge

10   of the underlying records.

11         The jury will consider all of his answers, all of the

12   evidence and give it the weight that they deem appropriate

13   after the witness has been fully examined by both sides.

14   BY MR. CRUZ:

15   Q.   Do you know what Morgan Stanley is?

16   A.   Yes.

17   Q.   What is it?

18   A.   It's a brokerage company.

19   Q.   Other than the cash that you testified about earlier, did

20   you come to learn of other potential assets that were acquired

21   using RBL investor money?

22   A.   Yes, sir.

23   Q.   What is the difference between real property that's land --

24   strike that.

25         What kind of assets, sir?
```

1  A.   The one primary one that we found within a very quick time

2  was money being used to acquire some real estate in Broward

3  County.

4  Q.   Do you recall the name of the individual that the RBL funds

5  were used for the acquisition of that property in Pompano, sir?

6  A.   I do.

7  Q.   Go ahead.  What's the name of the person that the RBL money

8  was used for to buy the property in Pompano?

9  A.   It was -- it's a corporate name with the signature of

10 Mrs. Constantina Celicourt, so that was the relationship

11 through Mr. Celicourt.

12 Q.   Ricardi Celicourt, the vice president?  I just want to make

13 sure that we have the right person.

14 A.   Yes, sir.

15      MR. CRUZ:  With the Court's indulgence, please,

16 Your Honor.

17 BY MR. CRUZ:

18 Q.   Almost done, Mr. Kapila.  Last couple of questions.

19      As far as the RBL account for the year 2022, Exhibit 28 in

20 evidence, did you come across any other wires that were derived

21 from investor funds in or around --

22      MR. VAN DYKE:  Objection as to leading.

23      THE COURT:  Sustained as to form.

24 BY MR. CRUZ:

25 Q.   If you know, tell us what this document shows, this

1    highlighted item on Government's Exhibit 28, please.

2    A.   This particular exhibit shows $250,000 transfer, wire

3    transfer to Mr. Sanjay Singh, sir.

4    Q.   What were the source of the funds used to fund the wire

5    from this account from RBL to Mr. Singh, sir?

6         MR. VAN DYKE:  Objection.  Personal knowledge and 702.

7         THE COURT:  I'm going to sustain it.

8         You can move on, sir.  Asked and answered.

9         MR. CRUZ:  Yes, Judge.  If you will allow me, Judge.

10   BY MR. CRUZ:

11   Q.   In April of 2022, were there any sources of other funds

12   used to send wires out in April 2022, sir, other than investor

13   funds?  Any other source?

14        MR. VAN DYKE:  Objection.  Same objection.

15        THE COURT:  Overruled.  I'll let him answer that.

16   A.   It would be investor funds, sir.

17        MR. CRUZ:  I'm trying to figure out some last-minute

18   stipulations potentially, Judge.

19        Judge, I just believe we only have some documents that

20   the defense and I would like to discuss.  With the Court's

21   permission, we'll break and take it up on the other side?  Is

22   that acceptable?

23        THE COURT:  We'll take our lunch break now?

24        MR. CRUZ:  Yes, Your Honor.

25        THE COURT:  Okay.  We'll take our lunch break now.

```
 1            Ladies and gentlemen of the jury, it's 12:27.  We'll
 2   get started up at 1:45.  That will give you an hour and
 3   15 minutes for lunch.  Don't discuss the case.  Keep an open
 4   mind.  You have still more to hear, and I look forward to
 5   seeing you at 1:45.
 6            All rise for the jury.  Thank you.
 7            (Jury out at 12:28 PM.)
 8            THE COURT:  Mr. Kapila, sir, we will see you back here
 9   at 1:35 p.m.
10            THE WITNESS:  Yes, sir.
11            THE COURT:  Have a nice hour.  Thank you.
12            THE WITNESS:  Thank you.
13            (Witness exits courtroom at 12:28 PM.)
14            THE COURT:  Please be seated.  Anything we need to do?
15            MR. CRUZ:  I'm sure you saw, Judge, we are just trying
16   to get some last-minute stipulations.
17            THE COURT:  Yes.  You're going to stip in certain
18   records?
19            MR. CRUZ:  You got it.
20            THE COURT:  And then you're going to tender them?
21            MR. CRUZ:  Yes, Your Honor.
22            THE COURT:  Okay.  Assuming that we start up at around
23   1:45 p.m. and that Mr. Van Dyke gets his full and total cross,
24   is there a witness after Mr. Kapila today?
25            MR. CRUZ:  We have our very short witnesses, Judge.
```

```
 1              THE COURT:  Great.  So we're just going to keep going.

 2              MR. CRUZ:  We're going to rest today, Judge.

 3              THE COURT:  Super.

 4              MR. VAN DYKE:  Well --

 5              THE COURT:  Well, Mr. Van Dyke may have something to

 6    say about that.

 7              MR. CRUZ:  Of course.

 8              THE COURT:  I like the optimism.  I'll see everyone at

 9    1:35 p.m.  Thank you very much.  Have a nice lunch.

10         (Off the record from 12:30 PM to 1:45 PM, after which the

11                 following proceedings were had:)

12              THE COURT:  Welcome back, everybody.  Please be seated.

13    If this jury was a watch, they would be a Swiss watch.  It's

14    1:45 p.m.  We are going to continue our direct examination.

15              MR. CRUZ:  May I proceed, Your Honor?

16              THE COURT:  Yes.

17              MR. CRUZ:  Thank you, Judge.  Your Honor, I believe

18    without objection the Government moves the following exhibits

19    into evidence:  123, 125, 143-1 through 143-4, 61, 62, 84, 85,

20    87, 88, 99, and 100.

21              THE COURT:  Any objection?

22              MR. VAN DYKE:  No objection, Your Honor.

23              THE COURT:  All of those exhibits are received.

24         (Government's No. 123, 125, 143-1, 143-2, 143-3, 143-4,

25           61, 62, 84, 85, 87, 88, 99, 100, Documents, were received
```

1      in Evidence.)

2          MR. CRUZ:  Your Honor, with that, the Government

3   tenders its witness for cross-examination.

4          THE COURT:  Thank you, sir.

5          Cross-examination, Mr. Van Dyke, your witness.

6          MR. VAN DYKE:  Thank you, Your Honor.

7                          CROSS-EXAMINATION

8   BY MR. VAN DYKE:

9   Q.   Good afternoon, sir.

10  A.   Good afternoon.

11  Q.   So, we have got a lot to get through today.  I just want to

12  let you know if you ever need a break, just let me know, and we

13  can recess for a couple minutes.  All right?

14  A.   Sure.

15  Q.   I actually want to start my examination in the exact same

16  place that the Government started, and talk about what you're

17  doing here today and what you're not doing here today.  Okay?

18  A.   Okay.

19  Q.   Now, in the last four years, you have testified either at

20  depositions or at trial, 17 total times; correct?

21  A.   I don't have a count of it, but if you do, that's good

22  enough.  I mean, I can't speak to the precise number but I have

23  testified in depositions and in trial on multiples of occasions

24  in the past few years and many years.

25  Q.   Okay.  And in the majority of those, you testified as

```
 1    what's called an expert witness; correct?
 2    A.  That is correct.
 3    Q.  And as an expert witness, you understand, you're a very
 4    experienced witness, that you're entitled to provide expert
 5    opinions; right?
 6    A.  Yes.
 7    Q.  As an expert witness, you're allowed to be asked
 8    hypotheticals; right?
 9    A.  Yes.
10    Q.  But here you're testifying as what's called a fact witness;
11    correct?
12    A.  Yes.
13    Q.  And specifically a type of fact witness known as a summary
14    witness; right?
15    A.  Correct.
16    Q.  You're here to testify as to a summary of the bank records
17    that you reviewed in this case; right?
18    A.  Yes.
19    Q.  And as to things you drew from those bank records through
20    your five senses; is that fair?
21    A.  Yes.
22    Q.  Okay.  Before we talk about your actual involvement in the
23    case -- and I see my whiteboard is falling down a bit -- I want
24    to just go over some of your experience as a forensic
25    accountant.  Okay?
```

```
 1   A.   Okay.
 2   Q.   We reviewed -- or you reviewed a number of financial
 3   statements, they're called, with the Government attorney;
 4   correct?
 5   A.   I don't know what you call a financial statement but
 6   I reviewed whatever records I have reviewed with the
 7   Government.
 8   Q.   So we've reviewed balance sheets from the QuickBooks;
 9   right?
10   A.   They're not multiples of them, but, I mean, yes.
11   Q.   A balance sheet at least; right?
12   A.   Yes.
13   Q.   A profit and loss statement?
14   A.   Yes.
15   Q.   And then a cash flow analysis?
16   A.   I don't believe -- the cash flow analysis was our cash
17   reconstruction, if that's what you're referring to.
18   Q.   It is, sir.
19   A.   Okay.  Yes, sir.
20   Q.   And you would refer to as a cash flow analysis; right?
21   A.   We can call it that.  It's a reconstruction of cash inflows
22   and cash outflows.
23   Q.   Okay.  I would like to just briefly summarize for the
24   jury -- I know there are some people with a finance
25   background -- but what each of those statements are and what
```

1   are they're not.  Okay?

2   A.   Okay.

3   Q.   Let's start with balance sheets.  Can you describe for the

4   jury what a balance sheet is?

5   A.   Sure.  A balance sheet is summarization of the assets and

6   liabilities of an entity.  It will show you in a more

7   compressed form what are the assets an entity owns:  Fixed

8   assets, current assets, other assets.  And it will show you

9   what are the obligations of an entity, like bank debt, any

10  debt, equity invested by principals, regular liabilities,

11  accounts payable, not paid and owed to vendors.  And I'm giving

12  a few examples.  And it is the product of the accounting

13  records of an entity which is summarized in one document as

14  compared to giving a massive amount of detail.

15  Q.   So I believe you said all assets and liabilities; correct?

16  A.   Yes.

17  Q.   And it's a snapshot in time; is that right?

18  A.   That's a good word.  It's a snapshot at a particular moment

19  in time.

20  Q.   Can you still see that, sir?

21  A.   I can.

22  Q.   Okay.  Now, a balance sheet is going to include everything

23  that a company has on its books at a given time; right?

24  A.   It should.

25  Q.   All cash reserves?

```
 1   A.   Yes.

 2   Q.   All physical assets?

 3   A.   Yes.

 4   Q.   All retained earnings?

 5   A.   Yes.

 6   Q.   Deferred revenue?

 7   A.   Yes.

 8   Q.   Accounts receivable and accounts payable?

 9   A.   Yes.

10   Q.   And notes payable as well?

11   A.   Yes.

12   Q.   We're not going to draw an example of it.  Let's move on to

13   profit and loss statements.  Okay?

14   A.   Yes.

15   Q.   Those are commonly referred to in your industry as a P&L;

16   is that right?

17   A.   Abbreviated, yes.

18   Q.   Well, it will save me some time, I don't have to write out

19   the whole thing.

20   A.   Good by me.

21   Q.   P&L.  Can you describe for the jury what a profit and loss

22   statement is, please?

23   A.   A profit and loss statement will show you the revenues

24   derived by an entity from its business, from its customers, if

25   you will, and it will show you what are the costs and expenses
```

1    to generate those revenues.  And it could be direct expenses

2    which results in gross profit and then it could be all the

3    overhead and business carrying costs, operating costs which are

4    deducted from it, and then the net of that revenues minus all

5    expenditures is what is called a profit or a loss, depending on

6    if it is positive or negative.

7        Now, it's important to know that you can have profit and

8    loss accounts which are -- not to confuse counsel, can be cash

9    basis.  They can be accrual basis.  So an accrual basis P&L is

10   one where you take in revenue as you bill it, even if you have

11   not collected it.  To simplify it.  And you provide for the

12   expenditures to generate that revenue even if you have not paid

13   for it.  And if you haven't, that becomes a liability.  That's

14   an accrual basis profit and loss account as simply as I can put

15   it.

16   Q.  Understood.  And for both a cash-basis and an accrual-basis

17   P&L statement we're not looking at a moment in time; right?

18   A.  It is all for a period of time.

19   Q.  It's for a period of time.  And I already wrote down "all

20   revenue and expenses"; is that accurate?

21   A.  Yes.

22   Q.  Okay.  Now, we must be on the same wavelength because you

23   mentioned "operator expenses"; right?

24   A.  Yes.

25   Q.  The next thing I want to discuss the difference between --

```
 1   well, let's focus on this.  The purpose of a profit and loss

 2   statement is to assess the profitability of a company; right?

 3   A.   Yes.

 4   Q.   And that's why it includes only operating expenses and not

 5   capital expenses; right?

 6   A.   Correct.

 7   Q.   Okay.

 8        So I wrote down "only operating expenses" and now I'm

 9   writing "purpose is profitability"; is that fair?

10   A.   Yes, sir.

11   Q.   Thank you.  Let's move on to expenses.

12        You drew a distinction between operating expenses and other

13   expenses, and I would like to focus on capital expenses.  All

14   right?

15   A.   Okay.

16   Q.   In your industry, capital expenses are usually referred to

17   as CapEx; right?

18   A.   Yes.

19   Q.   And operating expenses are OpEx?

20   A.   You can call it that.

21   Q.   Is there another shorthand?  I'm trying to save my wrist.

22   A.   Op expenses.

23   Q.   Okay.  Can you describe for the jury what the difference is

24   between an operating expense and a capital expense?

25   A.   An operating expense is a cost incurred specifically to
```

1    earn a revenue.  So, of course, there are the basic overhead

2    type expenses -- rent, fees, utilities, bills, et cetera, is

3    the cost of material, if you are manufacturing, which -- and

4    facility costs of any form or nature would be an operating

5    expense, as a few examples.

6        A CapEx, as you called it, would be a cash outlay for a

7    capital expenditure, for example, to purchase an asset which

8    can be -- which will provide you benefits over the life of the

9    asset.  So if you purchase a machine, it may provide you the

10   production benefits for five years.

11       So it's not an item that you expense in a small period of

12   time.  You effectively spread it in different ways or amortize

13   it over a period of time of its lifespan.

14   Q.   And we talked about how capital expenses wouldn't appear on

15   a profit and loss statement; right?

16   A.   They would not, other than in the context after

17   depreciation or amortization of some fashion.

18   Q.   If a capital expense appears on a P&L, it has to be

19   depreciated or amortized over its useful life; right?

20   A.   The part that appears on a P&L is the amortized portion for

21   that period.

22   Q.   Okay.  Let's go through some examples.

23       You listed machines?

24   A.   Yes.

25   Q.   Real property?

1    A.   Yes.

2    Q.   If you purchase a company, that would be a capital expense?

3    A.   Well, if you purchase a company, it depends on how you

4    purchase it.

5    Q.   Okay.

6    A.   If you don't want to complicate it, you can purchase stock.

7    Q.   If you purchase --

8    A.   As an investment in a company, you know --

9    Q.   Sure.

10    A.   -- you could purchase assets, and then you would record the

11    assets.  There are different accounting concepts that come into

12    play.

13    Q.   So let's talk about purchasing a privately owned company.

14    Let's say you're buying 50 percent of the equity of that

15    company.  That would be a capital expense; right?

16    A.   It would not be an expense or it will not be an outlay that

17    goes to a P&L account; it would be an investment shown on your

18    balance sheet.

19    Q.   Okay.  And that was actually where I have going next.

20        If you purchase an asset, the price you pay for that asset

21    is going to be amortized on the P&L; right?

22    A.   Yes.

23    Q.   But the value of the asset will immediately appear on the

24    balance sheet?

25    A.   At that point, it add cost value or historic costs that you

1    pay for it.

2    Q.   And operating expenses -- let's list a few examples.

3         Let's imagine a trucking company.  An operating expense

4    would be fuel and maintenance; right?

5    A.   Yes.

6    Q.   That are required to operate the fleet?

7    A.   Correct.

8    Q.   It would be the salary of the dispatchers that are booking

9    loads for the trucks?

10   A.   Yes.

11        MR. VAN DYKE:  And just for the record, Your Honor, I'm

12   going to mark the flip chart Defense Demonstrative A.

13        THE COURT:  You let me know when you want to put it in,

14   sir.

15        MR. VAN DYKE:  Thank you.

16   BY MR. VAN DYKE:

17   Q.   Last one, let's talk about cash flow statements and then

18   we'll get to your work on this case.  What is a "cash flow

19   statement"?  Can you describe it to the jury, please?

20   A.   A cash flow statement is intended to show how much cash an

21   enterprise generated from cash inflows netted against cash

22   outflows.

23   Q.   When you're conducting a cash flow analysis, you're looking

24   at all of the cash inflows?

25   A.   Yes.

```
 1    Q.   And all of the cash outflows?

 2    A.   That's the way it should be, yes.

 3    Q.   And that's the way it should be.

 4         And the purpose of a cash flow analysis is to assess

 5    liquidity; right?

 6    A.   Yes.

 7    Q.   It's not to assess profitability?

 8    A.   Correct.

 9    Q.   And it's not to assess the financial state of a company at

10    a particular moment in time?

11    A.   It can be a contributing factor to the financial state of

12    the company.

13    Q.   But it's not the primary purpose of a cash flow statement;

14    is that fair?

15    A.   Well, I don't think I can corner myself that way.

16    Q.   Okay.  That's fine.

17    A.   Yep.

18    Q.   So I wrote "all cash inflows" and "all cash outflows" and

19    then "purpose is to assess liquidity"; right?

20    A.   Yes, sir.

21    Q.   Thank you.  All right.  Let's go to the beginning of your

22    involvement in this case.

23         You would agree with me, sir, that other than the

24    QuickBooks, everything that you reviewed with the Government

25    attorneys are documents you prepared for this case; right?
```

```
 1   A.   When they were summarized, yes.

 2   Q.   Thank you.

 3        When you first got involved in this case, it was around

 4   June 23rd, 2023; right?

 5   A.   That sounds right.

 6   Q.   And that's when Paul Lopez and Jennifer Wahba, the new

 7   managers, hired you to be a forensic accountant; right?

 8   A.   Yes.

 9   Q.   Soon after you were hired, you -- or Paul Lopez, in

10   consultation with you, made the decision to shut down RBL's

11   trucking operations; is that fair?

12   A.   All I know is he decided to shut the operation down.

13   I don't know that -- if it's important to you whether it was in

14   consultation with me, I mean, we provided him what data he

15   wanted, and he had to make an independent decision.

16   Q.   Okay.

17   A.   If you design around the words of "in consultation with

18   me," I'm not sure I can agree with you.

19   Q.   The words are not that important.

20        Soon after you were hired, Paul Lopez made the decision to

21   shut down RBL's trucking operations; correct?

22   A.   That's my understanding, yes.

23   Q.   Okay.  When you provided this data to Paul Lopez and

24   Jennifer, all I had access to were RBL's QuickBooks; correct?

25   A.   In the first two -- yes, that's correct.  In the first two
```

1    or three days, that's all we had.

2    Q.  So just to be clear:  The summary exhibits that you

3    reviewed with the Government were not available to you; right?

4    A.  The summary exhibits -- the summary exhibits that we

5    prepared, based on the massive cash reconstruction, were not

6    available in those few days.  They were -- that's the effort of

7    a long many hours, if you will, and effort, yes.

8    Q.  And that cash reconstruction also wasn't available to you;

9    is that fair?

10   A.  Well, the cash reconstructs is what we're talking about --

11   to get to the summary exhibits.

12   Q.  Correct.  And in those first few days, after Mr. Lopez

13   hired you, you did not have the cash reconstruction?  That's

14   all I'm asking.

15   A.  That's correct.

16   Q.  Thank you, sir.

17        MR. VAN DYKE:  Could we pull up 119-50, please?  It's

18   already in evidence.

19        THE COURT:  Yes, sir.

20   BY MR. VAN DYKE:

21   Q.  Now, I want to kind of take the jury into the

22   decision-making that was made in -- around June 23rd, 2023, or

23   at least what you were able to see.  All right, sir?

24   A.  Okay.

25   Q.  You would agree with me that those QuickBooks are, on their

1   face, incomplete; correct?

2   A.   I know that -- I do know that the company stopped -- ceased

3   to keep the QuickBooks records current from the -- almost early

4   part of January 2023 or the year 2023.

5   Q.   And that's what I mean when I say "incomplete."  It's

6   missing data for six months, essentially?

7   A.   Yes.

8   Q.   And you were aware that these QuickBooks were incomplete on

9   June 23rd, 2023; correct?

10  A.   Excuse me.  I was aware -- I had become aware that there

11  was no activity being recorded in the first several months of

12  the year.

13  Q.   Okay.  You would also agree with me that there are pretty

14  noticeable errors in the QuickBooks; is that fair?

15  A.   I don't know whether it's error or not.  You would have to

16  point me to the errors, and I can tell you what I may believe

17  it to be.

18  Q.   Sure.

19       MR. VAN DYKE:  Can we scroll down to -- can we go left

20  on payroll general?  Or actually -- sorry, not all the way

21  left.

22  BY MR. VAN DYKE:

23  Q.   So we can see that for -- just to use a few examples,

24  January 2021 and February 2021, there's no payroll entered;

25  correct?

1              MR. CRUZ:  Sorry, what exhibit?

2              MR. VAN DYKE:  119-50.

3    A.   I'm looking at this exhibit you put forth and there are --

4    there's no data populated from November 2020 to February 2021

5    on general payroll.

6    BY MR. VAN DYKE:

7    Q.   And as you testified on direct, you later got access to

8    RBL's payroll records and you were able to learn that they

9    were, in fact, paying payroll during those months; right?

10   A.   Well, we did not -- let me try and clarify my response.

11        We looked at payroll records not to start testing who

12   they're paying and what the payroll is.  We look at them

13   secondarily as ancillary information available to us.  It

14   wasn't the purpose to start testing if they're recording their

15   payroll in each month or not.  Because at that point, that was

16   totally irrelevant to us.

17   Q.   Okay.  Again, my question is actually just you would agree

18   with me that RBL was paying payroll during those months despite

19   the fact that it's not reflected on the QuickBooks?

20   A.   Well, I can agree that employees were working on the

21   presumption that they were getting paid.  I can't agree with

22   you as to when they were being paid.  It was conceivable that

23   RBL did not record the payroll in those months, but I don't

24   know.  As I said the QuickBooks records were whatever they were

25   as recorded by RBL's pre-change management, if you will, the

```
 1    prior management.

 2    Q.   Sure.

 3    A.   It's their records, it's their data and it is facially what

 4    it is.

 5    Q.   Understood.

 6    A.   If you're telling me they recorded it incorrectly, I have

 7    no basis to argue or not argue with you.

 8    Q.   Okay.  Thank you, sir.

 9         Again, the QuickBooks are missing data for those months;

10    right?

11         MR. CRUZ:  Objection, Your Honor.  Asked and answered.

12         THE COURT:  Overruled.  I'll allow it.

13    BY MR. VAN DYKE:

14    Q.   Just the QuickBooks -- QuickBooks is missing data?

15    A.   Well, you see that's where -- I'm not saying I disagree

16    with you.  The point I just made is I don't want my testimony

17    to be misconstrued.  I said to you that it is conceivable that

18    they didn't record it in the right month.

19         Yes, there are blanks in those months.  The data is not

20    populated.  It could be because they didn't record it, or it

21    could be because it's recorded in different months or different

22    line items.  It may be categorized differently.  There can be

23    multiple reasons for it.

24    Q.   Perfect.  We talked about different line items.

25         MR. VAN DYKE:  Can you go down to the "ask my
```

1  accountant" line, please?

2  BY MR. VAN DYKE:

3  Q.  Now, you see that there's about $3.5 million of entries in

4  the "Ask My Accountant line?

5  A.  Yes, sir.

6  Q.  What you learned, not on June 23rd but later on, is that

7  RBL, under what you called the pre-new managers, had hired an

8  accounting firm to help organize the QuickBooks; right?

9  A.  Well, what I do know is they had an outside accounting firm

10  retained to do their tax returns, et cetera, and whatever other

11  services they were looking to get from them.  That's what I

12  know, they had an outside independent accounting firm.

13  Q.  And you also know that that outside accounting firm had

14  access to their QuickBooks system; right?

15  A.  I understood that to be the case later, yes.

16  Q.  Okay.  And that outside accounting firm had the ability to

17  recategorize certain entries as assets, liabilities, or even

18  expenses, as you pointed out?

19  A.  They had access to the QuickBooks records online and had

20  the -- I guess the ability to recategorize or reclassify data,

21  yes.

22  Q.  And you learned that those outside accountants had made

23  around 13,000 entries between January 2023 and June 2023;

24  right?

25  A.  To be specific, all I know is they had access to it and

1    they made, I don't know, I'll just call it many entries.  Do I

2    have a number on it?  I do not.

3    Q.   Okay.  That's fine.  And you know that those entries were

4    all retrospective; right?

5    A.   I assume they covered that period of time.

6    Q.   Perfect.

7    A.   Which is pre-June 2023.

8    Q.   Okay.  Would you agree with me, sir, that due to the

9    incompleteness and inaccuracy of the QuickBooks, they are, on

10   their face, unreliable?

11   A.   The way you pose the question, I'm not agreeing to anything

12   whether they were inaccurate, et cetera, whatever words you

13   used in your question.  And I'm not being asked to opine on the

14   reliability or unreliability of the historic books.

15        And the reason is my scope of my work for my client was to

16   understand the entire universe of cash flows, and as I said to

17   you, what these QuickBooks ultimately did, et cetera, was quite

18   irrelevant to what I was doing for the new management.

19   Q.   Okay.  Who's Kevin McCoy, sir?

20   A.   Kevin McCoy is a partner in my firm.

21   Q.   And is he here in the courtroom today?

22   A.   He is.

23   Q.   Can you point him out for me with an article of clothing?

24   A.   If you can stand up, Mr. McCoy.  That's Mr. McCoy.

25              THE COURT:  The record will so reflect that he

```
 1    identified a gentleman in the gallery.

 2    BY MR. VAN DYKE:

 3    Q.   So he's a partner at your firm; right?

 4    A.   Yes, sir.

 5    Q.   And he worked with you on this case?

 6    A.   He did.

 7    Q.   And he did a lot of work on the bank reconstruction; is

 8    that fair?

 9    A.   He and some of the members of my firm, yes.

10          MR. VAN DYKE:  Could I have the HDMI just for the

11    witness, please?  Could I have AG-42 just for the witness and

12    the Government, please?  Please scroll down.  And could you

13    actually go up to get the date for the witness.

14    BY MR. VAN DYKE:

15    Q.   You see the email is written on October 14th?

16    A.   I'm sorry.

17    Q.   Bottom of the page.

18    A.   Yes.

19    Q.   You're cc'd on this mail; correct?

20    A.   I am.

21    Q.   Please go down to the next page.  On October 14th,

22    Mr. McCoy wrote, "Irrespective of the dates, the data within

23    the QuickBook P&Ls is" --

24          MR. CRUZ:  Objection, Your Honor.  Hearsay.

25          MR. VAN DYKE:  It's for impeachment, Your Honor.
```

```
 1              THE COURT:  Just one moment.

 2              You're just asking questions about the second page,

 3     sir?

 4              MR. VAN DYKE:  Just one statement for impeachment

 5     purposes.  I'm not seeking to introduce this, Your Honor.

 6              THE COURT:  So if it's for impeachment, let him read it

 7     and then ask him questions that properly impeach.

 8              MR. VAN DYKE:  Okay.

 9     BY MR. VAN DYKE:

10     Q.   "Irrespective of the dates, the data within the QB P&Ls is

11     unreliability and misleading due to the classification of

12     expenses."

13          Did I read that right?

14     A.   I read the sentence, yes.

15     Q.   Okay.  Would you agree with Mr. McCoy that irrespective of

16     the dates, the data within the QB P&Ls is unreliable and

17     misleading due to the classification of expenses?

18     A.   I think that merely questions the classification of

19     expenses from a categorization point of view.

20     Q.   Okay.

21     A.   That's my view of it.

22     Q.   You would disagree that they are unreliable and misleading?

23     A.   I don't think one can conclude.  I'm not trying to say

24     they're reliable, I'm just saying to you that they are -- it's

25     questionable whether one can make that conclusion, and as I
```

 1    said to you, for the scope of my work for the new management,

 2    you know, I wasn't relying on these QuickBooks in any

 3    meaningful way to reconstruct the cash flows.

 4    Q.   Correct.  But as you've testified, reconstructing the cash

 5    flows came after the decision to shut down the business; right?

 6    A.   That is correct.

 7    Q.   Thank you, sir.

 8         Let's talk about what else was known and unknown on

 9    June 23rd, okay?  Would it be fair to say that you didn't have

10    a full picture of RBL's assets on that day?

11    A.   What would be fair to say is the only picture we had of the

12    assets in those two or three days was based on the QuickBooks

13    records and I would say whatever the receiver knew and to the

14    extent we had any conversations.

15         MR. VAN DYKE:  Could we sidebar very briefly,

16    Your Honor?

17         THE COURT:  Sure.  We can sidebar.  First stretch break

18    of the week.  I'll see you in a minute.

19         (The preceding proceedings were had before the Court and

20         out of the hearing of the jury.)

21         THE COURT:  Yes, sir.

22         MR. VAN DYKE:  So I just wanted to state for the record

23    I think he was reactive, I don't think it was intentional, but

24    he did say "receiver."

25         THE COURT:  That's okay.  Do you want an instruction?

 1          MR. VAN DYKE:  We don't want an instruction at this

 2    time.

 3          THE COURT:  You're just going to let it go?  because

 4    you would be entitled to if you want it and only if you want

 5    it, something to explain after a break and we all vetted,

 6    something like how the receiver, manager, CEO, can you yourself

 7    introduce a time period of when the company was shut down.  I

 8    could give you something like that if you guys wanted that

 9    because as the Court has said, the receiver in this context

10    does not have the kind of connotations.  So if you wanted

11    that -- you don't have to answer me now.  You can answer me

12    maybe at the break, and I could instruct, but at this time, I

13    see that you don't want such an instruction.

14          MR. VAN DYKE:  No.  I just wanted to put it on the

15    record, and I think it was inadvert to his credit.

16          THE COURT:  That's why you have the Court's permission

17    to lead, if you want, on those kinds of terms, but I think he's

18    done a remarkable job for two hours but there may be other

19    slips.  So I appreciate that, Mr. Van Dyke.

20          MS. BECKER:  My only request would be if there's

21    another slip, that we excuse the jury so we can then

22    re-advise --

23          THE COURT:  And think about an instruction.

24          MS. BECKER:  Or re-admonish and let him know he needs

25    to be careful, just as a reminder.  I don't think we're there

1    yet.

2         MR. CRUZ:  I echo your statement.  I believe he caught

3    himself and he shook his head acknowledging he made the

4    mistake, the witness did.

5         THE COURT:  I saw it too.  Thank you.

6         MR. VAN DYKE:  Thank you, Your Honor.

7         (The preceding proceedings were had before the Court and

8         out of the hearing of the venire.)

9    BY MR. VAN DYKE:

10   Q.  Mr. Kapila, we talked about having the full picture of

11   RBL's assets on June 23rd; right?

12   A.  Yes, sir.

13   Q.  You have since learned that there were a number of assets

14   that were acquired in that kind of January to June period that

15   are not reflected on the QuickBooks; is that fair?

16   A.  I don't know where that statement is coming from.  I don't

17   recall that came up.

18   Q.  No, no, no.  I'm just asking you if you're aware.

19   A.  Okay.  If you can ask the question again, please.

20   Q.  Sure.  You're aware that RBL had purchased a number of

21   assets before June 2023 that were not reflected on the

22   QuickBooks?

23   A.  I don't know that.

24   Q.  Well, you later became aware that RBL had purchased a

25   property in Pompano, Florida; correct?

1   A.   I learned that after coming on board.

2   Q.   You learned that RBL had a number of liquid cash assets on

3   hand?

4   A.   Liquid, yes.

5   Q.   You learned that RBL had multiple properties in Lubbock,

6   Texas?

7   A.   I learned that much later and that they had some property

8   in Lubbock, Texas.

9   Q.   Okay.  You learned that RBL had purchased a stake in a

10  flight school?

11  A.   I learned that much later.

12  Q.   You learned that RBL had purchased a stake in an airline?

13  A.   I don't recall that, yeah.

14  Q.   Okay.  And you learned later as well -- and I want to be

15  clear, I'm just talking about the distinction between what was

16  known on June 23rd and what was learned later.  All right?

17  A.   Yes.

18  Q.   You had also learned that RBL had purchased a number of

19  trailers that were in the process of being delivered; right?

20  A.   I don't know that I actually learned that and I don't know

21  if there were trailers delivered and I don't know that they

22  actually bought the trailers or built them.

23  Q.   Okay.  But you did learn that there were trailers in the

24  process of being delivered at least?

25  A.   No, I don't know that.

1   Q.   Okay.

2   A.   I have no personal knowledge of that.

3   Q.   Would it be fair to say that because the QuickBooks were

4   incomplete, you did not have a complete picture of RBL's cash

5   flow or income for the preceding months before June 23rd, 2023?

6   A.   The part I can agree with is I did not have the picture of

7   the cash flows because my cash reconstruction was giving me the

8   most accurate and concrete picture of the cash inflows and cash

9   outflows.  And the books themselves, the QuickBooks, by their

10   own statement, were labeled as being accrual basis.  When we

11   exported information from it, it said at the bottom, not by us,

12   that it's accrual basis.

13   Q.   Okay.  So again, the cash reconstruction came after

14   June 23rd; right?

15   A.   Yes.

16   Q.   So as of June 23rd, you did not have a complete picture of

17   RBL's cash flow; fair?

18   A.   Well, the only picture I had was what was in the

19   QuickBooks.

20   Q.   And that was incomplete; right, sir?

21   A.   I did not agree on that.  I think we went through that in a

22   few questions.

23   Q.   Okay.  Is it your testimony that the QuickBooks portrayed a

24   complete picture of RBL's cash flow for the preceding months?

25   A.   That's not my testimony either.  I don't want any my

1   statements to be misconstrued.

2       As I said to you, I do not have a basis to tell you whether

3   they were accurate or inaccurate.  They were the books of RBL.

4   They were the books maintained by the old management, if I can

5   call it that, prior to the June change of RBL.

6       So I take them at face value for what they show, right,

7   wrong, or indifferent, and what became more important was the

8   precise cash inflows and outflows which we undertook an

9   analysis of after June.

10  Q.  Just to use a very easy example, you described a quarter as

11  the first three months of the year, right, or any three-month

12  segment of the year; right?

13  A.  Any three-month segment.

14  Q.  Quarter one 2023, the QuickBooks show no cash inflows;

15  right?

16  A.  I think you're right.  It's almost zero, if nothing else,

17  yes.

18  Q.  And your cash reconstruction showed an inflow; right?

19  A.  I think it showed inflow all the way through, yes.

20  Q.  So the QuickBooks as compared to the cash reconstruction

21  contained less data; right?

22  A.  In the sense that if they didn't classify where it should

23  be, it would be classified somewhere else.  But we all agreed,

24  I think, that in the early part of 2023 they stopped recording

25  the transactions.  So I will agree with you that the QuickBooks

1   was incomplete for the first five months or six months of 2023,

2   but that's a different issue than saying the QuickBooks were

3   reliable or unreliable overall.

4   Q.   No, no, I understand.  I moved on from the liability.

5   A.   Excuse me.  My apologies.

6   Q.   No worries at all.  I'm just talking about completeness at

7   this time.

8   A.   Okay.

9   Q.   All right.  Let's talk about what was known and not known

10  on June 23rd.

11      You didn't know how many trucks RBL had in its fleet; is

12  that fair?

13  A.   Not when I came on board, I did not.  Correct.

14  Q.   You didn't know how many trucks RBL was in the process of

15  picking up?

16  A.   That's correct.  I frankly didn't consider that relevant to

17  the scope of my work.  I -- the management's job.

18  Q.   Okay.

19  A.   Yeah.

20  Q.   You have since learned that on June 23rd, RBL had already

21  paid for, but had not yet picked up, a number of tractor

22  trailers to add to its fleet; right?

23  A.   I don't know that for a fact.  I didn't know it then, and I

24  don't know today.

25          MR. VAN DYKE:  Could we pull up what has already been

 1   admitted as Defense Exhibit S-1, please?  And could we scroll

 2   down?  Stop there.

 3   BY MR. VAN DYKE:

 4   Q.   Do you see that the heading says "Approval accepted truck

 5   locked"?

 6   A.   Yes.

 7   Q.   And there's an Approval Value column; it's column F?

 8   A.   Yes, sir.

 9        MR. VAN DYKE:  Could you scroll to the right, please?

10   BY MR. VAN DYKE:

11   Q.   Then it says Deposit Ready Column I?

12   A.   It says that.

13        MR. VAN DYKE:  And then let's go to column -- what

14   comes after K -- L, please.

15   BY MR. VAN DYKE:

16   Q.   And it says "approval accepted, maximum approval accepted"

17   on each of those entries.  Do you see that?

18   A.   Yes.

19   Q.   And I believe the line items are 66 through 84.

20        MR. VAN DYKE:  Could you go up just one little bit?

21   BY MR. VAN DYKE:

22   Q.   Do you see 66 is the first line entry in this section?

23   A.   Yes.

24   Q.   84 is the last line entry?

25   A.   Yes, sir.

1    Q.   So these are 18 trucks for which down payments were already

2    made and approvals already written that were about to be added

3    to RBL's fleet?

4    A.   I'm at a loss because I don't know what document I'm

5    looking at other than what you put on the screen.  If you can

6    educate me on that, then I may give context.

7         It may be a document I've never looked at.  I can read

8    English and agree with you.  I can't agree to the accuracy to

9    the content of document because I may not know nothing about

10   it.

11   Q.   Understood.  You never looked at how many trucks were about

12   to get picked up; you said it wasn't relevant to your analysis;

13   right?

14   A.   It wasn't relevant to what I was doing on the cash flow

15   analysis, yes.

16   Q.   We're focusing on June 23rd, 2023; right?

17   A.   Okay.

18   Q.   As to this wasn't relevant to the work you were doing on

19   June 23rd, 2023?

20   A.   The new management was focusing on what they had in assets

21   or not had in assets at that time.

22   Q.   And we've already talked about the assets that you weren't

23   aware of on June 23rd, and now we're talking about potential

24   revenue as well; right?

25   A.   We could be.  I don't think you touched on it yet.

1    Q.   Okay.  Let's talk about what you knew about RBL's debt

2    obligations on June 23rd, 2023.  Okay?

3    A.   Okay.

4         MR. VAN DYKE:  Could we pull up what's already been

5    admitted as Government's Summary Exhibit 119-23, please?

6    BY MR. VAN DYKE:

7    Q.   You testified as to a -- like about a $50 million figure

8    that RBL owed investors; correct?

9    A.   Yeah, I think it was about 53 million, but we can look at

10   it if you want.

11        Oh, there it says.  Yes, sir.

12   Q.   About 53 million.  Now this was a product of the cash

13   reconstruction; right?

14   A.   Yes, sir.

15   Q.   Were you aware of what RBL's debt obligations were on

16   June -- June 23rd, 2023?

17        MR. VAN DYKE:  It's already in evidence.

18        Can we publish to the jury, Your Honor?

19        THE COURT:  Thank you, sir.  You can publish.

20   BY MR. VAN DYKE:

21   Q.   So my question is just -- did you have this data available

22   to you on June 23rd, 2023?

23   A.   No, sir.

24   Q.   Okay.  You stated on direct examination that you've

25   reviewed investor contracts in the course of your work as a

```
 1   forensic accountant; correct?
 2   A.  Not 100 percent, but yes.
 3   Q.  A sampling?
 4   A.  Yes.
 5   Q.  And you understand there were long-term trucking contracts;
 6   right?
 7   A.  There were.
 8   Q.  And then there were short-term contracts as well?
 9   A.  Yeah they were called short-term loans, and they are loans,
10   which I don't know if they're labeled, but they were not
11   short-term loans.
12   Q.  Okay.
13   A.  Okay.  And then there were -- I'll call them truck leasing
14   programs.  Then there was the trailer building program.  And
15   there was a real estate program of some kind.  I think that
16   encompasses the universe.  If I missed one, you'd tell me.
17   Q.  That's perfectly fine.
18       I want to talk about the general structure of investor
19   contracts or loan contracts, whatever we want to call them.
20   The short-term contracts have a maturity date that was either
21   three, six or nine months, right, as best you can recall?
22   A.  I don't know why I thought it was less than nine months,
23   but it is whatever the contract says.  I thought it was three,
24   six, 90-days type of thing, but I could be wrong.
25   Q.  Okay.  And those would be paid out kind of at the end of
```

1   the maturity period of loan; right?

2   A.   That's my recollection.

3   Q.   Okay.   The trucking contract was different; is that fair?

4   A.   They were different.

5   Q.   The trucking contract, the investor would provide a down

6   payment to RBL; right?

7   A.   Yes.   And again, we would pull the documents, and I'm

8   trying to remember if that was one where they said the down

9   payment was nonrefundable.

10  Q.   I don't remember if it says nonrefundable, but it involved

11  a down payment from the investor to RBL; right?

12  A.   Yes.

13  Q.   And then, in return, the investor would receive monthly

14  lease payments?

15  A.   That was the terms -- if it's the same contract we're

16  talking about, yes.

17  Q.   And that contract had a five-year maturity period of time;

18  right?

19  A.   I don't remember, but it had a longer maturity period.   If

20  we can pull one, we can look at it.

21  Q.   We will pull one in just a moment.   You know what, we can

22  do that for a moment.

23        MR. VAN DYKE:   Can we go to Government's Exhibit --

24  I think it's 3-4.   Can we scroll down a few pages -- up.   Right

25  there is good.

```
1    BY MR. VAN DYKE:

2    Q.  So under the section -- and again this is page 5 of what's

3    already been admitted as Government's Exhibit 3-4.  So you see

4    under "Start Up," you see it says:  "For this operating lease

5    agreement, you will need to pay us 55,000 to get your business

6    started"?

7    A.  Yes.

8            MR. VAN DYKE:  If we go down one more page.  Stop right

9    there.

10   BY MR. VAN DYKE:

11   Q.  Lease payment.  "We will pay lease payments to monthly

12   except for the month that we entered into this agreement and

13   the following months.  In total, we will pay you for a total of

14   fifty-eight payments, five years of payments minus the first

15   and second month"; right?

16   A.  Yes, sir.

17   Q.  So this contract had a five-year maturity date?

18   A.  Yes, sir.

19   Q.  And we talked about the 53 million that was owed to

20   investors as of June 23rd -- or June 21st, 2023; right?

21   A.  I would label it as that being what I call -- I think the

22   investor loss at that time, yes.

23   Q.  Your characterization is fine.

24       It was owed $53 million -- RBL owed investors $53 million

25   as of June 21st, 2023; right?
```

```
 1    A.   Based on a cash-in and cash-out basis, yes.

 2    Q.   At no time did you attempt to segregate the number of funds

 3    that were owed to long-term investors versus short-term

 4    investors; right?

 5    A.   That's correct.

 6    Q.   The 53 million was not due on June 21st.  You would agree

 7    with that?

 8    A.   Well, I don't know if I can agree with that.

 9    Q.   So the contract said a five-year maturity period?

10    A.   The presumption in that statement, Counsel, is that --

11    assuming all of it had to just -- to do with that five-year

12    contract, was we agreed there were short-term, there were non

13    short-term loans.  There was the program that you just

14    identified.

15    Q.   Of course.

16    A.   I can't remember the leasing program.  There was the fourth

17    program and fifth program, and the $53 million is /PWUPBD will

18    program amount for all the investment programs because

19    otherwise your presumption would be that each of the short-term

20    loans was satisfied.  We don't know that it was, so it could be

21    in that same loss.

22    Q.   It wasn't, actually.  We've heard testimony that it wasn't.

23         My point is --

24              MR. CRUZ:  Objection as to --

25              THE COURT:  Sustained as to that.
```

BY MR. VAN DYKE:

Q.   My point is simply that some of the loans were due on a monthly basis; right?

A.   Yes.

Q.   Five years into the future?

A.   Yes.

Q.   Some of the loans were due maybe the day after the new managers took over; right?

A.   Could be.

Q.   Maybe three months?

A.   Yes.

Q.   Maybe six months?

A.   Maybe.

Q.   Okay.  So the 50 million -- I'm not saying it was due in five years, but it was due on a rolling basis on the course of five years.  You would agree with that?

A.   I don't agree with that.  And here's why:  Again, the presumption is, it is theoretically possible that 30 million of it was due four months ago because don't forget the trajectory of the investment funds being raised was increasing, and if RBL was not honoring the terms of those investor contracts, those particular investment contracts, whether they were loans or non-loans were becoming due, and it is quite possible that they were due in, I don't know, January of 2023.

Q.   Of course.

 1   A.   So I think embedded in your question is the assumption that

 2   these were all still not due.

 3   Q.   Okay.

 4   A.   That's the point I'm making.

 5   Q.   No, no.  I'm not saying that at all.  I'm actually making a

 6   different point.

 7   A.   Sorry.

 8   Q.   If RBL signed up just one investor in June 2023 --

 9   A.   Yes.

10   Q.   -- to a trucking contract --

11   A.   Right.

12   Q.   -- his final payment would not be due until June 2028;

13   correct?

14   A.   The final one, yes.

15   Q.   Okay.

16   A.   Yes.

17   Q.   So it's fair to say that the 53 million was not all due on

18   June 21st?

19   A.   To the extent it has a number, which is as recent as let's

20   call it a week before to use your example.

21   Q.   Sure.

22   A.   Where a new contract was signed a week before, ten days

23   before new management came in.  And if you believe the contract

24   is genuine, okay, yes, the terms would imply that it will be

25   honored over a five-year term.

1    Q.   Okay.  Thank you, sir.

2         I want to talk about what goes into a going concern or

3    viability analysis.  Okay?

4    A.   Okay.

5    Q.   So you conducted a number of these throughout your career;

6    is that fair?

7    A.   I have.

8    Q.   Sorry?

9    A.   I have.

10   Q.   I'm sorry.  The mic cut out.

11        And the purpose of these analysis -- analyses is to see if

12   a business can continue operating; is that fair?

13   A.   If it can continue operating in the foreseeable future.

14   Q.   And usually it's either like thirteen weeks or a year for a

15   purports of going concern analysis; right?

16   A.   Usually.

17   Q.   If it can continue operating, the business is called a

18   going concern?

19   A.   Question.

20   Q.   And if it cannot, it's called a failing concern; right?

21   A.   It's just not a going concern, whatever label you put on

22   it, I mean.

23        THE COURT:  Mr. Van Dyke, let's take a sidebar on this.

24   One minute.

25

```
 1            (The preceding proceedings were had before the Court and

 2        out of the hearing of the jury.)

 3            THE COURT:  Okay.  In an abundance of caution, I wanted

 4    to interrupt before you got into a flow because maybe I am

 5    mishearing or misunderstanding.  But the initial questions

 6    sounded very much like you were getting into an area on a

 7    forward-looking basis that in the voir dire is ruled out and is

 8    ruled out with the defense's consent.  I wanted some sort of

 9    proffer, and I just want to know where we're going.

10            MR. VAN DYKE:  I thank you, Your Honor.  The defense's

11    concern is that he would have been conducting a forward-looking

12    analysis, which we're satisfied he's not.  He did not conduct

13    any forward-looking analysis.  I think I'm entitled to explore

14    that he did not, I'm just trying to establish that he did not.

15    I'm certainly not going to ask him to conduct one on the stand.

16            THE COURT:  Well, what I would wonder then is I don't

17    understand the setup as to why you are developing the kinds of

18    going-forward analyses, including two terms that you just had

19    him adduce from the stand, when you can clearly and quickly and

20    leadingly do what you did in voir dire, which is "I didn't do

21    it.  I did not do a going-forward anything."

22            What you're starting to get into now is, it sounds at

23    least initially, like a failure to do something, when in fact

24    you have stated on behalf of the defendant that you don't want

25    him doing anything like that in his testimony.  So again, I'm
```

```
1    putting it out there because if you start to get into what a

2    going concern is and a failing concern is and things

3    post-June 23rd that do not involve the bank records on

4    reconstruction, I think that you are running afoul of the voir

5    dire, and the way to not run afoul of it is to have him testify

6    like you asked him to testify in the voir dire.  So maybe I

7    just want to make sure that I'm being clear.

8            MR. VAN DYKE:  No -- and I appreciate the opportunity,

9    Your Honor.  I did absolutely intend to elicit there are

10   certain industry standards on how to assess a business as a

11   viable going concern and that he did not meet those standards

12   here.  It is our theory, as we have already proffered, the

13   decision to shut down RBL was hastily made and this just leads

14   into that theory of the case.

15           So I did intend to elicit that there are certain things

16   that you must do when conducting a going-concern analysis that

17   were not done here.  I don't think the Government should be

18   permitted to use the fact that he's a summary witness as both a

19   sword and a shield.  We should be entitled to explore what he

20   normally does when he does these analyses and that he did not

21   do it here.

22           THE COURT:  Okay.  So I'm going to do it one last time.

23   There were parts of that answer that you're entitled to.  You

24   did not do a forward-looking going-concern analysis, I think we

25   addressed and that is permitted.  To the extent that you go
```

1    beyond that, you are opening the door because he's going to

2    answer.  Then, if you start to go into things like "Well, did

3    you do a going-concern analysis, that's fine.  If you go beyond

4    that in terms of data and what he saw, it is completely within

5    the ken of this witness to say based on the cash that I saw and

6    the inflows and outflows that I saw that, it's not a full

7    going-concern analysis.  They only had six-week left.

8          Now, I'm not saying he would say that, but I'm

9    surprised that if you go beyond the voir dire of the very few

10   questions of what he did not do, you open the door.

11         MR. VAN DYKE:  Thank you, Your Honor.

12         MR. CRUZ:  Briefly, so that we're clear, I ordered the

13   transcript from the voir dire so that we would stay away from

14   this area, and I prepared the witness to not go there.

15         THE COURT:  Sure.

16         MR. CRUZ:  But when we talked about it, he said, "I can

17   go forward," and I said, "You can't."  So he understands his

18   limitations.  But if the door is opened, Judge, we'll address

19   it after.

20         THE COURT:  We'll see where Mr. Van Dyke does.

21         MR. CRUZ:  Yes, Judge.

22         THE COURT:  I think right now he has not gone over the

23   line.  And I think Mr. Van Dyke is right that he gets to

24   establish what he did not do, but there were some of your

25   questions that were becoming rather detailed.  And so I just

```
 1    wanted to make sure that you have the Court's guidance.

 2              MR. VAN DYKE:  I appreciate that.

 3          (The preceding proceedings were had before the Court and

 4       out of the hearing of the venire.)

 5              THE COURT:  Thank you for your patience.  We will

 6    continue with the cross-examination.

 7              MR. VAN DYKE:  Thank you, Your Honor.

 8    BY MR. VAN DYKE:

 9    Q.  Okay.  I want to jump back to June 23rd, 2023.  Okay?

10    A.  Yes, sir.

11    Q.  At that time when you had access to the QuickBooks, you did

12    not project -- you did not project RBL's revenue going forward;

13    correct?

14    A.  Correct.

15    Q.  You did not create any summary chart of their debt

16    obligations on a rolling basis?

17    A.  Correct.

18    Q.  Or a quarterly basis?

19    A.  You mean going forward; right?

20    Q.  Correct.

21    A.  Yes.

22    Q.  Thank you, sir.  Okay.

23        Let's discuss what you did kind of after June 23rd which

24    you described as a cash reconstruction or a bank

25    reconstruction; right?
```

```
1    A.  Yes, sir.

2    Q.  Okay.

3         MR. VAN DYKE:  Can we pull up 119-24?  And it's already

4    in evidence, Your Honor.  Permission to publish?

5         THE COURT:  Yes, sir.

6    BY MR. VAN DYKE:

7    Q.  So, again, this isn't the actual bank reconstruction;

8    correct?

9    A.  No, this is only a partial illustration of summarizing the

10   activity for insiders and related parties.  That's what you're

11   showing me.

12   Q.  Of course.  Yes, sir.

13        The actual bank reconstruction is like an Excel

14   spreadsheet; right?

15   A.  Well, the actual bank reconstruction is a pretty large

16   database, and, yes, it can be a spreadsheet.  But, I mean, it

17   is -- it's got 42,000 triggered transactions in it.  That is

18   the actual bank reconstruction.

19   Q.  Okay.  And this is just a kind of callout of particular

20   rows that are on the bank reconstruction; correct?

21   A.  Yes.

22   Q.  Okay.

23        MR. VAN DYKE:  Could we jump to 119-22?

24   BY MR. VAN DYKE:

25   Q.  And this again, same thing as 119-24; right?  This isn't
```

 1  the actual bank reconstruction?

 2  A.   This is a summary which is derived from that bank

 3  reconstruction.

 4  Q.   Perfect.  Thank you, sir.

 5       And this shows RBL operating at a loss for every month on

 6  this sheet; correct?

 7  A.   Quarter.

 8  Q.   For every quarter on this sheet.  Thank you, sir.

 9       It's operating at a loss on every one; right?

10  A.   Yes, sir.

11  Q.   Okay.  We already discussed -- I'm going to flip to the

12  page.  First of all, how would you describe this document in

13  terms of the financial statements that we've already reviewed?

14  A.   When you say financial statements we've reviewed, what are

15  you referring to?

16  Q.   Balance sheet, P&L for cash flow analysis.  How would you

17  describe 119-22?

18  A.   On the closest equivalent would be a cash basis P&L.

19  Q.   Cash basis P&L.  Okay.  You said the closest equivalent.

20  What make this different?

21  A.   Because this is cash basis.  It's not accrual basis.  When

22  I described the P&L account, you will recall me talking about

23  accrual basis P&Ls and drawing the basic explanation of what

24  that means.  And then when we did our work for the managers,

25  the new managers, we did a cash reconstruction and this exhibit

```
 1   we're looking at, 119-22, is a byproduct, if you want to call
 2   it, from that big cash reconstruction.
 3   Q.   Okay.  I want to talk to you about the difference between
 4   capital expenses and operating expenses.  All right?
 5   A.   Yes, sir.
 6   Q.   We've already --
 7             MR. CRUZ:  Counselor -- one moment, Your Honor.
 8             THE COURT:  Sure.
 9             MR. VAN DYKE:  Can I have the ELMO, please, Madam
10   Deputy?
11             THE COURT:  Can you see that, Mr. Kapila?
12             THE WITNESS:  Yes, sir.
13             THE COURT:  Just for the record, what's on the ELMO,
14   sir?
15             MR. VAN DYKE:  This is Government Exhibit 119-22 which
16   is already in evidence.
17             THE COURT:  Thank you, Mr. Van Dyke.  You can continue.
18   BY MR. VAN DYKE:
19   Q.   So you said the closest equivalent as to which financial
20   statement this is a cash-based P&L; correct?
21   A.   Yes.
22   Q.   And we already discussed the difference between capital
23   expenses and operating expenses; right?
24   A.   Yes, sir.
25   Q.   You've already testified that capital expenses don't belong
```

```
 1   on a P&L; right?
 2   A.   On an accrual basis P&L, correct.  And even on a P&L
 3   otherwise, yes.
 4   Q.   Thank you, sir.  Okay.
 5        Now, you have a line item here that is payroll, contract
 6   labor, and employee benefits; right?
 7   A.   Yes.
 8   Q.   Okay.  I'm going to highlight it.
 9        MR. VAN DYKE:  Just for the record, I highlighted
10   payroll, contract labor, and employee benefits under expenses
11   net.
12        THE COURT:  So noted.
13   BY MR. VAN DYKE:
14   Q.   What did you include -- so let's take a step back.  Strike
15   that question.
16        On the cash reconstruction you said that you categorized
17   certain expenses as -- or categorized them; right?
18   A.   Yes.
19   Q.   One of the categories was payroll, contract labor, and
20   employee benefits; right?
21   A.   Yes, sir.
22   Q.   Do you recall what you included in this section?
23   A.   It will be cash outflows which were labeled as related to
24   payroll personnel, any contract labor.  I hate to state the
25   obvious, but -- and any employee benefits that RBL was funding.
```

1    Q.   And these would be labeled by you; right?

2    A.   It would be categorized by me and my team, yes.

3    Q.   Perfect.  Okay.  I'm going to go page 3 of the exhibit and

4    under note two, you describe the categorization a bit; correct?

5    A.   Yes, sir.

6    Q.   And you list under operating expenses, Black Lion and its

7    affiliated entities; right?

8    A.   I do.

9    Q.   Okay.  What is your understanding of what services

10   Black Lion provided to RBL?

11   A.   Black Lion, to my understanding, was a company in India, if

12   I'm not mistaken.  I don't know what its purpose was other than

13   it was in India.  I'm trying to remember if it was a company

14   expressed as one that would handle the trailers or not in that

15   building but I don't know that as I sit here, concretely.

16   Q.   Okay.  If they were the company that are handling trailers,

17   you would agree that the trailer would be an asset for the

18   company; right?

19   A.   If one existed, yes.

20   Q.   Correct.  That would be a capital expense; right?

21   A.   Yes.

22   Q.   And based on your recollection, Black Lion was the company

23   that built trailers for RBL?

24   A.   As I said, I'm not 100 percent sure, but I'm talking from a

25   little bit of memory lapse, but I believe it was.

```
 1    Q.   Okay.  Expenses related to trailer manufacturing would be
 2    capital expenses; right?
 3    A.   To the extent they are the build outside of it.  Excuse me.
 4    When you say expenses, it can be an expense that is not
 5    capital.  All I'm saying is to the extent the outlays relate to
 6    the construction, if you want to call it, or the build up of
 7    the trailer, yes, that would be a capital expense.
 8    Q.   So an operating expense is a cost incurred to generate
 9    revenue.  That's the definition that you gave me; right?
10    A.   That's an operating expense.
11    Q.   Right.  And that would be like fuel and maintenance and
12    salary of the dispatchers.  Those are the examples we have
13    listed; right?
14    A.   Yes.
15    Q.   They are operating expenses because they're necessary to
16    operate the function of the company; right?
17    A.   Yes, sir.
18    Q.   Which you described on direct examination as a trucking and
19    logistics company?
20    A.   Yes.
21    Q.   A capital expense is a cash outlay to purchase an asset;
22    right?
23    A.   Yes.
24    Q.   If RBL paid a manufacturer to develop a trailer, that would
25    be a capital expense; right?
```

```
 1    A.   Yes.

 2    Q.   Thank you, sir.

 3         Are you aware that Black Lion was also involved in the

 4    purchase of an -- in the purchase of an airline with RBL?

 5    A.   As I sit here, I'm not aware of that, no, sir.

 6    Q.   But again, you included all payments to Black Lion as an

 7    operating expense on your cash-based P&L?

 8    A.   I beg to differ with you on how you're reading that

 9    exhibit.  As I said to you, the purpose was to trace cash

10    flows, inflows and outflows, and categorize them between

11    operational and nonoperational.

12         And it was our determination that unless you could

13    attribute or categorize a cash flow to -- I don't have that

14    sheet in front of me, which was investor-related, et cetera --

15    it would be labeled as an operating expense.  And to that

16    extent, yes, we did put it in operating expenses, outlays, cash

17    flows, yes.

18    Q.   All of the payments to Black Lion are listed there; right?

19    A.   I believe so, yes.

20    Q.   Despite the fact that Black Lion was involved in the

21    manufacturing of trailers?

22    A.   Yes.

23    Q.   Okay.  Black Lion was also involved in the purchase of an

24    airline; right?

25    A.   You told me that.  I don't know.
```

1    Q.   Would seeing -- did you ever know?

2    A.   As to Black Lion, no.   I mean, I'm aware -- you asked me

3    earlier today -- that there was some airline involved in

4    acquisition or whatever.   That's what all I know.

5        There was a company that was acquiring -- intended to

6    acquire an airline or an airplane.   I just don't recall it

7    precisely.

8    Q.   Let's go back to page 1 of 119-22, and I apologize it's a

9    little bit fuzzy.

10        Do you see how the numbers increase at about a steady rate

11    until Q4 2023, Q1 2023, and then Q2 2023, it almost doubles?

12    Do you see that, sir?

13    A.   I do.

14    Q.   You are aware that in late or late, middle 2023 is when RBL

15    and Black Lion entered into this contract to purchase the

16    airline?

17    A.   I'm not.   I just don't -- sit here, I don't know.   I wasn't

18    focused on that airline, no.

19    Q.   Okay.   Would seeing a copy of the remittances to Fly Big

20    refresh your recollection as to the amount of money that was

21    sent to Fly Big through Black Lion and RBL?

22    A.   Yes.

23        MR. VAN DYKE:   Could we have Government's exhibit -- or

24    excuse me.

25    ///

BY MR. VAN DYKE:

Q.   Is it your recollection, sir, that it was about
3.6 million?

          MR. CRUZ:   Objection, Your Honor.  He said lacks
personal knowledge.

          THE COURT:   Overruled.

A.   As I said to you, I don't have the recollection.  I thought
you were going to show me some documents.

BY MR. VAN DYKE:

Q.   Okay.  I'll show you the document, sir.  We can come back
to that in a moment.  I apologize for the technical
difficulties.

     Would you agree with me, sir, however, that the purchase of
an airline is not an operating expense for a trucking company;
right?

A.   That is true.  It would be classified as -- depending who
it was paid to, for the purchase of an airline.

Q.   -- okay.  You would also agree with me that purchasing a
truck is not an operating expense; right?

A.   Yes.

Q.   Thank you, sir.

     You see that there's a line item here listed as trucks,
trailers, and equipment?

A.   Yes.

Q.   That line item includes, in its categorization, the

```
 1    purchase of entire trucks; right?

 2    A.   It would, if it was known.  All I'm saying is anything

 3    which we could identify to be a truck, trailer and equipment,

 4    we would categorize into that line item.

 5    Q.   Despite the fact that we just agreed that would be a

 6    capital expense?

 7    A.   Well, yes.  That is correct.

 8    Q.   Thank you, sir.

 9    A.   I agree with you if they were actually acquiring the

10    trucks, yes.

11    Q.   Okay.  You are aware that RBL did own about eight to ten

12    trucks; right?

13    A.   Yes.

14    Q.   Okay.

15    A.   They owned some trucks.  I don't know how many, but yes.

16    Q.   And as you testified, you included the purchase of those

17    trucks in this line item; right?

18    A.   To the extent, I could tie up the cash to that transaction,

19    yes.

20    Q.   Despite the fact it's a capital expense?

21    A.   Yes.

22    Q.   The trick and trailers that are owned by RBL could have

23    been sold by RBL; correct?

24    A.   They could have been, yes.

25    Q.   Okay.  I want to talk about one more here.
```

1          Do you see the line item listed fuel, maintenance or --

2    I apologize, fuel and maintenance.  It's the second line item

3    on expenses net -- and I do apologize for the blurriness.

4          The second line item under expenses net?

5    A.   I see it.

6    Q.   You see that in Q2, 2020, the trucking revenue is $221,000;

7    right?

8    A.   Yes, sir.

9    Q.   And the fuel and maintenance cost is $24,000; right?

10   A.   I see it.

11   Q.   So about 10 percent of the trucking revenue; right?

12   A.   Mathematically, yes.

13   Q.   About.  I'm not going to hold you to it.

14         You see that over time the fuel and maintenance costs

15   increase in relation to trucking revenue?

16   A.   Yes.

17   Q.   In some months, I believe it actually even exceeds trucking

18   revenue?  Well maybe not, but it's close.

19         By the end of Q2, 2023, there's 1.9 million in fuel and

20   maintenance and 1.96 million in trucking revenue; right?

21   A.   Where are you?  You lost me.

22   Q.   I apologize, sir.  I'll just point.  Q2, 2023?

23   A.   2023, yes.

24   Q.   1.96 million?

25   A.   Yes, sir.

1    Q.   And 1.95 million?

2    A.   Yes, sir.

3    Q.   You are aware that RBL opened its investment program in

4    mid-2020; right?

5    A.   I don't know the precise date because they were changing

6    product -- they were adding products, if you will.

7    Q.   Sure.

8    A.   I can't remember as to what was the precise timing of

9    adding to the loan program with the other programs.

10   Q.   Okay.  So the cash outflow that's represented on this chart

11   includes the cash outflow for fuel and maintenance for newly

12   acquired trucks; is that fair?

13   A.   To the extent, they're on the road, you would assume so.

14   Q.   Okay.  So if a truck had just been purchased in Q2 2023, it

15   would not be on revenue yet for RBL.  You agree with me?

16   A.   Yes.

17   Q.   But the fuel and maintenance costs would be represented

18   here?

19   A.   I don't draw that correlation.  Either I misunderstood your

20   question -- if you're saying it is put into service in Q2 of

21   2023.  Is that what I heard?

22   Q.   If it was purchased in Q2.

23   A.   It was purchased in -- and not even put into service at

24   that time.

25   Q.   Well, it would be put into service after it was purchased

1    and registered; right?

2    A.  Yes.

3    Q.  You did not attempt to segregate the fuel and maintenance

4    costs in this line item between trucks that were currently in

5    the fleet and trucks that were being added to the fleet; is

6    that fair?

7    A.  Well, I'm also inferring from your question, Counsel, that

8    if it was purchased in Q2 2023, it wasn't that long in service

9    and the fuel costs related to that would be minimal in relative

10   terms.

11   Q.  Why are you concluding that it would be minimal?

12   A.  Well, your fact pattern is certain trucks -- a number of

13   trucks are purchased in Q2 of 2023.

14   Q.  Right.

15   A.  So they haven't been on the road that long.  So your fuel

16   cost isn't going to be as high, yet I'm seeing fuel costs of

17   $1.95 million here.  Okay?  So they must relate to the trucks.

18       If the ones which have been on the road for some time and

19   the monthly cost is running at a million nine, as you pointed

20   out to me with trucking revenues of a million nine sixty-three.

21       So strictly on a cash basis, it puts into question as to

22   how do these number correlate or why isn't there trucking

23   revenue to be commensurate with the fuel revenue on a cash

24   basis.

25   Q.  I understand, sir.  My question is actually more specific.

1          RBL was constantly in the process of acquiring new trucks;

2     right?

3     A.   I don't know constantly.   I mean, they had a program to

4     acquire new trucks, yes.

5     Q.   They added new trucks to its fleet every month, correct?

6     A.   I don't know.   Maybe they did.   I don't know.

7     Q.   Those new trucks would have to be brought from wherever

8     they were purchased to RBL's facility in Lubbock, Texas; right?

9     A.   You would think so.

10    Q.   Then they would have to be inspected; right?

11    A.   I didn't know their operational controls, if you will,

12    or --

13    Q.   Okay.

14    A.   -- the processes.

15    Q.   If it's something wrong with the truck, it can't be put on

16    the road until that's fixed; is that fair?

17    A.   I should hope so.

18    Q.   So those trucks that are in the process of being purchased,

19    taken to Lubbock and fixed, your chart represents the fuel and

20    maintenance costs associated with those trucks, as well as the

21    ones that were already in the fleet.   That's all I'm asking.

22    A.   Yes.   It represents whatever they spent on fuel and

23    maintenance for whatever trucks they had.

24    Q.   Okay.   So we have talked about segregating capital expenses

25    from operating expenses.   We have talked about the difference

1    between trucks that are in the fleet and trucks that were being

2    added to the fleet.  I want to ask a few more questions about

3    the decision to shut down RBL's trucking operations.  All

4    right?

5        Did you, at any time, conduct an analysis that's

6    essentially a budget analysis for Mr. Lopez and Ms. Wahba?

7    A.   For the business, you mean?

8    Q.   Correct.

9    A.   No.

10   Q.   Okay.  You would agree with me that there were portions of

11   RBL's business that could have been, you know, fired or

12   excluded, and just the trucking business could have continued;

13   correct?

14        MR. CRUZ:  Objection, Your Honor.  That calls for

15   speculation.

16        MR. VAN DYKE:  I can rephrase.

17   BY MR. VAN DYKE:

18   Q.   You agree with me that there were employees that were

19   building trailers; right?

20   A.   See, here's my hesitation or pause.  I wasn't into the

21   inner sanctums of the operations before June 23rd, and I wasn't

22   in the inner sanctums of what the new management was doing from

23   June 2023, whichever date the change occurred.

24   Q.   Okay.

25   A.   My role was the forensic person, so I wasn't doing an

```
 1   operational analysis for Mr. Lopez or Ms. Wahba.  The data we

 2   gave them, we gave them.  The data and how they interpreted and

 3   how they used for the purpose of their decision-making was

 4   their independent decision.

 5        As I said earlier today, it wasn't collaborative.  It

 6   wasn't a criticism.  It was their independent role and

 7   decision.

 8   Q.  Yes.

 9   A.  So I'm not sure that I can respond to your question as you

10   put it.

11   Q.  Okay.  We discussed that RBL was manufacturing trailers

12   with Black Lion; right?

13   A.  Amongst other things -- amongst buying them, et cetera.

14   Q.  RBL employed individuals in the United States to put those

15   trailers together; right?

16   A.  I assume so.  They had a payroll.

17   Q.  Those employees are represented in the payroll section as

18   you just said?

19   A.  I would think so, yes.

20   Q.  Those employees could have been fired in order for the

21   trucking operations to continue; right?  It's almost

22   tautological.  It speaks for itself; right?

23   A.  Can you say that again, please?

24   Q.  Sure.  I apologize.

25        You don't need trailer builders to run a trucking company;
```

```
 1   right?

 2   A.   Not to run the trucking operation side of it.

 3   Q.   Thank you.

 4        You don't need a business development department to run a

 5   trucking company; right?

 6   A.   I don't know the answer to that.

 7   Q.   You don't need a trailer manufacturer --

 8   A.   You know they had a business development.  I thought Mr. --

 9   Q.   Correct.  They did.

10   A.   Was the vice president of business development.

11   Q.   Yes.  He could have been fired in order to keep running the

12   trucks.

13        MR. CRUZ:   Objection, Your Honor.  Calls for

14   speculation.

15        THE COURT:   Yeah.  At this point, Mr. Van Dyke, we're

16   going to move off of this.  He's asked and answered variations

17   of this.

18        MR. VAN DYKE:   Okay.

19   BY MR. VAN DYKE:

20   Q.   You see the line item related to -- you are aware that RBL

21   hired certain outside vendors to provide services for RBL;

22   correct?

23   A.   I suppose, I don't know if you mean contract labor.

24   I don't know what kind of outside vendors you're talking about.

25   Q.   Okay.  We don't have to get into the specifics.  I guess
```

1    what I'm asking is this, sir:  You cannot testify as to what

2    needed to be locked off the business in order to continue

3    running the trucking operations; correct?

4    A.   I cannot because I wasn't asked to do that analysis.

5    Q.   Perfect.  Thank you, sir.  Okay.

6         I want to go back for a moment to the line that relates to

7    truck, trailers and equipment.

8         Do you see that?

9    A.   Yes, sir.

10   Q.   As we testified -- we already discussed the long-term

11   trucking lease operating agreement; right?

12   A.   Yes.

13   Q.   You are aware that investors were making down payments to

14   RBL for the purpose of purchasing a truck; right?

15   A.   Yes.

16   Q.   We also discussed that you didn't segregate from the total

17   investor funds the long-term funds from the short-term loans;

18   right?

19   A.   Correct.

20   Q.   Some of this cash outflow for the purpose of purchasing

21   trucks came from investors; right?

22   A.   The outflow came from investors, you mean the funding came

23   from investors?

24   Q.   Correct.

25   A.   Yes.  That would be in the investors' cash inflows into

```
 1  RBL.

 2  Q.   And you already discussed this with the Government -- I'm

 3  just going to ask you one yes-or-no question -- those inflows

 4  are not represented on the P part of P&L; correct?

 5  A.   On the P part?  Oh, on the revenue part?

 6  Q.   Correct.

 7  A.   Correct.

 8  Q.   Thank you, sir.

 9        MR. VAN DYKE:  Your Honor, this is a natural breaking

10  point if you want to take an afternoon break.

11        THE COURT:  We will see you at 3:20 p.m. Have a good

12  break.

13        (The jury exited the courtroom at 3:05 PM, after which

14  the following proceedings were had:)

15        THE COURT:  Okay.  Mr. Kapila, we will see you in about

16  ten minutes.  Okay?  If you could step into the hallway, sir.

17        THE WITNESS:  Thank you.

18        (The witness exited the courtroom at 3:05 PM, after

19  which the following proceedings were had:)

20        THE COURT:  Okay.  If the record could reflect the

21  witness has left the courtroom.

22        Anything we need to do?

23        Mr. Van Dyke, how much longer do you got?

24        MR. VAN DYKE:  How long have I been going?  Two hours?

25  An hour and a half?
```

```
 1                THE COURT:  Time flies.

 2                MR. VAN DYKE:  Maybe 45 minutes.

 3                THE COURT:  Okay.

 4                MR. VAN DYKE:  And I'm switching topics.

 5                THE COURT:  That's fine.

 6           So you will be done before the next break after they

 7    get back.  And I guess I would leave it here because of all

 8    that you raised this morning.  I have heard nothing so far that

 9    he has not been able to answer, explore, such that some extra

10    set of facts that need to be crunched need to be done.

11                Please tell me if that is incorrect.

12                MR. VAN DYKE:  That's absolutely accurate.  I actually

13    moved that to the back of my cross just in case we wouldn't get

14    to it.  We are going to get to it today.  And depending on how

15    it comes out, we might request some relief or not.  But it

16    hasn't come up yet.

17                THE COURT:  Great.

18                MR. VAN DYKE:  Thank you, Your Honor.

19                THE COURT:  Great.

20           Yes, sir.

21                MR. CRUZ:  Just to put it on the record, Judge, you

22    might have seen me get up and go over and --

23                THE COURT:  I saw.  I appreciate you doing that.

24                MR. CRUZ:  Do you know what I was doing?

25                THE COURT:  Absolutely.
```

1            MR. CRUZ:  Okay.

2            THE COURT:  I appreciate you doing it.

3            MR. CRUZ:  I wanted to make sure.

4            THE COURT:  It was seamlessly done.

5            I'll see everybody in ten minutes.

6            Okay.

7         (Off the record from 3:07 PM to 3:31 PM, after which the

8       following proceedings were had:)

9            THE COURT:  Please be seated.  Welcome back, everybody.

10   We're going to continue our cross-examination.

11           Mr. Van Dyke, sir.

12           MR. VAN DYKE:  Thank you, Your Honor.

13   BY MR. VAN DYKE:

14   Q.  Good afternoon again, Mr. Kapila.

15   A.  Good afternoon.

16   Q.  Okay.  We're going to leave the cash reconstruction behind

17   and talk about some of documents that you reviewed.  Okay?

18   A.  Okay.

19   Q.  You mentioned that you reviewed not all of the investor

20   contracts but a sampling of them; is that right?

21   A.  Yes.  Yes.

22   Q.  And you reviewed the long-term contracts and the short-term

23   contracts; right?

24   A.  Yes.

25   Q.  And you referred to them as loans; right?

 1   A.   I think that's what they call them on the contract.

 2   Q.   Okay.

 3   A.   What you call the contract, yes.

 4   Q.   Okay.  Can you describe for the jury what the difference is

 5   between principal and interest in the context of a loan?

 6   A.   Well, in the context of a loan, principal is the amount

 7   that a borrower receives from a lender or a lender gives to a

 8   principal -- to a borrower.  That is the nominal dollars

 9   attributed.  And interest is the percentage of return that the

10   lender gets and the borrower promises to pay by agreement to

11   borrow those funds.

12        MR. VAN DYKE:  Can we pull up Government Exhibit 3-4,

13   please?  And it's already in evidence.

14        THE COURT:  It's in evidence.  Yes, publish as you

15   wish.

16   BY MR. VAN DYKE:

17   Q.   I would like to just summarize the structure of the

18   contract for the jury.  Okay?

19   A.   Okay.

20   Q.   So at the inception of the long-term trucking contract, the

21   investor pays a down payment to RBL; right?

22   A.   That's what it is meant to be, yes.

23        Do you mind going to page 1 of this for me, if you don't

24   mind?  I just want to visualize it.  Sorry.  Thank you.

25   Q.   Page 1 of the PDF or page 1 of this contract?

1   A.   Well, this one is labeled as page 2, so I -- there you go.

2   Q.   Yeah, this is the whole investor file.  I apologize.

3   A.   Okay.  So this particular contract I assume is the

4   operating lease agreement.

5   Q.   Correct.  Let's go back down.  I'm going to write 55,000

6   goes to RBL in the beginning; right?

7   A.   Yes, sir.

8   Q.   And then the contract is structured over a period of

9   months; right?

10  A.   Yes.

11  Q.   So I'm going to draw a column here for the months.  One --

12  or this would be zero, actually.  Month one, there's no payment

13  to the investor.  We can go down a page to double-check.

14  A.   Okay.

15  Q.   You would agree with me, sir, that month one under lease

16  payment, the first two months are excluded; right?

17  A.   It's 58 payments, five years of payments, okay.  Minus the

18  first and second month.

19  Q.   Okay.  I didn't fit 20 rows on the chart so we're going to

20  have to go step-by-step.  Month one is zero payments to the

21  investor; right?

22  A.   Yes.

23  Q.   Month two, zero payment to the investor; right?

24  A.   Yes.

25  Q.   And in month three, we start with $2,500 -- or excuse me,

1   $3,000 payments on this contract; right?

2   A.   Yes, sir.

3   Q.   Now, you have testified today that you reviewed the

4   promises within the four corners of the contract; right?

5   A.   Yes.

6   Q.   You have never sat in on an investment pitch at RBL?

7   A.   Correct.

8   Q.   You don't know what investors were told about how the money

9   was used?

10   A.   Not in other communications, correct.

11   Q.   Thank you, sir.  At that first $3,000 payment, the

12   principal that was given to RBL would be 52,000; correct?

13   55 minus 3?

14   A.   Well, you're saying -- okay, the remaining principal.

15   Q.   Remaining.  Exactly, sir.

16   A.   I'll follow your math for a bit, yes.

17   Q.   I hope you can follow it all the way, not just for a bit,

18   but we'll see.  Month two -- or month four now, another $3,000

19   payment and it would reduce to 49,000; right?

20   A.   Yes, sir.

21   Q.   I'm going to skip to -- I am going to ask you to do a

22   little bit of math.  I have a calculator for you if you would

23   like.  3,000 times 20 is what?

24   A.   3,000 times 20?

25   Q.   Yes.

A.   60,000.

Q.   60,000.  Now, the first two months aren't paid so we would be at 54,000 after month 20; right?

A.   Yes.

Q.   So after 20 months, 55 minus 54, there would still be 1,000 left of that investor's principal with RBL.

A.   Okay.

Q.   Would you agree with me?

A.   If your math is right, yeah.  I didn't do the math.

Q.   You know what, I think I have this on an Excel spreadsheet.

        MR. VAN DYKE:  Can we pull up what's been premarked as Defense Summary Exhibit A?  Just for the witness.  Okay.

BY MR. VAN DYKE:

Q.   You would agree with me, sir, that this is structured the same way as that sheet; right?

A.   Yes, sir.

Q.   And if you go down to payment number 20 or payment number 19.  Oh, yeah, no.  The 21st month is the one where that investor's initial principal is exhausted; right?

A.   It's 20 payments of 3,000 each; right?

Q.   Well --

A.   It's that 20 rows without the first two, sorry.

Q.   Correct.

A.   So it's 18 payments of 3,000 each, which is, mathematically -- so you're left with 1,000 at that time out of

```
1    the 55, okay.

2    Q.  That's accurate; right?

3    A.  Yes.

4    Q.  This is a fair and accurate summary of the investment

5    contract structure; right?

6    A.  That's the way it would flow.

7    Q.  Okay.

8         MR. VAN DYKE:  At this time we would move to admit

9    Defense Summary Exhibit A as a summary exhibit of the structure

10   of the investment contracts.

11        MR. CRUZ:  Objection, Judge.  Lack of foundation, lack

12   of disclosure, lack of everything.

13        THE COURT:  Yeah.  The objection is sustained as to

14   foundation.  Maybe you will build more of a foundation, but not

15   yet, Mr. Van Dyke.

16   BY MR. VAN DYKE:

17   Q.  Could we -- you reviewed a number of these contracts; sir,

18   correct?

19   A.  Yeah, between my team and myself.

20   Q.  There's very voluminous in nature; correct?

21   A.  If you start reviewing 1,600 of them, that would be very

22   voluminous.

23   Q.  Very voluminous in nature.  The structures contained in

24   each of those documents; right?

25   A.  You know --
```

```
 1   Q.   Sir, I apologize.  You're very experienced in this.

 2        My question is the structures contained in each of those

 3   contracts; right?

 4   A.   I will answer your question, but you're assuming this

 5   morning we talked about five particular product lines.  I mean,

 6   the short-term contract, my recollection is four or five pages

 7   on the high side.  As a contractor, it's not voluminous.  By

 8   the time you review many, it can get a lot of paper.  Same with

 9   the non short-term contract.

10        And some of these other -- whether they're leased contracts

11   or purchase contracts or trailer-built contracts or not a mega

12   number of pages.  One of them is, without remember, maybe six

13   or seven pages.

14   Q.   Okay.

15   A.   You will tell me, but this could be one of them.

16   Q.   So you disagree with me that the long-term investment

17   contracts are voluminous?

18   A.   The one I have seen, I don't think it runs into pages and

19   pages.  The long-term loan contracts, the non short-term

20   loans --

21   Q.   There are hundreds of them?

22   A.   As investments, yes.

23   Q.   Okay.

24   A.   As investors.

25            MR. VAN DYKE:  In that case, Your Honor, we'll mark it
```

```
 1   as Defense Demonstrative B.
 2           THE COURT:  Well, Mr. Van Dyke, you haven't laid a
 3   foundation.  Did he prepare this document?
 4           MR. VAN DYKE:  No.
 5           THE COURT:  Does he recognize the document; right?  So
 6   if you want to use it as demonstrative aid, it has to be
 7   demonstrative of what he's testifying about.  It's not clear to
 8   me that it does.
 9   BY MR. VAN DYKE:
10   Q.  So we talked about how the principal would be exhausted
11   after 20 months; correct?
12       21 months?
13   A.  Yeah.  By the time you used $3,000 over 21 months, you have
14   paid off more than the 55.
15   Q.  Correct.
16   A.  Do we agree on that.
17   Q.  Yes.
18   A.  Then I have a comment for you, Counsel, if you'll allow me.
19   It's very important you keep calling that as a principal.
20   Built in there is some kind of an inherent return rate.  All
21   I'm saying is you're paying $3,000.  Are you just paying the
22   principal?  Are you paying in the built-in inherent return
23   rate?  Because at the end of the day, you end up paying them
24   $60,000, which is $5,000 more than the 55.
25           So you are telling me to assume -- and I will if you ask me
```

1    to just assume -- that each payment is just a principal payment

2    until the end of 20 months or 21 months when the investor gets

3    his or her return --

4    Q.  Okay.

5    A.  -- of the extra 5,000.

6    Q.  Let's go about it a different way.  We don't have to call

7    it principal and interest?

8    A.  Okay.

9    Q.  After 21 months of a $3,000 payment, you would exhaust the

10   $55,000 that was made as a down payment to RBI.  Forget about

11   the terminology.  Do you agree with that?

12   A.  Yes.  You would have paid more than that, yes.

13          MR. VAN DYKE:  Thank you.

14          At this time, I'd ask to publish Defense Demonstrative

15   Exhibit B.

16          THE COURT:  Any objection to this?

17          MR. CRUZ:  Same objection, Judge.

18          THE COURT:  So I'm going to allow it.

19          Now just to be very clear:  There's an exhibit that

20   hasn't been published yet that Mr. Van Dyke is seeking to offer

21   as a demonstrative aid; right?  Demonstrative aid, you heard me

22   do this before in this trial, it is now being offered to you as

23   an illustration or an aid to the extent that it helps you

24   understand the underlying testimony of this witness.

25          Just like with that rolling transcript and the videos,

1    to the extent that this exhibit, which is now -- it is now

2    admitted as a demonstrative aid.  To the extent that it

3    deviates from the witness's, which is being put down word for

4    word by a transcript, right here by this court reporter, you

5    can deviate from this aid.

6         But to the extent that it helps you understand this

7    witness's testimony, you can use it as a demonstrative aid for

8    the underlying testimony.

9         Okay, Mr. Van Dyke?

10        MR. VAN DYKE:  We don't even need to publish it.  We

11   can save it.  We can move on.

12   BY MR. VAN DYKE:

13   Q.   So we talked about the 20 months; correct, sir?

14   A.   Yes, sir.

15   Q.   What is 20 months before June 21st, 2023?

16   A.   You mean, counting back 20 months?

17   Q.   Correct, sir?

18   A.   Well, it's six months of that year starting with June or

19   starting with May.

20   Q.   So June 21st, 2023, 20 months before is October 21st, 2021;

21   right?

22   A.   Yes.

23   Q.   Do you agree with me?

24   A.   Yes.

25   Q.   Okay.

1    A.   Do you have a darker color, Counsel?

2    Q.   Excuse me?

3    A.   Do you have a darker color, please, if possible?

4    Q.   I wish I had one.  Let me see if I can find something.

5    A.   I apologize.

6    Q.   I apologize for my handwriting as well.  Okay.

7         Assuming this 20-month -- I'm going to refer to as a

8    runway; okay?

9    A.   Okay.

10   Q.   We talked about how you didn't segregate the long-term

11   loans and short-term loans in your analysis of how much was

12   owed to investors already; right?

13   A.   Yes.

14   Q.   Assuming this 20-month runway, any investor who signed a

15   long-term trucking contract after October 21st, 2021, would not

16   have exhausted the initial down payment that he paid to RBL?

17   A.   Correct.  It takes --

18   Q.   Thank you.

19   A.   -- 21 months or so.

20   Q.   I would like to look at an actual example.

21        Are you familiar with the investor Camy Bertrand?

22   A.   Not by name.

23   Q.   He testified -- well, it doesn't matter what he testified.

24        MR. VAN DYKE:  Can we pull up what's already been

25   admitted as Government Exhibit 3, please?

```
 1   BY MR. VAN DYKE:

 2   Q.  Okay.  There's a date of the initial investment; right?

 3   A.  On the exhibit you're showing me?

 4   Q.  Correct.

 5   A.  Hold on.  That's the investor.

 6         THE COURT:  Mr. Van Dyke, sir, do you want this

 7   published to the jury?

 8         MR. VAN DYKE:  I'm drawing out this exhibit --

 9         THE COURT:  No, this exhibit, this is in evidence.

10         MR. VAN DYKE:  Oh, yes.  Yes, I would.  I apologize,

11   Your Honor.

12         THE COURT:  Thank you, sir.

13   BY MR. VAN DYKE:

14   Q.  There's a date of the contract; correct?

15   A.  I assume -- you're moving this pretty fast so I'm trying to

16   find the date.

17   Q.  What is the date of the contract, sir?

18   A.  April 2nd of 2021.

19   Q.  Here I go.  I wrote the date from the first page.  You know

20   what?

21      Now, this is one of the prior contracts that involved a

22   2,500 -- or excuse me, $35,000 down payment; right, sir?

23   A.  I have to scroll up the pages to find that I don't know

24   that for a fact until I see it.

25   Q.  Of course.  Just let me know.
```

```
 1            MR. VAN DYKE:  It's on the first page,

 2   ^ Michele ^ Michelle.  First page of the document.

 3   A.   There you are.

 4   BY MR. VAN DYKE:

 5   Q.   35,000; correct?

 6   A.   Yes.  Yes.

 7            MR. VAN DYKE:  Could we scroll to page 21 of the

 8   document?  This truck was purchased -- well.  This is a bad

 9   example.  You know what?  This truck was purchased actually

10   before the contract.  I apologize.

11            Let's go to 3-1.  I think that was what I intended, all

12   right, in evidence.

13            Permission to publish, Your Honor?

14            THE COURT:  Yes.

15   BY MR. VAN DYKE:

16   Q.   What is the date of this contract, sir?

17   A.   This one investor payment date -- investor payment date.

18        I assume that would be on page -- well, there's a manually

19   scribbled note that says the contract date is August 3rd of

20   2021.

21   Q.   Okay.

22   A.   As in notation, yeah.

23   Q.   Which means the first payment wasn't due until October 3rd,

24   2021.

25            MR. VAN DYKE:  Could we go to page 27?
```

```
 1   BY MR. VAN DYKE:

 2   Q.   What was the down payment made on the truck?

 3   A.   Okay.  It shows a sale price of the -- the down payment is

 4   $19,972.29.

 5   Q.   And what's the date of that contract?

 6   A.   August 8th of 2021?  Is that the correct field?

 7   Q.   So at this time --

 8        THE COURT:  She took it away from him, Mr. Van Dyke.

 9   A.   August 3rd, 2021.

10   BY MR. VAN DYKE:

11   Q.   That's the contract.  Okay.

12        MR. VAN DYKE:  Can we go to page 21, please?  27,

13   I apologize.

14   BY MR. VAN DYKE:

15   Q.   The down payment was?

16   A.   $19,972.29.

17   Q.   19,000 -- so that's less than 35; correct?

18   A.   Yes.

19   Q.   And it was purchased the same month that the first payment

20   was due; right?

21   A.   Yes.

22   Q.   So you would agree with me, sir, that this investor, who

23   received a truck, did not receive a single dollar of another

24   investor's money up until the portion -- the time that the

25   truck was purchased?
```

1          MR. CRUZ:  Objection, Your Honor.  That calls for

2    speculation.

3          THE COURT:  Sustained.

4    BY MR. VAN DYKE:

5    Q.   You would agree with me that 19,972 plus 2,500 is less than

6    35,000; correct?

7    A.   Mathematically, I agree with you, yes.

8    Q.   Thank you.

9         This analysis, that we just did in the last few minutes,

10   with a few slip-ups on my part, did you do an

11   investor-by-investor analysis similar to this?

12   A.   No, sir.

13   Q.   Nor did you look at the revenue that Mr. Bertrand's truck

14   generated after October 3rd, 2021?

15   A.   Not on a truck-by-truck basis.

16   Q.   Not on a truck --

17   A.   It would be in that revenue line item, in the cash flows

18   that we looked at.

19   Q.   Like we already discussed, every investor who was in the

20   20-month runway would not have exhausted his down payment

21   before the end of 20 months; right?

22         MR. CRUZ:  Objection, Your Honor.  Calls for

23   speculation.

24         THE COURT:  Overruled.

25   ///

```
 1    BY MR. VAN DYKE:

 2    Q.  We can move on.  Let's jump to 119-24, and this will be the

 3    last topic.

 4        Now, this again is based on your bank reconstruction;

 5    right?

 6    A.  I'm sorry.  I was scratching my throat.

 7    Q.  This was based on your bank reconstruction.  We have

 8    already covered that; right?

 9    A.  Yes.

10    Q.  The bank reconstruction involved RBL's bank accounts;

11    right?

12    A.  Correct.

13    Q.  Just RBL's bank accounts?

14    A.  That is correct.

15    Q.  You didn't have access to any of -- essentially any of the

16    entities listed on this chart, their bank accounts; right?

17    A.  That is correct.

18    Q.  Okay.

19            MR. VAN DYKE:  Could I have just one moment to confer?

20            THE COURT:  Yes, sir.

21    BY MR. VAN DYKE:

22    Q.  So I wanted to talk about the limitations that that

23    necessarily imbues into this document?

24    A.  Okay.

25    Q.  One of them is that if a transfer is made to pay off a bill
```

```
 1   for RBL, to one of these entities, you would not be able to see

 2   that that bill was paid off; right?

 3   A.   You mean -- let me restate in my mind the way I understood.

 4   You said if payment is made to one of these entities to pay a

 5   bill off?

 6   Q.   You got it.

 7   A.   That entity or someone else?

 8   Q.   No, of RBL?

 9   A.   Okay.  Sorry.  So I'll make it easy -- if you don't mind

10   restating your question, please.

11   Q.   Not at all.  I'll actually use an actual example here.

12        If a payment was made to Cingar Transports, that payment

13   would be represented on this; correct?

14   A.   Yes.

15   Q.   But if the payment was for the purpose of an RBL business

16   expense, you would not have the second part of that

17   transaction; right?

18   A.   That is correct.

19   Q.   You wouldn't have the Cingar Transport's payment to RBL's

20   vendor?

21   A.   That is correct.

22   Q.   This is just inflows and outflows?

23   A.   Yes.

24   Q.   Okay.  I would like to go through this.  So this is just --

25   we discussed this.  It's just inflows and outflows.  This is
```

 1  not a money-in-the-pocket document?

 2  A.  No, it's inflows and outflows from the RBL bank accounts to

 3  or for the benefit of the parties listed on this chart.

 4  Q.  But you see you say to or for the benefit of; right?

 5  A.  Yes.

 6  Q.  But we just discussed how you don't know how the money was

 7  used once it reached that account; right?

 8  A.  Well, I don't know how that entity used the money.

 9  Q.  Correct.

10  A.  The next entity, yes.

11  Q.  So any of these transfers could have been to or for the

12  benefit of RBL and that wouldn't be captured on this sheet; is

13  that fair?

14  A.  If that were the case, yes, it would not be captured on the

15  sheet.

16  Q.  If that were the case.  Okay.  Let's talk about some of

17  entries.

18          MR. VAN DYKE:  Could I switch to the ELMO, please?

19  BY MR. VAN DYKE:

20  Q.  You included in this categorization under parties related

21  to Sanjay Singh, a company called Riya Enterprise; right?

22  A.  I do, I did, yes.

23  Q.  What's Riya Enterprise?

24  A.  You know, I would have to refer to my notes.  But we had

25  looked at all of these entities and they were -- in this case,

 1    they were related to Mr. Sanjay Singh, the ones listed under

 2    that block.  And I don't remember what exactly Riya Enterprises

 3    did.

 4    Q.   Okay.  It is it your recollection that Riya Enterprises is

 5    a flight school in California?

 6    A.   Yes.  It was linked with the flight school, now that you

 7    jogged my memory, yes.

 8    Q.   Okay.  It's a flight school owned by a company called

 9    Skyview Aviation; right?

10    A.   I don't know that.

11    Q.   Royal Bengal -- would seeing a copy of the contract between

12    Royal Bengal and --

13    A.   I could read it and see what it says.

14         MR. VAN DYKE:  Could we pull up AG, what's been

15    premarked as AG-28 just for refreshing purposes, Your Honor?

16         THE COURT:  Just for the witness?

17         MR. VAN DYKE:  Just for the witness, yes.  Thank you.

18         Actually, Your Honor, this was admitted.  I apologize.

19    Let me get the right exhibit number.

20         THE COURT:  Then it's for everybody.

21         MR. VAN DYKE:  Well, you have it.  You can review, sir,

22    and then I'll get it up for the jury in a moment.

23         THE COURT:  He doesn't have it yet.

24         MR. VAN DYKE:  Okay.  We can just do AG-28 just for the

25    witness, Your Honor, for refreshing purposes.

```
 1              THE COURT:  You're going to put it in front of him?

 2              MR. VAN DYKE:  Yes, Your Honor.  Thank you.

 3              THE COURT:  When you get this, sir, just read it to

 4    yourself and then answer any questions that he asks.

 5              MR. VAN DYKE:  Can we switch to the HDMI just for the

 6    witness, Ms. Shotwell?

 7    BY MR. VAN DYKE:

 8    Q.  Is it on your screen, sir?

 9    A.  I see a document here, yes, sir, AG-28.

10    Q.  Does this refresh your recollection as to whether the Riya

11    expense was related to a corporate acquisition of Riya

12    Enterprise by Royal Bengal Holdings?

13    A.  That's what it represents, the acquisition of the -- of the

14    membership interest of Riya Enterprises, LLC.

15    Q.  And the contracts between Royal Bengal Holdings and Riya

16    Enterprises; right?

17    A.  Yes, sir.

18    Q.  Okay.

19              MR. VAN DYKE:  I'm just going to highlight that,

20    please.  And actually I found the exhibit number, Your Honor.

21    This is S-34 already admitted into evidence.

22              THE WITNESS:  I might just make a refinement.

23              MR. VAN DYKE:  There's no question.

24              THE WITNESS:  No, no, I'm not changing my --

25              THE COURT:  One moment, sir.
```

```
 1              S-34 is the actual document?
 2              MR. VAN DYKE:  That's correct, Your Honor.
 3              THE COURT:  And it is in evidence?
 4              MR. VAN DYKE:  It is.
 5              THE COURT:  All right.  So are you going to publish it?
 6              MR. VAN DYKE:  If we could publish it, Your Honor, yes.
 7              THE COURT:  All right.  So now a document that is in
 8    evidence is before the witness and the jury.  I'll give
 9    everyone a chance to glance and then we can move on.  Okay.
10              MR. VAN DYKE:  So we talked about Riya Enterprises.
11    Can we go back to the ELMO, please, Ms. Shotwell?  This is, for
12    the record, Government's Exhibit 119-24.
13    BY MR. VAN DYKE:
14    Q.  So you see I have highlighted the row related to Riya
15    Enterprises?
16    A.  Yes, sir.
17    Q.  Okay.  There's an entry here for BSC Holdings.  Do you see
18    that?
19    A.  I do.
20    Q.  BSC Holdings was an LLC run by Sheetal Singh; correct?
21    A.  Yes.
22    Q.  Who signed investment contracts with RBL?
23    A.  I don't know that.
24    Q.  Would seeing a copy of those contracts refresh your
25    recollection, sir?
```

1   A.  Yes, it would.

2   Q.  I'll do this on paper to expedite things.

3       MR. VAN DYKE:  For the record, I'm handing up what has

4   been premarked -- this is just for refreshing.  I have handed

5   the witness what has been premarked, but will not be admitted,

6   as AG-1 through 4.

7       THE COURT:  You want him to read it to himself?

8       MR. VAN DYKE:  Yes, Your Honor.

9       THE COURT:  There you go, sir.

10      MR. VAN DYKE:  And just let me know once you had a

11  chance to review.  There are three copies of each in the

12  folder.

13      THE WITNESS:  They are the same?

14      MR. VAN DYKE:  Each of the three copies are the same,

15  yes, sir.

16      THE WITNESS:  I looked at the lead sheets, if you will.

17      MR. VAN DYKE:  And I'll retrieve the exhibit, Your

18  Honor.

19      THE COURT:  Yes, sir.

20  BY MR. VAN DYKE:

21  Q.  Does that refresh your recollection as to whether BSC

22  Holdings was a company that invested in RBL through its

23  investors --

24  A.  It's listed as -- I'll just use the generic label of

25  investor, whether they're a lessor or a lender, et cetera,

1  because each of those contracts, if you will, I looked at are

2  different as to --

3  Q.  And --

4  A.  -- the entity.

5  Q.  And just like every other investor, you know that the new

6  managers stopped making payments to BSC Holdings as of

7  June 21st, 2023?  Just a yes or no, please.

8  A.  My understanding is they start making payments to any

9  investor.

10  Q.  I'll highlight that line as well.  Let's keep going down

11  the list.  Realty Land Title Company.  Do you see the amount

12  listed as a disbursement, it's $2,055,591.06?

13  A.  Yes.

14  Q.  That money was disbursed to purchase a plot of land in

15  Pompano, Florida, for the benefit of RBL; right?

16  A.  I'll agree to half of that, that it was used to purchase a

17  lot or a plot in Pompano.  I can't agree or disagree on for the

18  benefit of RBL.

19  Q.  Okay.  You're aware that the property was deeded back to

20  RBL; right?  Just yes or no.

21  A.  After the new management came in.

22  Q.  You are aware; right?

23  A.  Well, yeah, timing it important.  But yes, after the new

24  management came in.

25  Q.  Okay.  And that property was subsequently sold for

1    $3.2 million; right?

2    A.   I do know it was sold.   I just don't have the data on the

3    precise price point, sir.

4    Q.   I'll leave that as a note for myself later.

5         Reach Logistics Express.   Do you see that?   That's the next

6    line item?

7    A.   Yes, I do.

8    Q.   You were aware that Reach Logistics Express was

9    Ricardi Celicourt's owner-operator company; right?

10   A.   All I remember is it was Ricardi Celicourt's company.

11   I don't know much more.   It's related to him, effectively.

12   Q.   And just like BSC Holdings, it's one of his investment

13   companies that invested in RBL; correct?

14   A.   But it doesn't change the fact that it's a related entity.

15   Q.   I understand, sir.

16   A.   Okay.   Yes.

17   Q.   You agree?

18   A.   Yes.

19   Q.   Okay.   I'm going to highlight that row as well.   Just like

20   BSC Holdings and every other investor, payments were stopped on

21   June 21st; right?

22   A.   Yes.

23   Q.   June 21st?

24   A.   June 23rd.

25   Q.   Now, we talked about it being an owner-operator company.

```
 1   R.H.C. Legacy Inc was Ricardi Celicourt's investment LLC that
 2   purchased trucks through RBL; correct?
 3   A.   I don't remember that.
 4   Q.   Would seeing a copy of his contract refresh your
 5   recollection, sir?
 6   A.   Yes, sir.
 7        MR. VAN DYKE:   For the record, this is AG-30 through
 8   31 -- or 30 through 33, Your Honor.  I apologize.
 9        THE COURT:   33 is in evidence.
10        MR. VAN DYKE:   AG --
11        THE COURT:   AG-33 is in evidence.  I don't know about
12   the others.
13        MR. VAN DYKE:   I'll just show it to the witness for
14   refreshing purposes, Your Honor.
15        THE COURT:   Which one are you showing?
16        MR. VAN DYKE:   I'm going to show all three.
17        THE COURT:   Okay.  31 through 33.
18        MR. VAN DYKE:   30 through 33, Your Honor.
19   BY MR. VAN DYKE:
20   Q.   Just let me know when you've had a chance to review and if
21   these refresh your recollection.
22   A.   Counsel, if you don't mind, can you refresh me with what
23   your question is?
24   Q.   Sure.   These are -- R.H.C. Legacy was a company that
25   Ricardi Celicourt owned that invested in RBL; correct?  Do the
```

1    documents refresh your recollection as to the answer to that

2    question?

3    A.  I'm trying to find where in the document where I might pick

4    on that.  Registered agent.

5         THE COURT:  To yourself, sir.

6         THE WITNESS:  My apologies.

7         THE COURT:  It's okay.  After reviewing those

8    documents, does it refresh your recollection as to whether

9    R.H.C. Legacy was a company that Ricardi Celicourt owned that

10   invested in RBL?  That is the question before you after you

11   review the documents.

12   A.  If I go by this document, Ricardi Celicourt, I don't

13   interpret this to mean that he himself owned the company, sir.

14   And I can show you on the document why.

15        MR. VAN DYKE:  Can I retrieve the exhibit, Your Honor?

16   A.  Since I'm not (indicating).

17   BY MR. VAN DYKE:

18   Q.  I apologize.  It's a company Constantina Celicourt owned

19   that invested in RBL.

20   A.  Yes.

21   Q.  Do you agree?

22        MR. VAN DYKE:  Permission to retrieve the exhibits,

23   Your Honor?

24        THE COURT:  Yes.

25   A.  I haven't looked at the other files.  Same thing, sir, with

1    AG-31.

2    ^ BY MR. VAN DYKE:

3    Q.  You just read -- sir, you can just read to yourself.

4    A.  I'm not reading it.  The exhibit --

5    Q.  I'll retrieve --

6    A.  The answer is the same for the next one involved.

7    Q.  I'll retrieve the exhibits at this time.

8    A.  You don't want -- I'm done.

9    Q.  Yeah.

10   A.  Okay.  You gave me four folders.  I just haven't gone

11   through each one.

12   Q.  Just like every other investment company, stopped receiving

13   payments on June 21st; right?

14   A.  Yes, sir.

15   Q.  Let's talk about Cingar Transports LLC American Express

16   credit card.  Do you see that?

17   A.  Yes.

18   Q.  These were payments that RBL made to American Express?

19   A.  Yes.

20   Q.  The American Express was used for business purposes.

21   That's your understanding; right?

22   A.  I don't know.  All I know is it was paid directly to

23   American Express card of Cingar Transport LLC.

24   Q.  And just to expand on what it means that you don't know,

25   you do not know if that was a valid business expense or

1    otherwise?

2    A.   I cannot tell you the answer, correct.  I don't because --

3    Q.   Thank you.

4    A.   -- I have not looked at it, and I don't have access to the

5    American Express statements of that account.

6    Q.   Perfect.

7         Okay.

8            THE COURT:  Same instruction, ladies and gentlemen.

9    All the highlighting -- all the handwriting, that is not

10   evidence.  That is for presentation of Mr. Van Dyke, just so

11   the record is clear.

12   BY MR. VAN DYKE:

13   Q.   Cingar Transports, LLC was Barathi Chidambaram's investment

14   company that invested in RBL; right?

15   A.   I don't know the answer to that without looking at

16   documents, Counsel.

17   Q.   Okay.  Would seeing a copy of his contract refresh your

18   recollection, sir?

19   A.   I hope it will help.

20           MR. VAN DYKE:  Permission to approach what's premarked

21   as AG-5 through 8, just for refreshing purposes.

22           THE COURT:  Yes.

23           MR. VAN DYKE:  Thank you.

24           THE COURT:  What's the question before him?

25   ///

```
 1   BY MR. VAN DYKE:

 2   Q.  Are you aware, sir, that Cingar Transports LLC was Barathi

 3   Chidambaram's investment company that invested in RBL?

 4        THE COURT:  After you review all of those to yourself,

 5   sir, that's the question before you, whether those documents

 6   refresh your recollection as to that question.

 7        THE WITNESS:  Yes, sir.  I mean, yes, acknowledging

 8   what you're telling me.

 9   A.  That is correct, sir.

10        MR. VAN DYKE:  Thank you.  Can I retrieve the exhibits,

11   Your Honor?

12        THE COURT:  Yes.

13   BY MR. VAN DYKE:

14   Q.  And just like every other investment company, he stopped

15   receiving payment on June 21st, 2023; right?

16   A.  Yes.

17   Q.  I have a few more questions about this.

18        Because you're not able -- you would agree with me that you

19   can't trace the money because you only had access to RBL's bank

20   accounts; right?

21   A.  Well, there's two reasons.  One is, yes, I don't have

22   access to any other bank accounts other than RBL.  Two, my

23   client had not asked me to do that.  I can only assume they

24   don't have access either.

25   Q.  I would like to show you what's already been admitted --
```

```
 1            MR. VAN DYKE:  And this is just for the witness --
 2   actually, this is already been admitted as Defense Exhibit S-7?
 3            THE COURT:  Yes.  S-7 is in evidence.
 4            MR. VAN DYKE:  Thank you, Your Honor.
 5   BY MR. VAN DYKE:
 6   Q.  Switching from 119-24 to Defense Exhibit S-7.
 7       Do you see that the year-end summary for the Amex card is
 8   2.7 million?
 9       I can zoom in for you.  I apologize.
10   A.  I see it, yes, sir.
11   Q.  Okay.  I would like to switch back to 119-24 for the
12   record.  You see that the amount listed on 119-24, for all
13   time, is 2.4?
14   A.  Yes, sir.
15   Q.  The reason for that is what we were talking about, the
16   tracing of funds; right?
17   A.  The reason for what?
18   Q.  For the disparity between the year-end summary for 2022 and
19   the $2.4 million figure in your chart?
20   A.  I don't know.  I haven't done the tracing.  I'm reading the
21   statement you showed me, and it shows me 2.7 million.
22   Q.  What I'm asking, sir, is if Cingar Transports LLC paid off
23   the Amex itself, but RBL transferred money to Cingar Transports
24   LLC, that wouldn't be captured in this; right?
25   A.  Not in my analysis, no.
```

```
 1   Q.   Perfect.

 2        So this 2.5 million might represent some of the expenses

 3   related to the American Express card?

 4   A.   Anything is possible.  I don't know.

 5   Q.   Okay.  You --

 6   A.   You're asking me to make an assumption.

 7   Q.   And Cingar Transports LLC was -- we already described is

 8   Barathi Chidambaram's investment company.

 9        I'm going to highlight that line as well just for my

10   purposes.

11             MR. VAN DYKE:  Can we briefly come sidebar, Your Honor?

12             THE COURT:  Sure.

13             See you in a minute.

14         (The preceding proceedings were had before the Court and

15         out of the hearing of the jury.)

16             MR. VAN DYKE:  So the only thing I have left is the

17   3.9 million.  We discussed this morning.  I have taken the

18   liberty of just highlighting the parts that I want him to add

19   and subtract.  I have a calculator.  This has already been

20   admitted.

21             THE COURT:  That's in evidence.  You can have him

22   affirm and read things in this record that you need in the

23   record.

24             Any objection to that?  It's in evidence.

25             MR. CRUZ:  No.
```

```
1                MR. VAN DYKE:  I'm almost done.

2                THE COURT:  And just one moment, Mr. Cruz.

3                MR. CRUZ:  Yes, Your Honor.

4                THE COURT:  If you do that, everything that you said

5      this morning is by the boards; right?  You don't need the

6      factual stipulation from this witness beyond that?

7                MR. VAN DYKE:  Can I confer one moment?

8                THE COURT:  Sure.

9                MR. VAN DYKE:  My understanding is that Mr. Tatelbaum

10     informed me -- I don't know if it was his final decision.  He

11     doesn't have access to the Robinhood accounts, in which case

12     that would obviate the $500,000.

13               THE COURT:  Get that from him on the stand of whether

14     or not --

15               MR. VAN DYKE:  Perfect.  He has access, and then that

16     will be clear beyond --

17               MR. CRUZ:  Can we take a bathroom break before

18     redirect?

19               THE COURT:  Yes.

20         (The preceding proceedings were had before the Court and

21          out of the hearing of the venire.)

22               THE COURT:  Thank you for your patience, ladies and

23     gentlemen.  We're going to continue with cross-examination.

24     BY MR. VAN DYKE:

25     Q.   Okay.  Mr. Kapila, I just have a few more questions for
```

```
 1   you.  All right?

 2   A.  Sure.

 3   Q.  The top line -- we were talking about tracing money; right?

 4   A.  Yes.

 5   Q.  The top line here includes receipts and disbursements to

 6   Mr. Singh; right?

 7   A.  Yes.

 8   Q.  The total amount is 4.4 -- $4,478,695.38; right?

 9   A.  Net amount, yes.

10   Q.  Now you didn't have access to Mr. Singh's personal

11   accounts; right?

12   A.  Correct.

13   Q.  But you are aware that Mr. Singh had a personal TD America

14   account?

15   A.  I'm aware of that, yes.

16   Q.  Would you agree with me, sir, that about $3.9 million of

17   that disparity reflected in 4.4 is attributed to trading losses

18   in Mr. Singh's personal TD Ameritrade account?

19   A.  I don't know that.

20          MR. VAN DYKE:  Permission to approach, Your Honor.

21          THE COURT:  Yes.

22   BY MR. VAN DYKE:

23   Q.  I have a calculator for you, sir.  It's a little bit of

24   math.  Can I give you a pen and piece of paper, and I

25   highlighted the rows.  I would like to see what number you come
```

1    up with, okay?

2    A.   Okay.  I don't have the access to those accounts.

3    Q.   No.  I'm not saying that you did anything wrong.  I would

4    just like you to calculate this for us quickly.

5         THE COURT:  For the record, this document is marked as

6    what in evidence?

7         MR. VAN DYKE:  This is in evidence as -- I just want to

8    make sure -- Government's Exhibit 60, and I have specific

9    callouts just for identification, AG-47, AG-48, and AG-49.

10        THE COURT:  You want the jury to follow along as he

11   does this, because it's in evidence?

12        MR. VAN DYKE:  Can I direct him to the pages?

13        THE COURT:  Of course, you could.  It's in evidence.

14        MR. VAN DYKE:  For the record, I've handed the witness

15   a calculator and notepad and a pen.

16   BY MR. VAN DYKE:

17   Q.   I would just like to you calculate on each year-end summary

18   the trading losses, and give us the complete number that you

19   come up.  Okay?  I'll flip to the pages.

20        THE COURT:  Just make the record, please, Mr. Van Dyke,

21   of each page.

22        MR. VAN DYKE:  Apologies, Your Honor.

23        THE COURT:  It's okay.

24        MR. VAN DYKE:  Page 3 of AG-47.

25   ///

1   BY MR. VAN DYKE:

2   Q.   I would like you to subtract securities purchase from

3   securities sold.

4        Page 3 of AG-48, and page 3 of AG-49.  And I do apologize

5   for putting you on the spot, Mr. Kapila.

6   A.   I'm going to try again.  The numbers don't seem to come up.

7        I have a number.  Do you want me to call it?

8   Q.   Is it around 3.9 million?

9   A.   Then my math is wrong.  It's not -- it's showing

10  1.9 million.

11  Q.   1.9?  Okay.

12        MR. VAN DYKE:  I'll just save it for closing,

13  Your Honor.

14  A.   Maybe I'm instructing with your calculator.

15        THE COURT:  Why don't you do this:  There's three

16  records before him; correct?

17        MR. VAN DYKE:  Yes.

18        THE COURT:  Restate what it is that you asked him to do

19  and lead him.

20        MR. VAN DYKE:  Okay.

21        THE COURT:  Do you have the records before you,

22  Mr. Kapila, the TD Ameritrade records?

23        THE WITNESS:  He took them back?

24        THE COURT:  Put them in front of him Mr. Van Dyke.

25  There's useful of this time.  For each record, see if he agrees

```
 1    with your calculations.

 2            Because all you're doing, if I understand, is asking

 3    him to conduct three calculations and add them together?

 4            MR. VAN DYKE:  That is correct.

 5            THE COURT:  Since we spent this much time on it, let's

 6    see if we can close the loop.

 7            Mr. Kapila, take your time, sir.

 8            THE WITNESS:  Yes, sir.

 9            THE COURT:  You can lead him right through it,

10    Mr. Van Dyke.

11            MR. VAN DYKE:  Thank you, Your Honor.

12    BY MR. VAN DYKE:

13    Q.  Do you have the document open with statement reporting

14    period 12/1/22 through 12/31/22?

15    A.  I do, but I have two statements which cover that period,

16    Counsel, two different accounts, I think.

17        Oh, they're the same account numbers.  Excuse me.

18    Q.  Let me make you -- you have the right one.  You have one

19    for 12/1/22 to 12/31/22; correct?

20    A.  Yes.

21    Q.  Do you have one for 2023?

22    A.  I have one for from 10/1/23 to 1/31/2023.

23    Q.  Okay.  And do you have one for 2021?

24    A.  I do not.

25            MR. VAN DYKE:  Permission to approach, Your Honor?
```

1         THE COURT:  Yes, sir.  You can stand right next to him

2   and you can lead at him through it.  These are in evidence.

3         MR. VAN DYKE:  Yes, Your Honor.

4         THE COURT:  Yes.

5         THE WITNESS:  Now I have '21 also.  These two are both

6   for 2022.

7         MR. VAN DYKE:  Let me withdraw this one.

8         THE WITNESS:  They're the same account number,

9   interestingly.

10  BY MR. VAN DYKE:

11  Q.  Okay.

12  A.  Yes, sir.

13  Q.  For the 2022 account, 12/1/22 to 12/31/22 --

14        MR. VAN DYKE:  Can I have the ELMO just for the

15  witness, Your Honor?

16        THE COURT:  These are in evidence.

17        MR. VAN DYKE:  Well, it's just my notepad, to lead him

18  through the calculation.

19        THE COURT:  That's okay.  You can do it.

20        MR. VAN DYKE:  Okay.

21        THE COURT:  You have a good faith basis to track the

22  document.

23  BY MR. VAN DYKE:

24  Q.  Securities purchased are negative 382,984,924 --

25  A.  Yes, sir.

```
 1   Q.   -- .51?

 2   A.   Yes.

 3   Q.   That's in parentheses?

 4   A.   Yes.

 5   Q.   Securities sold are 380,921,274.31; right?

 6   A.   Yes.

 7            THE COURT:  What year is that?

 8            MR. VAN DYKE:  This is 12/1/22 to 12/31/22.

 9            THE COURT:  Thank you.  So that's one calculation.

10            You agree with those two numbers; right Mr. Kapila?

11            THE WITNESS:  I do.

12            THE COURT:  Thank you.

13            THE WITNESS:  One is a purchase and the other one is a

14   sale.

15   BY MR. VAN DYKE:

16   Q.   That results in negative two million?

17   A.   Correct.

18   Q.   Did you have that number?

19   A.   I did have that number.

20   Q.   Okay.  Let's look at 12/1/21 to 12/31/21.  Do you see that?

21   A.   Yes, sir.

22   Q.   Negative 14,826,973.23.  Did I read that right?

23   A.   Yes, sir.

24   Q.   Positive $13,001,011.31.  Did I read that right?

25   A.   Yes, sir.
```

```
 1   Q.   Negative $1,825,961.92.  Is that what you got?

 2   A.   Yes, sir.

 3   Q.   Okay.

 4   A.   Well, I didn't have the statement before.  But I got that

 5   now.

 6   Q.   Oh, that was my mistake.  I apologize.

 7        THE COURT:  It's all right.  Two down, one to go.

 8   BY MR. VAN DYKE:

 9   Q.   Next one is positive $17.64?

10   A.   Yes, sir.

11   Q.   All right.  I should have known that with an accountant, it

12   was my error.  2,063,650 plus two, plus 1,825,961.92 is

13   3.8 million -- 3,889,612.12.

14   A.   Your calculator reads $3,889,612.12.

15        MR. VAN DYKE:  Okay.

16        THE COURT:  Those are the two number added together.

17        MR. VAN DYKE:  The three.  The last one is just a --

18        THE COURT:  The three numbers added together.

19        MR. VAN DYKE:  It's just a positive seventeen

20   sixty-four.

21        THE COURT:  It's a negative two million -- if you put

22   up there, Mr. Van Dyke, just one more second, your notepad, so

23   that the record is clear.

24        The witness will confirm this.  There's a 2022

25   calculation of negative $2,063,650.20.  That's correct.
```

1          THE WITNESS:  That is correct, Judge.

2          THE COURT:  Then there's a 2021 calculation of negative

3     $1,825,961.92.  And that's correct.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  And then there's a 2023 calculation of

6     positive $17.64; correct?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  When you add all three of those numbers,

9     two negative numbers and the positive number, the sum total of

10    these three numbers is negative 3,889,612.12.  You agree with

11    that, sir?

12         THE WITNESS:  Yes, I think I do.  The math is right.

13    Yes, sir.

14         THE COURT:  All right.

15         MR. VAN DYKE:  All right.

16    BY MR. VAN DYKE:

17    Q.  I'm just going to make that notation for myself on 119-24.

18    This is going to be a defense demonstrative.

19         We went over what some of the payments that Sanjay Singh

20    made out of the RBL accounts were, and I think you went over

21    mortgage payments with the Government.

22         MR. VAN DYKE:  Permission to retrieve the exhibits,

23    Your Honor?

24         THE COURT:  Yes, sir.

25    ///

```
 1   BY MR. VAN DYKE:

 2   Q.  Mortgage payments; correct?

 3   A.  From which account?

 4   Q.  You went over some documents with the Government in direct.

 5   Do you recall?

 6   A.  Yes.

 7   Q.  There were mortgage payments made out of RBL accounts?

 8   A.  Yes, sir.

 9   Q.  Do you recall what Sanjay Singh's salary was when he was

10   the president of RBL?

11   A.  No, I do not.

12   Q.  Would it -- does it match your recollection that it was

13   never above --

14        MR. CRUZ:  Objection, Your Honor.  He said he didn't

15   know.

16        THE COURT:  Let's hear the question.

17   BY MR. VAN DYKE:

18   Q.  Are you aware, sir, that it was never above $78,000 a year?

19   A.  I just don't remember.  I don't know.

20   Q.  Okay.  We're not going to pull them out.

21        What is owner draw in a -- as an accounting term?

22   A.  An owner draw is, basically, when an owner of a business

23   draws out cash -- cash meaning whether it's by check or bank

24   transfer, on an ad hoc basis whatever money that owner may wish

25   to draw out.
```

1   Q.   And this is an accounting term that you're familiar with?

2   A.   It's not a particularly term of art.  I mean, it's money an

3   owner draws out.

4   Q.   I just have a few more questions, sir.

5        We discussed that $16 million, I believe you said, were put

6   at risk; correct?

7   A.   With the TD Bank in the RBL side, yes.

8   Q.   Yes.  And that $250,000 was transferred to Mr. Singh at

9   some point in 2023.  Do you recall that?

10  A.   There was one, yes.

11  Q.   You testified confidently that those were investor funds;

12  right?

13  A.   That investor funds were used to make those disbursements.

14  I did testify that, yes.

15  Q.   Okay.  You would agree with me that money is fungible?

16  A.   Yes, I do.

17  Q.   You'd agree with me, as you've testified many times, that

18  because of your cash reconstruction, you're unable to trace the

19  money; right?

20  A.   On the basis of fungibility, but there are different ways

21  of tracing methodologies in my profession, yes.

22  Q.   There was less than 16.5 million that the Government went

23  over with you; correct?

24  A.   I don't follow your question.

25  Q.   16 million plus 250,000?

1    A.   Oh, okay.  Yes.

2    Q.   And trucking revenue is about 17 and a half million; right?

3    A.   Oh, over that entire time window?

4    Q.   Yes.

5    A.   The trucking revenue was about that, yes.

6    Q.   And that's more than the 16 and 250 that you went over with

7    the Government?

8    A.   Well, mathematic -- or arithmetically, yeah, 17 is more

9    than 16.

10   Q.   Thank you.

11          MR. VAN DYKE:  Just with the Court's brief indulgence,

12   Your Honor.

13          THE COURT:  Yes.

14          MR. VAN DYKE:  I tender the witness, Your Honor.  Thank

15   you.

16          THE COURT:  We're going to take an afternoon break for

17   a good 15 minutes after all that math.  I'll see you in

18   15 minutes.

19          THE COURT SECURITY OFFICER:  All rise for the jury.

20   (The jury exited the courtroom at 4:23 PM, after which the

21   following proceedings were had:)

22          THE COURT:  See you in ten minutes.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Thank you.  If everyone would please be

25   seated.

1          Mr. Kapila, you can head to the hallway for your ten

2   minutes, sir.  Thank you.

3          (The witness exited the courtroom at 4:24 PM, after

4   which the following proceedings were had:)

5          THE COURT:  If the record could reflect that the

6   witness, who will be on the stand when the jury comes back, has

7   left the courtroom.

8          Mr. Van Dyke, if I understood correctly, your requests

9   and concerns voiced this morning are all by the boards;

10   correct?

11          MR. VAN DYKE:  Yes.  Mr. Tatelbaum represented that

12   Mr. Lopez and Mr. Kapila did not have access to the Robinhood

13   accounts and the Amex accounts.  I believe that's accurate.

14          THE COURT:  And the bottom line is that the witness was

15   available to the defense.

16          MR. VAN DYKE:  Oh.  Yes, Your Honor.

17          THE COURT:  You have explored everything that you

18   wanted to explore, and there is no basis that the Court can see

19   to have this witness ever be recalled or perform additional

20   calculations.

21          MR. VAN DYKE:  That's fair, Your Honor.

22          THE COURT:  So you waive?

23          MR. VAN DYKE:  We withdraw the request.

24          THE COURT:  Thank you very much.  There's going to be

25   redirect when we get back of this witness in about ten minutes,

```
 1   and we'll go from there.

 2          MR. CRUZ:  So the Court knows, I'll try to be brief.

 3   I don't think I'll be more than 10, 15 minutes, Judge.

 4          THE COURT:  I love the sound of that.  I'll see you in

 5   ten minutes.

 6       (Off the record from 4:25 PM to 4:37 PM, after which the

 7       following proceedings were had within the presence of the

 8       jury:)

 9          THE COURT:  Welcome back, please be seated.

10          Redirect examination, Mr. Cruz.

11          MR. CRUZ:  Thank you, Your Honor.

12                        REDIRECT EXAMINATION

13   BY MR. CRUZ:

14   Q.  Mr. Kapila, Exhibit 137 in evidence -- do you recognize

15   this building?

16   A.  Yes, sir.

17   Q.  What is it?

18   A.  I think that's where the RBL offices were.

19   Q.  And the second page of that same exhibit, do you see

20   something that you recognize?

21   A.  Yeah.  One is the label RBL on -- it looks like a door, and

22   then on one side it looks like the face of a truck.

23   Q.  And that's what I wanted to ask you about.  Okay?  The

24   agreements that you went over with counsel on

25   cross-examination, this isn't the same exact one but it's the
```

```
 1   same person, Mr. Costello.
 2       Sir, who is the agreement with, Mr. Costello and who else?
 3   A.   Royal Bengal Logistics, Inc.
 4   Q.   You were asked a series of questions about Royal Bengal
 5   Holdings.
 6   A.   Okay.
 7   Q.   Royal Bengal Holdings.  The people that hired you, the two
 8   managers, Paul and Jen, which entity were they the new managers
 9   of?
10   A.   I thought it was RBL Logistics.
11   Q.   RBL Logistics.  The contract that you were shown on cross
12   was for RBL Holdings; correct?
13   A.   I, obviously, missed that.
14   Q.   I'm not criticizing you, sir.  My question is simple.
15       The contract that you were shown on cross, what entity was
16   it for?
17   A.   Honestly, I do not notice.  I was focused on the parties
18   there without focusing on the holdings word.
19   Q.   I'm not going to bring it up on the screen, but again, is
20   there a difference, in fact, between the new managers being
21   part of RBL logistics and the work you did compared to the one
22   that was shown on cross?
23   A.   Yes.
24   Q.   What did the new -- strike that.  I'll move on.
25       You were asked some questions about Fly Big.  Do you
```

```
 1   remember that?

 2   A.   About who?

 3   Q.   Fly Big?

 4   A.   Yes.

 5   Q.   Exhibit 119-28.   Revenue versus investor funds raised.

 6   Exhibit 119-28?

 7   A.   Yes, sir.

 8   Q.   This is the first pie chart that we saw together this

 9   morning.   Do you remember?

10   A.   Yes, sir.

11   Q.   You were asked a series of questions about Fly Big; right?

12   A.   Yes.

13   Q.   And you were asked about questions about royal bengal

14   holdings.   Tell me where the revenue is on this pie chart for

15   either of those two companies.

16   A.   No, this would be RBL Logistics.

17   Q.   Was there revenue for Fly Big or RBL Holdings?

18   A.   No, sir.

19   Q.   You were asked by Mr. Van Dyke about trailers.   Do you

20   remember that?

21   A.   Yes.

22   Q.   Whether or not they were assets or not, remember those

23   questions?

24   A.   Yes.

25   Q.   Sir, were there any trailers that were sold, according to
```

```
 1   the bank reconstruction that you did, and you have testified

 2   about?

 3   A.   Not that I'm aware of.

 4   Q.   Was there any revenue whatsoever from the sale or

 5   manufacturing of trailers according to your bank

 6   reconstruction?

 7   A.   No, sir.

 8   Q.   You were asked about a viability assessment.  Do you

 9   remember that?

10   A.   I remember.

11   Q.   I'm not going to ask you about forward assessments.  Okay?

12        I do want to ask you, were you asked to do a

13   forward-looking assessment of viability?

14   A.   No, sir.

15   Q.   What does the word "insolvency" mean?

16             THE COURT:  Sustained.

17             MR. VAN DYKE:  Beyond -- yeah.

18             THE COURT:  Move on.

19   BY MR. CRUZ:

20   Q.   On the day that you were hired, did you have an ability to

21   compare debt with assets on hand?

22   A.   Only as of that point in time.

23   Q.   And looking backwards, did you assess, as far as what the

24   debt compared to assets were at the time that the new managers

25   took over?
```

```
 1   A.   In the sense that there was a balance sheet from the

 2   QuickBooks records that I recall, and it would give me the

 3   answer to what the assets and liabilities were.

 4   Q.   You brought up the QuickBooks.  Just a couple questions on

 5   that.  You were asked some questions about the P&Ls and the

 6   QuickBooks; is that accurate?

 7   A.   Yes, sir.

 8   Q.   Now, as far as the internal records -- I'm going to ask you

 9   a few questions about the internal records.

10        The P&Ls that are on the screen, Government's 119-25,

11   119-27, 119-27, the payments to investors, if you know, were

12   they memorialized or captured in the internal P&L for RBL

13   logistics?

14   A.   They would not be by way of the line item there, sir,

15   unless they were embedded in one of the other numbers.  They

16   would not be.

17   Q.   And you were asked a series of questions about how the

18   QuickBooks affected your reconstruction.  Do you remember those

19   questions?

20   A.   Yes.

21   Q.   Were you asked to compare the internal records with the

22   actual reconstruction, sir?

23   A.   No, sir.

24   Q.   Why not?

25   A.   As I said, repeatedly, the cash reconstruction is as
```

1    concrete as you can get on the flows of monies, and the

2    QuickBooks records in that context were pretty irrelevant to

3    what the new manager asked me to do.

4    Q.   You were asked about the reliability or unreliability of

5    those very QuickBooks records.  Do you remember those questions

6    by counsel?

7    A.   Yes.

8    Q.   Whether or not they were viable or reliable, the QuickBooks

9    records, who was responsible for inputting the information into

10   the QuickBooks?

11   A.   It would be the old prior management before the change --

12   prior management of RBL, the logistics company.

13   Q.   And if they were incomplete, whose -- which group was the

14   one that had the incomplete records?

15         MR. VAN DYKE:  Objection.

16         THE COURT:  Sustained.

17   BY MR. CRUZ:

18   Q.   Mr. Van Dyke asked you about liquid and not liquid.  Do you

19   remember those questions?

20   A.   Yes.

21   Q.   I think it was specifically about the property.  Remember

22   those questions?  Real property?

23   A.   He did ask me questions on the real property, yes.

24   Q.   By definition, is real property a liquid asset sir?

25   A.   Yes.

```
 1   Q.   Whether is a liquid asset?
 2   A.   Liquid asset is either cash, cash in the bank or let's say
 3   an investment that can be immediately monetized in a relatively
 4   immediate term.
 5   Q.   Was there enough liquid assets to satisfy the debt
 6   obligations of Royal Bengal Logistics when the new managers
 7   took over?
 8           MR. VAN DYKE:  Objection.  702.
 9           THE COURT:  Overruled.  He can answer.
10   BY MR. CRUZ:
11   Q.   I'll ask it and move on:  Was there enough liquid assets,
12   sir, to satisfy the debt obligations of Royal Bengal Logistics
13   when the new managers took over?
14   A.   No, sir.
15   Q.   You were asked about -- by Mr. Van Dyke later today -- so
16   recently about whether or not you saw the revenue per truck
17   being subaccounted.  Do you remember?
18   A.   He did ask that question, yes.
19   Q.   What is "subaccounting"?
20   A.   I assume that he means you have to subtract the revenue by
21   truck, in the context of the question he asked that I'm
22   recalling.
23   Q.   Let me turn it around.  The different revenue that you
24   examined, the trucking and the other potentials, did your
25   internal records assessment see any separation or segregation
```

1    of the different types of investments by bank account?

2    A.   No, sir.

3    Q.   What did you see instead?

4    A.   Just money coming in, and money going out, but it wasn't

5    tracked by the type of investment, if that's your question.

6    Q.   It is.  And what did that do, if anything, for your job as

7    understanding the flow and outflow of money?

8    A.   Well, I mean, to try and attribute the cash inflows by

9    investment would be an enormous task, by tracking each

10   investment contract, if you will, and linking the money in the

11   bank account to those contracts, which would be -- I would say

12   with 1,600 investors plus, it's a fairly substantial and

13   insurmountable time from a practicality point of view.

14           MR. CRUZ:  Two more questions, and then I'll tender.

15   BY MR. CRUZ:

16   Q.   Mr. Kapila, you were asked about again -- strike that.

17   I apologize.  I have two more areas and I'll tender.

18       Exhibit 119-24, Mr. Van Dyke spent some time with you -- do

19   you recall the questions from this exhibit, sir?

20   A.   I do.

21   Q.   And I believe you highlighted a few of the lines and asked

22   you if they might have been miscategorized.  Do you remember

23   those questions?

24   A.   Yes, sir.

25   Q.   Let me ask you, do you recall being questioned about all of

```
 1    the money attributed to related parties?  Do you remember those
 2    questions?
 3    A.   Yes.
 4              MR. VAN DYKE:  Objection.  Beyond the scope.
 5              THE COURT:  Overruled.  Within the scope of cross.
 6              You may ask a question regarding that portion of the
 7    exhibit.
 8              MR. CRUZ:  Yes, Your Honor.
 9    BY MR. VAN DYKE:
10    Q.   So let me ask you this first one.  This exhibit, as far as
11    the related party Celicourt, you have the numbers -- and again,
12    I'm not going to go over the numbers, but I just wanted to make
13    a quick point on, for example, Celicourt.  You see Celicourt
14    there; right?
15    A.   I do.
16    Q.   And these are people under the related parties for
17    Celicourt on Exhibit 119-24?
18    A.   Yes.
19    Q.   Now, what about 1099 and W-2, are those accounted for on
20    those items that counsel asked you about on Exhibit 119-24
21    four?
22    A.   W-2s, I would ordinarily expect there in the wages and
23    payroll, but I don't remember if they were quoted to the
24    related parties to this chart.
25    Q.   A few more questions on this, and I'll move on and tender.
```

1    As far as Celicourt 17-3 --

2         MR. VAN DYKE:  Beyond the scope as to this exhibit.

3         THE COURT:  Yes, but he's asking about something within

4    119-24.

5         You can ask.

6         MR. CRUZ:  Thank you, Your Honor.

7    BY MR. CRUZ:

8    Q.  Just a few questions sir.

9         These payments -- and again, I highlighted and Your Honor

10   already mentioned highlights by counsel.  I just want to make

11   the point, sir.

12        Are these items such as -- again, my highlights, 10,000,

13   10,000, 15,000, and then finally $26,968.94, as well as 25,000

14   for the period of February 2023, another February 2023, 50,000,

15   and February 24th, 2023, for 50,000.

16        Sir, based on your testimony prior, do you believe

17   Exhibit 119-24 captures these payments to Celicourt?

18   A.  I'm trying to look at these numbers.  I really don't know.

19   I don't remember where they were coded in our categorizations,

20   if that's your question.  I'm sorry.

21   Q.  That's okay.  I'll move on.

22        The wire details, again, same exhibit, you were asked some

23   questions, remember, about this and a few of the other related

24   parties; right?

25   A.  Yes.

```
 1    Q.  But from Exhibit 27 in evidence -- we talked about it

 2    briefly.  Just a couple follow-ups within this.  The wire on

 3    February 5th, 2021, that says "POP family support"?

 4    A.  Yes.

 5    Q.  Going out of the RBL operating account.  That is reflected;

 6    is that accurate, sir?

 7              MR. VAN DYKE:  Objection.  Leading.

 8              THE COURT:  That --

 9         Just one moment.  You're going through the exhibits

10    very quickly, and I can't see the numbers, Mr. Cruz.  You're

11    question is what?  Please rephrase your question.  And then

12    Mr. Van Dyke will let me know if he has an objection.

13    BY MR. CRUZ:

14    Q.  Uday Singh -- you were asked a series of questions about

15    your numbers and how you categorize, on Exhibit 119-24.  The

16    types of transactions to this individual, Uday Singh, which is

17    over here net, 432,500, was that number taken from exhibits in

18    evidence, such as Exhibit 27, the Bank of America account?

19         Let me zoom out --

20              MR. VAN DYKE:  Objection.  Leading.

21              THE COURT:  Just wait.  Let me hear the question.

22    BY MR. CRUZ:

23    Q.  Did you account for these wires with these descriptions,

24    sir?

25              THE COURT:  Are they entries in 27?
```

```
 1              MR. CRUZ:  Yes.

 2              THE COURT:  Encompassed within 119-24.  Is that your

 3    question?

 4              MR. CRUZ:  Thank you, Judge.

 5              THE COURT:  Is there an objection?

 6              MR. VAN DYKE:  No, Your Honor.

 7              THE COURT:  You can answer.

 8              THE WITNESS:  Yes, for Uday Singh, yes, there would be.

 9    BY MR. CRUZ:

10    Q.  Finally, sir, Exhibit 119-30, you were asked a series of

11    questions.

12              MR. VAN DYKE:  Objection.  Beyond the scope.

13              THE COURT:  Of cross, it depends.  I got to hear the

14    question.

15    BY MR. CRUZ:

16    Q.  When Mr. Van Dyke was asking you with the payments from

17    under the example, remember the monthly payments, he had you

18    add them up.  Remember?  And then --

19    A.  Oh, yes.

20    Q.  -- he exhausted the total funds provided on the contract.

21    Do you remember that?

22    A.  Yes.

23    Q.  I'm not going to do the drawing, but I would like to ask

24    you about those questions in relation to this exhibit that's in

25    evidence.
```

```
 1              MR. CRUZ:  If the Court will allow me?

 2              THE COURT:  Yes.

 3    BY MR. CRUZ:

 4    Q.   Do you remember those questions?

 5    A.   I do.

 6    Q.   And you had -- you were asked to sum up, under these

 7    contracts, the monthly payment, and then come up with an

 8    ultimate delta what was left over after a series of time.

 9         Do you remember that?

10    A.   Yes.

11    Q.   Now, the questions that he asked you about, did the money

12    going back to the investor, did that account for the principal

13    and interest owed under the terms of the contract?

14    A.   It would be, because as I pointed out, we can't talk in

15    terms of just principal because the repayment structure is

16    embedded in a total payment over a period of time, which

17    exceeds the original investment.

18              MR. CRUZ:  Last question, Your Honor, with your

19    permission.

20    BY MR. CRUZ:

21    Q.   The payments, back to the example that Mr. Van Dyke gave

22    you on that contract, what was the source of the payments

23    according to Exhibit 119-30?

24    A.   It would be the investor funds which are in the orange

25    bars.
```

```
 1            MR. CRUZ:  No further questions, Your Honor.  Thank

 2   you.

 3            THE COURT:  Recross.

 4            MR. VAN DYKE:  Very briefly, Your Honor.

 5                      RECROSS-EXAMINATION

 6   BY MR. VAN DYKE:

 7   Q.  On redirect, the Government drew a distinction between

 8   Royal Bengal Holdings and Royal Bengal Logistics; correct?

 9   A.  Yes.

10   Q.  I would like to show you what's already been admitted into

11   evidence as Government Exhibit 116.

12            THE COURT:  You may.

13   BY MR. VAN DYKE:

14   Q.  Do you see this yellow tag here?

15   A.  I do.

16   Q.  Does that say government or defense?

17   A.  It says Government Exhibit.

18   Q.  Who is this contract with?

19   A.  It says Royal Bengal Holdings.

20            MR. VAN DYKE:  Nothing further.  Thank you, Your Honor.

21            THE COURT:  Okay.  Mr. Kapila, thank you.  You are

22   excused, sir.  You may step down.

23            THE WITNESS:  Thank you, Judge.

24            THE COURT:  You have permission to leave, sir, and they

25   will clean up after you.  Thank you very much.
```

1          MR. CRUZ:  May I approach, Judge?

2          THE COURT:  Yeah.  You can clean up and call your next

3     witness.

4          MR. MOORE:  Your Honor, the Government calls

5     Kara Cooper to the witness stand.

6          THE COURT:  I was getting worried that you wouldn't

7     have anything to do today, Mr. Moore.

8          MR. CRUZ:  May I clean up, Judge?

9          THE COURT:  Yes.  Clean up whatever you see fit.

10          You may please step forward to the witness box.  My

11     deputy will swear you in.

12          THE COURTROOM DEPUTY:  Please raise your right hand to

13     be sworn.

14     Thereupon,

15                          KARA COOPER,

16     having been first duly sworn or affirmed, was examined and

17     testified as follows:

18          THE WITNESS:  Yes.

19          THE COURTROOM DEPUTY:  Please state your full name for

20     the record and spell and your last name.  There's a microphone

21     and you maybe seated.

22          THE WITNESS:  Kara Helene Cooper, C-O-O-P-E-R.

23          THE COURT:  Ms. Cooper, if you would make yourself

24     comfortable in the chair, if you'd always try your best to make

25     sure that the microphone is close where you speak so that you

1    can be heard.

2           Mr. Moore, your witness.  Direct examination.

3                        DIRECT EXAMINATION

4    BY MR. MOORE:

5    Q.   Ms. Cooper, where are you from?

6    A.   Detroit, Michigan.

7    Q.   And what do you do for a living?

8    A.   I'm a traveling ER nurse.

9    Q.   And where are you traveling to currently?

10   A.   California, I'm working in right now.

11   Q.   Have you traveled to some other locations in the past?

12   A.   Yes.

13   Q.   If you can, just tell the ladies and gentlemen of the jury

14   a couple of locations where you did work in the past?

15   A.   Texas, I think that's -- California and Texas.

16   Q.   Now, at some point in November of 2021, let's say in

17   November of 2021, where were you working at that point?

18   A.   Temple, Texas.

19   Q.   While working in Temple, Texas, did you come into contact

20   or hear about the name Royal Bengal Logistics?

21   A.   Yes.

22   Q.   How did you hear about the name Royal Bengal Logistics?

23   A.   I was working with another ER nurse, Esther ^ , which she

24   had gone to church with some of the people from RBL.  And she

25   had told me about RBL.

1  Q.  And I referenced, actually, November of 2021, but when did

2  you actually hear about RBL?

3  A.  I believe it was sometime in September of 2021.

4  Q.  And after hearing about RBL from your friend Esther

5  Bienami, or coworker, what actions did you take?

6  A.  She pretty much gave me Ricardi's number, so I had

7  contacted Ricardi, which he was part of RBL.

8  Q.  Do you know Mr. Ricardi's last name?

9  A.  It starts Celicourt, somewhere around there.

10 Q.  What, if anything, did you do with the information that she

11 gave you regarding Ricardi Celicourt?

12 A.  So she had actually showed me like her bank account and

13 stuff, that she had been doing RBL for about a year, I think,

14 somewhere around there, so I was able to see the payments that

15 she had gotten from them.  And then I called Ricardi and pretty

16 much talked to him about RBL and --

17 Q.  When you talked to Ricardi, what information did he give

18 you about the company?

19 A.  He just said that it had been like it was -- he was excited

20 about it.  It was -- the business had been booming.  They were

21 very profitable and they were about to go into doing airplanes,

22 they were doing so well.

23 Q.  And around when was this conversation?

24 A.  September of 2021.

25 Q.  And when he talked about the business booming and being

1    profitable, what aspect of the business did he tell you was

2    booming and profitable?

3    A.   He just said that they were doing the trucking business and

4    that they were making a lot of profit off of pretty much doing

5    the trucking.

6    Q.   Did he tell you about any expansion that Royal Bengal had

7    done at that point into other locations outside of Florida?

8         MS. BECKER:  Objection.  Leading.

9         THE COURT:  Sustained.

10   BY MR. MOORE:

11   Q.   What, if anything, did he tell you about where Royal Bengal

12   Logistics had offices?

13   A.   So I was told -- I don't know about if it was at that

14   time -- that it was Texas, Florida, and Georgia.

15   Q.   And what did he tell you was done in Texas?

16   A.   It was just another location, pretty much like in Florida,

17   that they were doing their trucking business in Lubbock, Texas.

18   Q.   And based on the information that he gave to you

19   specifically about profitability, what actions did you decide

20   to take?

21   A.   I decided to get a -- pay 35,000 to get a truck at that

22   time, which was in November, I believe, of 2021.  I thought on

23   it for a month and was able to see Esther's bank account and

24   she had been in it for a year, so I was able to see like what

25   she was making pretty much.  So then in November of 2021 I

```
 1    think I decided to make that decision.
 2            MR. MOORE:  Your Honor, at this time the Government
 3    will move by stipulation to put 8 and 8-1 into evidence.
 4            THE COURT:  I'm sorry, 8-1?
 5            MR. MOORE:  8 and 8-1.
 6            THE COURT:  8 and 8-1.  Any objection?
 7            MS. BECKER:  No objection.
 8            THE COURT:  Those two are received.
 9         (Government's No. 8, 8-1, Documents, were received in
10         Evidence.)
11            MR. MOORE:  If I could have the ELMO.
12    BY MR. MOORE:
13    Q.   And Ms. Cooper, what is the date on this contract?
14    A.   11/8 of 2021.
15    Q.   And going to the second page of this seven-page contract,
16    how much was the contract for?
17    A.   It's a little bit blurry.  Now it's good.  The 35,000, is
18    that what you're asking?
19    Q.   Correct.  And what was to be in paragraph 6, the monthly
20    payment that you were supposed to receive?
21    A.   2,500 each month.
22    Q.   And when were you supposed to start receiving that payment?
23    A.   January 8th of 2022.
24    Q.   And when January 8th of 2022 arrived, did you eventually
25    receive payment?
```

```
 1  A.  Yes.
 2  Q.  And did you continue to receive your payments on this
 3  contract?
 4  A.  Yes.
 5  Q.  Were all of these payments on time?
 6  A.  No.
 7  Q.  And what, if anything, would you do when you did not
 8  receive payments on time?
 9  A.  I reached out to -- Laine was one of their main contacts
10  and I made multiple emails to Lane or -- I think they had
11  eventually given me their finance department because I had
12  reached out a handful of times.
13  Q.  What, if any, reason were you given by Laine or anyone else
14  at RBL, be it in the finance department, about why these
15  payments were late?
16  A.  They would say something about it was always regarding the
17  bank issues.
18  Q.  Now, despite late payments, what actions did you decide to
19  take after your November 2022 -- I'm sorry, 2021 contract?
20  A.  I'm not understanding the question.
21  Q.  What actions did you decide to take regarding any further
22  investment with Royal Bengal?
23  A.  I continued to get payments from them so -- but I did not
24  get that -- so I had to invest it again, March of 2022.  I did
25  not get the only truck that I -- from the first time until
```

1    January of 2023.

2          MR. MOORE:  I'm going to show the witness what is

3    entered by stipulation as Government's 119-4.

4          THE COURT:  Any objection?

5          MS. BECKER:  No objection, Your Honor.

6          THE COURT:  119-4 is received.

7      (Government's No. 119-4, Document, was received in

8      evidence.)

9    BY MR. MOORE:

10   Q.  What is the date and what does this highlighted portion

11   reflect?

12   A.  November 8th, 2021, 35,000.

13   Q.  And is that a wire?

14   A.  Yes, I believe so.

15   Q.  And I'll go to the third page, what is reflected here?

16   A.  Can you move it down a tad?  Thank you.

17       This is for the second truck, which was March 21st of 2022,

18   in person.  I went into the RBL office.

19   Q.  And with the first payment, where did you make that payment

20   from on November 8, 2021?

21   A.  It would have been in Michigan somewhere, but I don't know

22   exactly where.

23   Q.  And so on November the 8, 2021, you wired a payment from

24   out of state to the Royal Logistics?

25   A.  Yes.

 1          MS. BECKER:  Objection.  Leading.

 2          THE COURT:  Overruled.

 3   BY MR. MOORE:

 4   Q.   Now, after engaging in this first transactions with Royal

 5   Bengal Logistics, you've already testified about a second

 6   transaction?  A second contract?

 7   A.   Yes.

 8   Q.   Show you what is in evidence as Government's Exhibit 8-1.

 9   What is 8-1?  What is it?

10   A.   I'm not answer -- I'm not sure what you're asking.

11   Q.   What are we looking at?

12   A.   The second agreement for the second truck.

13   Q.   How much was this contract for?

14   A.   35,000.

15   Q.   And what was to be your monthly payment on this one?

16   A.   2,500.

17   Q.   Okay.  Now, as to this contract, did you receive all of

18   your payments on time?

19   A.   No.

20   Q.   And what, if any, action did you take when payments were

21   late?

22   A.   I emailed and called Laine.  She was the main contact, and

23   then they always referred me eventually to the business or

24   financial department.

25          MR. MOORE:  I'm showing defense counsel what is marked

1   as 8-2, 8-3, 8-4, 8-5, 8-6, 8-7, 8-8, and 8-10.

2          MS. BECKER:  Your Honor, we have no objection to 8-2,

3   8-3, 8-5 and 8-10.

4          THE COURT:  So 8-2, 8-3, 8-5 and 8-10 are received.

5       (Government's No. 8-2, 8-3, 8-5, 8-10, Documents, were

6       received in Evidence.)

7          THE COURT:  With respect to -4, -6, -7 and -8, what is

8   the objection?

9          MS. BECKER:  Your Honor, with respect to 8-4, hearsay,

10  not within an exception.

11         8-6 is essentially a duplicate of 8-5.

12         THE COURT:  So 403?

13         MS. BECKER:  403.

14         I'm sorry.  No objection to 8-7 either.

15         THE COURT:  So 8-7 is received.

16      (Government's No. 8-7, Document, was received in

17      Evidence.)

18         THE COURT:  How about 8-8?

19         MR. VAN DYKE:  Relevance, 401, 403.

20         THE COURT:  All right.  So deal with what you got in,

21  Mr. Moore, and see if you lay any more foundation on 4, 6 and 8

22  and offer them again.

23         MR. MOORE:  We'll withdraw 6 since it is duplicative.

24  So it will just be 4, 8.  And we'll work with the rest of them

25  for now.

1           THE COURT:  Okay.

2           Mr. Cruz, while he's doing that, if you have copies of

3   4-4 -- excuse me, 8-4 and 8-8, I'll look at them while

4   Mr. Moore is doing the rest of his examination.

5   BY MR. MOORE:

6   Q.  What's the date on this email, on 8-7?

7   A.  June 14, 2022.

8   Q.  And what does it reflect that you were contacting Royal

9   Logistics about?

10  A.  Because I was supposed to receive a payment -- this would

11  actually be for a second truck.  I put first, but it was

12  second.

13  Q.  And I'll show you 8-3.  If you could, who is 8-3 from?

14  A.  Laine.

15  Q.  And if you could read the bottom portion of this email

16  starting with the italicized portion?

17  A.  "We're facings some security issues with the bank and are

18  working diligently to get this resolved.  Please give us a

19  little bit of time and payment should be sent shortly.  Thank

20  you for your patience.  We're in the process of transitioning

21  our investor payments to be sent from a Wells Fargo account

22  rather than the Citibank account we used previously.

23      "Wells Fargo has a verification process to confirm your

24  account and guarantee that your funds arrive securely.  As soon

25  as Wells Fargo approves your account, the funds for this month

1    will be sent over.  As it is about to be a weekend, we cannot

2    provide a solid date at this time, but your funds will be

3    deposited by next week.  Thank you for your understanding."

4    Q.  And I'll show you also 8-2.  What's the date on that and

5    who is it from?

6    A.  June 21st, 2022, from Laine.

7    Q.  And what does that reflect?

8        If you could just read the language starting at the second

9    paragraph.

10   A.  "I am very appreciative of your patience.  Your business

11   development team and director of finance, including myself,

12   have been working really hard to resolve this hindrance in our

13   system.  We're very confident that all investor's accounts will

14   be current by the first week of July.

15       "I will also like to address to our new investors whose

16   first payment is due, most of you are on schedule, five to

17   seven days' delay, as a normal banking system delay from your

18   contract payment date.  If you are" --

19   Q.  Sorry.  If you could stop there.

20       What, in this first sentence, do they define as the actual

21   issue, what I'm underlining here?

22       MS. BECKER:  Objection.  Document speaks for itself.

23   BY MR. MOORE:

24   Q.  If you could read the language that I'm underlining on the

25   document.

```
 1   A.   "Resolving your banking transfer limit issue by the end of

 2   this week."

 3   Q.   Okay.  Now, let's talk about the actual trucks that you

 4   were supposed to be purchasing with regard to Royal Bengal

 5   Logistics.

 6        Did you get trucks from Royal Bengal Logistics?

 7   A.   I received one.

 8   Q.   And so your first contract, when was that?

 9   A.   November of 2022.

10   Q.   And when --

11   A.   Or I'm sorry, November of 2021.

12   Q.   And when did you receive your first contract?

13   A.   January of 2023.

14   Q.   And if you could, tell the ladies and gentlemen of the jury

15   what took place with regard to your purchase of that first

16   contract -- first truck?

17   A.   What are you -- like --

18   Q.   When you purchased -- were there any issues when you

19   received the first truck?

20   A.   I mean, there was --

21             MS. BECKER:  Objection as to form.  Vague.

22             THE WITNESS:  -- a long delay over a year.

23             THE COURT:  One moment.  One moment.

24             No, that objection is overruled.

25             You can re-ask the question, Mr. Moore.
```

BY MR. MOORE:

Q.   What, if any, issues did you encounter with regard to money that you had to spend when you got your first truck?

A.   So I received the truck.  I was receiving payments. I received it January 2023.  I was receiving payments for two trucks up until June of 2023.  Then, I had to pretty much take over the loan and make payments on it.  Is this what you're referring to?

Q.   Well, I guess at the time that you received the truck in January of 2023, did you reach out to Royal Bengal Logistics?

A.   Ricardi had reached out to me and sent me the picture of the truck, and from there, they said that it was working.

Q.   Prior to receiving a picture of a truck, what, if any, actions had you taken to obtain the truck?  Were there any document submissions back and forth that you had to do?

A.   Yes.  So I had to pretty much get a loan.  They had done the process for me.  We started with one loan company, and then they had denied the loan stating that there was -- it was pretty much not due to my credit, but due to something that came up with RBL.  So then we went through another loan company and was able to get the loan through them.

Q.   And just as to be clear:  What is your credit score?

MS. BECKER:  Objection.  Relevance.

THE COURT:  Now?  Today?

///

BY MR. MOORE:

Q.   At the time that you were attempting to get a loan for the truck?

A.   875.

Q.   So what, if anything, did the loan company say with regard to why a loan could not be given?

        MS. BECKER:  Objection.  Hearsay.

        THE COURT:  One moment.

        Yes.  Sustained.

BY MR. MOORE:

Q.   Now, after in January of 2023 when you received this truck, what, if any, communication did you have with Royal Bengal Logistics about the process that had taken place with regard to that truck?

A.   In what month was that?

Q.   In January of 2023?

A.   So Ricardi had sent me pictures and said that the truck was working.  I never really heard anything else besides that.

Q.   Did you see any emails to Royal Bengal Logistics at that time?

A.   The only time I would really send emails was when they were late on payments.

Q.   Would it refresh your recollection to see emails that you sent to Royal Bengal Logistics in January of 2023?

A.   Yes.

1          MS. BECKER:  Objection.  Improper refreshing.

2          THE COURT:  Overruled.

3          MR. MOORE:  You can't -- past judgments.

4          THE COURT:  Let's take a quick sidebar on these two.

5    Two minutes.

6          Thank you, ladies and gentlemen.

7       (The preceding proceedings were had before the Court and

8        out of the hearing of the jury.)

9          THE COURT:  So what was passed up to me was 8-4 and

10   8-8.

11         With respect to 8-4, the only possible portion of the

12   exhibit that would be admissible would be -- I will check on it

13   because the BDO email address the BDO@RBLtransport email

14   address, there's evidence in the evidentiary record that I will

15   check overcomes a hearsay objection and what is below is

16   context for that.

17         So if this could be redacted for that, the top part,

18   you stand down?

19         MS. BECKER:  I would stand down.

20         THE COURT:  Okay.

21         MS. BECKER:  Given the Court ruling, I don't request

22   the redaction.

23         THE COURT:  Okay.  8-4 can be used.

24         Now with respect to the 8-6, it's a similar issue which

25   is everything below Friday, January 13th, 2023, 8:56 a.m.,

1  Laine D'Orvillier -- if I read that upside down correctly --

2  from there all the way down, those statements and the

3  statements of witness's context that overcomes a hearsay

4  objection.  However, the two above would have to be redacted

5  for this exhibit to come in, or this witness would have to be

6  crossed in such a way that all of a sudden the prior consistent

7  statement above would become non-hearsay.

8       But with that said, because you can't redact this

9  instantly and because I haven't heard the defendant stand down

10  from the redaction, you can't use this in front of her, right

11  now, but my ruling on 8 dash -- is that 8-6?

12       MS. BECKER:  Eight.

13       THE COURT:  Thank you, Ms. Becker.  8-8, everything

14  from January 13, 8:56 AM below is admissible once redacted.

15  And I would just tell you that to the extent that you're doing

16  anything on the top half of this document, it better be perfect

17  in terms of refreshing because I don't see any top part ever

18  coming in.

19       MR. MOORE:  Understood.

20       THE COURT:  Thank you.

21   (The preceding proceedings were had before the Court and

22     out of the hearing of the venire.)

23       THE COURT:  Thank you, ladies and gentlemen.

24       Mr. Moore will continue his direct examination.

25  ///

BY MR. MOORE:

Q.   If you could read from 8-8 -- obviously, you cannot read it
out loud.  When your recollection has been adequately
refreshed, I'll take the document back and have questions.

A.   Okay.

Q.   Now, do you recall, Ms. Cooper, what, if any, issues did
you have with regard to the receipt of your first truck with
Royal Bengal Logistics?

A.   I wasn't happy at the time, just by -- there was not a lot
of communication, misinformation.  The loan -- the initial loan
that I thought that I was applying for had been changed, and
then we went with a different company.  They were telling me
that there was going to be certain things that were going to --
like the fees that would be covered, that weren't.

     So I had sent them an email pretty much stating this is my
credit that's on the line.  This is, you know, misinformation.
So I wasn't happy at the time with the way that the first truck
had went down.

Q.   During the time that you were an investor with Royal Bengal
Logistics, what, if any, information let's say from November
of 2021 until June of 2023, did you consume about the business?

A.   Can you restate that?

Q.   What if any -- did you receive emails?

A.   From them?

Q.   Yes.

```
 1   A.   I mean, I really didn't receive -- a lot of the emails that
 2   I received were for Zoom calls, you know, short-term and
 3   long-term like investments, but really didn't receive anything
 4   besides that unless I had reached out to them.
 5   Q.   Did you watch the Zoom calls?
 6   A.   I did, like.
 7   Q.   How many of the Zoom calls did you watch?
 8   A.   Just a few.
 9   Q.   What, if any, impact did the Zoom calls have on your desire
10   to invest with Royal Bengal Logistics?
11   A.   I mean, they were --
12   Q.   I'll withdraw the question.
13        What types of representations were made on the Zoom calls?
14   A.   Well, you're going to, you know, make this much.  You're
15   going to -- pretty much making money off of these short-term
16   investments and long-term investments.  If you, you know,
17   invest more, you're going to get more kind of thing.
18   Q.   What, if anything, did they say about the trucking business
19   itself?
20   A.   There was -- there was people that were unhappy with the
21   trucking business --
22             MS. BECKER:  Objection.
23             THE WITNESS:  -- during these times.
24             MS. BECKER:  Objection.
25             THE WITNESS:  -- and wanted --
```

```
 1              THE COURT:  Overruled.  She can answer.

 2              You can answer, ma'am.

 3    A.   There were people that were pretty much on the calls, and,

 4    like, Singh had addressed a bunch of people that were upset at

 5    how things had played out for them at him at that time.  And

 6    was promising them that things would get better for them, and

 7    if they wanted to, they could they would give them their money

 8    back.

 9    BY MR. MOORE:

10    Q.   And what, if any, representations were made about the

11    success of the business?

12    A.   They always, pretty much on every Zoom -- or they even had

13    like a banquet that pretty much showed that they were, you

14    know, profitable and it was a -- the business was getting

15    bigger, you know, was making a lot of money, that they were

16    going to go into airplanes next.

17    Q.   Did you attend the banquet?

18    A.   No.

19    Q.   How did you -- go ahead.

20    A.   They had sent out -- well, I think -- I believe Ricardi had

21    texted me there was a flier and then had called.  I was going

22    to attend but I was working, so...

23    Q.   And what, if anything, did you watch with regard to, or

24    about the banquet?

25    A.   The banquet was pretty much just like showing how
```

```
 1    profitable they were and how, you know, the business was
 2    growing so big that they were just doing so well kind of thing.
 3    Q.   And you already testified that you received a truck.  How
 4    many months did you have a truck that was working for you?
 5    A.   So I got it in January of 2023 and had to make a deal with
 6    my loan company this year in like May to --
 7              MS. BECKER:  Objection.
 8    A.   -- get rid of it.
 9              MS. BECKER:  401, 403.
10              THE COURT:  Overruled.
11    BY MR. MOORE:
12    Q.   Okay.  So let's take that in pieces.  Did you have the
13    truck from January to June of 2023?
14    A.   Yes.
15    Q.   Or did Royal Bengal have the truck from January --
16    A.   They had the truck.
17    Q.   And what, if anything -- after the new manager took over in
18    June of 2023, what, if anything, happened with your truck as it
19    relates to you?
20    A.   So they pretty much told us at that point that we had to
21    come pick it or it was going to be surrendered and pretty much
22    your loan would be screwed.  I mean, you pretty much would have
23    to take on that debt.
24         So I had pretty much went down to Lubbock, Texas, and had
25    to hire someone to go get the truck and bring it back.
```

```
 1   Q.   And what did you do with the truck after you brought it
 2   back?
 3   A.   I tried to get it -- I got it on the road to work, but it
 4   ended up being a shit show.  I mean, there was so much debt
 5   involved with that along with the money that I had already
 6   invested.
 7   Q.   So let's just -- I'll ask a couple more brief questions.
 8   When you got the truck, who drove the truck for you?
 9   A.   Back to Michigan?
10        MS. BECKER:  Objection.  Relevance.
11        THE COURT:  One moment.
12        What's the objection?
13        MS. BECKER:  Relevance, Your Honor.
14        THE COURT:  I'll allow it; but, yeah, I don't see where
15   it's going, but maybe you will disabuse the Court.
16        Understood.
17   BY MR. MOORE:
18   Q.   After you got the truck back, what, if anything, were you
19   able to do with the truck to generate revenue?
20   A.   I had pretty much contracted it out to a company and ended
21   up finding out that the trucking industry was, I mean, in bad
22   shape, with inflation and everything else --
23        MS. BECKER:  Objection, Your Honor.  401 and 403.
24        THE COURT:  I'll sustain.  The jury should disregard
25   this last answer.
```

```
 1              Next question, Mr. Moore.
 2    BY MR. MOORE:
 3    Q.   Were you able to pay the monthly lease on the truck?
 4    A.   No.  I had to pay out of my own pocket.
 5    Q.   What ultimately happened with the truck and the truck loan
 6    that you had for that truck?
 7    A.   So --
 8              MS. BECKER:  Objection.  401 and 403.
 9              THE COURT:  Overruled as to this.  She can answer.
10    A.   So I received the truck in -- I believe it was July
11    of 2023, and I pretty much had to pay the -- like the monthly,
12    which was 2,500, out of my own pocket until I was able to make
13    a deal with the loan company to pay them off, 15,000 as of May
14    of 2024.
15              MR. MOORE:  With the Court's brief indulgence.
16              THE COURT:  Yes.
17              MR. MOORE:  We tender the witness, Your Honor.
18              THE COURT:  Cross-examination?
19              MS. BECKER:  No, thank you, Your Honor.
20              THE COURT:  Ms. Cooper, thanks for coming in.  You may
21    step down.  You are excused.
22              THE WITNESS:  Thank you.
23              THE COURT:  Call your next witness.
24              MR. MOORE:  Yes, Your Honor.
25              The Government calls Christopher Apagwu.
```

```
 1    Thereupon,

 2                        CHRISTOPHER APAGWU,

 3    having been first duly sworn or affirmed, was examined and

 4    testified as follows:

 5              THE WITNESS:  I do.

 6              THE COURTROOM DEPUTY:  Please state your full name for

 7    the record and spell your last name into the microphone, you

 8    may be seated.

 9              THE WITNESS:  My name is Christopher Collins --

10              THE COURTROOM DEPUTY:  Sit down and speak into the

11    microphone, please.

12              THE WITNESS:  My name is Christopher Collins Apagwu.

13    Apagwu is spelled A-P-A-G-W-U.

14              THE COURT:  Mr. Apagwu, my name is David Leibowitz.  If

15    you'd make yourself comfortable in the chair and if you do your

16    best to make sure that the microphone is close to where you

17    speak so that you can always be heard.

18              Mr. Moore, your witness.

19                        DIRECT EXAMINATION

20    BY MR. MOORE:

21    Q.  Mr. Apagwu, where are you from originally?

22    A.  I'm from Nigeria.

23    Q.  How long have you lived in the United States?

24    A.  I've lived in the United States for 42 years.

25    Q.  The majority of that time, in what state have you resided?
```

```
 1    A.   State of Maryland.

 2    Q.   Are you married?  Do you have a family?

 3    A.   Yes, I do.  Yes, I'm married.  I have a family.

 4    Q.   And what is your wife's name?

 5    A.   Caitlin Apagwu.

 6    Q.   At some point, did you and your wife take a trip to

 7    South Florida?

 8    A.   Yes.

 9    Q.   And during that trip, what, if anything, do you remember

10    learning about a company called Royal Bengal Logistics?

11    A.   Okay.  My wife has a childhood friend, and on our way back

12    from vacation, so we stop by her place and it was through her

13    that we learn about RBL.

14    Q.   And at the time that you learned about Royal Bengal

15    Logistics, where, if anywhere, did you have money invested?

16         MS. BECKER:  Objection.  Relevance.

17         THE COURT:  Overruled.  He can answer this.

18    A.   Okay.  What was the question again?

19    BY MR. MOORE:

20    Q.   At the time that you were returning from this trip and you

21    learned about Royal Bengal Logistics, where, if anywhere, did

22    you have your money invested?

23    A.   No.  I invested only in 401(k), working for the federal

24    government, so I have my 401(k) there.

25    Q.   How many years with the federal government, sir?
```

```
1    A.   I worked fourteen -- for ten years and about six months.

2    Q.   And what department were you with?

3    A.   U.S. Department of Agriculture.

4    Q.   And after hearing about Royal Bengal Logistics, what, if

5    any, actions did you take?

6    A.   Okay.  The action that I took was to invest in Royal Bengal

7    Logistics.

8    Q.   And what money did you invest with?

9    A.   I used my 401(k) and also invested up to 230,000.

10   Q.   At some point, did you use money beyond your 401(k)?

11   A.   Yes.

12        MS. BECKER:  Objection.  Relevance.

13        THE COURT:  Overruled.

14   BY MR. MOORE:

15   Q.   Where did you get that money from?

16   A.   From my federal savings which is under my 401(k).

17   Q.   And outside of that, did you draw money from anywhere else?

18   A.   Yes, I did --

19        MS. BECKER:  Same objection, Your Honor.

20        THE COURT:  At this point, Mr. Moore, we'll move on.

21   BY MR. MOORE:

22   Q.   Now, tell me who you first spoke with from Royal Bengal

23   Logistics.

24   A.   I spoke with Ms. Laine, I don't recall her last name very

25   vividly.
```

```
1    Q.   And when you spoke to her, did you speak to her with your

2    wife or did you have a separate conversation with her?

3    A.   We had a separate conversation.

4    Q.   And why did have separate conversations?

5    A.   Initially, when my wife spoke to her, she informed her that

6    it was only one person that can invest in the company, that we

7    cannot do it jointly.

8    Q.   So based on her giving you that information, what actions,

9    if any, did you guys take with regard to setting up companies?

10   A.   So my wife went and registered a company under her name and

11   the company name.  And after that, I went and registered a

12   separate company.

13   Q.   And prior to deciding to make any investments, what, if

14   any, information were you given about Royal Bengal Logistics as

15   a company?

16   A.   Not necessarily so.  The only information that I can recall

17   on my own part was receiving emails from Laine about the

18   investment opportunities that they have, which was mostly for

19   trucks.

20   Q.   And what, if any, information did you have about how these

21   trucks operated and how you got paid?

22   A.   Not -- not much.  Just the information was very basic, if

23   you invest on the truck and you get paid every month a certain

24   amount, then after five years, then you can own the truck

25   itself or sell it back to Royal Bengal.
```

```
 1    Q.  And what made you decide to ultimately invest?  What

 2    information made you decide to ultimately invest in Royal

 3    Bengal?

 4    A.  The information that I received where the first time I

 5    spoke to Laine was that the company was doing very well.  Also,

 6    my wife's friend mentioned that the company was doing very

 7    well.

 8            MS. BECKER:  Objection.  Hearsay.

 9            THE COURT:  Overruled.  It's non-hearsay under the

10    rule.  It's not for the truth.  It's for what he did next.

11            Next question, Mr. Moore.

12    BY MR. MOORE:

13    Q.  At some point, Mr. Apagwu, did you decide to invest in

14    Royal Bengal Logistics?

15    A.  Yes, I did.

16            MR. MOORE:  And at this point, we'll move into evidence

17    by stipulation 11, 11-1, 11-2, 11-3, 11-4, 11-5, and 11-7.

18            THE COURT:  Any objection?

19            MS. BECKER:  No objection, Your Honor.

20            THE COURT:  Those exhibits are received.  You may

21    publish as you wish.

22        (Government's No. 11, 11-1, 11-2, 11-3, 11-4, 11-5, and

23        11-7, Documents, were received in Evidence.)

24    BY MR. MOORE:

25    Q.  Mr. Apagwu, I will show you 11 and 11-1 together.  What are
```

```
 1   we looking at in 11 and 11-1?
 2   A.   Okay.  11, part of them are the contracts that I signed
 3   with Royal Bengal for the two investments.
 4   Q.   What were you supposed to get with Government's Exhibit 11
 5   and Government's Exhibit 11-1?
 6   A.   I'm supposed to get a truck.
 7   Q.   Did you receive the truck from Government's Exhibit 11 or
 8   Government's Exhibit 11-1?
 9   A.   No, sir.  No.
10   Q.   Now I'm going to show you Government's Exhibit 11-2.  What
11   is Government's Exhibit 11-2?
12   A.   Okay.  That is a short-term investment.
13   Q.   And how much is it for?
14   A.   It's for 55,000.
15   Q.   Did you receive the return from Government's Exhibit 11-2?
16   A.   No.
17   Q.   Now I'm going to show you Government's Exhibit 11-3, 11-4,
18   11-5 and 11-7.  We'll start with 11-3 first.
19        What is 11-3?
20   A.   11-3 is another short-term investment.
21   Q.   And how many months was this supposed to pay out in?
22   A.   Three months.
23   Q.   Did you receive the payment for this?
24   A.   Nothing, no.
25   Q.   11-4 -- what is this?
```

```
1    A.    This is for 50,000 for three months.

2    Q.    Did you receive payment on this loan?

3    A.    No.

4    Q.    11-5?

5    A.    It's another 50,000 for three months.

6    Q.    Did you receive payment?

7    A.    No.

8    Q.    And what about 11-7?

9    A.    11-7 is my last investment that I made for three months.

10   So I did not receive anything either.

11   Q.    What, if anything, were you told about the money for the

12   short-term loan and what it was going to be used on?

13   A.    They all were to be used as investment into the trucking

14   company for Royal Bengal, for the business itself and that's

15   what I was told.

16   Q.    And what, if any, information were you sent from Royal

17   Bengal while you were investing?

18   A.    Can you repeat that?

19   Q.    What information was sent to you from Royal Bengal while

20   you were an investor?

21   A.    The information that I received was the contract with the

22   emails to sign and return to Royal Bengal.

23   Q.    Did you ever receive text messages?

24   A.    No.

25   Q.    What about, were you in a group chat?
```

```
 1   A.   Yes, I was in a group chat for quite some time, and I read

 2   other people's comments and also I commented on that.

 3   Basically the group chat itself, Mr. Singh himself made a lot

 4   of comments about how well the company is doing, how

 5   profitable, also how the company is expanding its revenue and

 6   all other businesses.

 7   Q.   At any point were you removed from the group chat?

 8   A.   Yes.

 9   Q.   Why were you removed from the group chat?

10   A.   I was removed after the comment was -- introduced the

11   Big Fly airline to the group.  And after that, I think some of

12   the officials of Royal Bengal travel to India and in the

13   process --

14           MS. BECKER:  Objection.

15           THE COURT:  One moment, sir.

16           What's the objection?

17           MS. BECKER:  Lack of personal knowledge.  Speculation.

18   Lack of foundation.

19           THE COURT:  Yeah.  So I'm going to strike the answer

20   once -- I'm going to allow the answer that said "I was removed

21   after the comment."  Everything after that is stricken.

22   BY MR. MOORE:

23   Q.   What you were just describing, was that information that

24   you learned from the group chat?

25   A.   Yes.
```

1   Q.   And what was the cause of you being removed from the --

2   A.   The cause was --

3        MS. BECKER:  Objection.  Same objection.  Calls for

4   speculation.

5        THE COURT:  No.  That's overruled.  He can answer that

6   if he knows.

7   A.   Was because there was a music -- place on a video that was

8   showing, and to me it was offensive because it was calling

9   black people "nigga" and calling women "bitches."  So I

10  commented this should be more professional.  Who put that,

11  maybe they should be in their right mind.  And to say that to

12  the group, they should be a little professional.

13       Immediately, I received a response from Mr. Singh that

14  said, okay, if you don't like it, remove, and I was removed

15  from the group chat.

16  BY MR. MOORE:

17  Q.   And how much did you invest totally in Royal Bengal

18  Logistics?

19  A.   Total from my calculations, and also the email that

20  I received from Laine, is about 230,000.

21  Q.   And how much did you lose?

22       MS. BECKER:  Objection.  401, 403.

23       THE COURT:  Overruled.  You may answer.

24  A.   Yes.  I received, within that time, the first investment,

25  I receive a payment of almost -- I would say not exactly, but

1    almost 16,000 or so.

2    Q.   And you said almost how much?

3    A.   16,000.

4    Q.   And your total losses, from all the contracts?

5    A.   Will be about 215 or about that much.

6         MR. MOORE:  Government tenders the witness.

7         THE COURT:  Cross-examination.

8         MS. BECKER:  Thank you, Your Honor.  If you can just

9    give me a just a moment.

10                        CROSS-EXAMINATION

11   BY MS. BECKER:

12   Q.   Good afternoon, Mr. Apagwu.

13   A.   Good afternoon.

14   Q.   Mr. Moore asked you some questions about a group chat just

15   now; correct?

16   A.   Yes.

17   Q.   Okay.  And I believe you testified that you made a comment

18   about some profanity that you heard in the chat.  Is that

19   right?

20   A.   Yes.

21   Q.   Now, just to be clear:  The profanity was in some music

22   that was included in a video; correct?

23   A.   Yes.

24   Q.   Okay.  So these were not statements that were made by

25   Mr. Singh; correct?  The profanity; right?

 1   A.   Yes.  It was posted in the music file.

 2   Q.   It was a music file.  So these were not statements that

 3   were made by any RBL employee; correct?

 4   A.   The way I look at it was the video was made by RBL.  Him as

 5   CEO, he was present in this chat, and instead of, you know,

 6   taking it apart that, okay, this is a mistake or something, and

 7   he went ahead and said, if you don't like it, remove him and

 8   that I was removed.

 9   Q.   Understood.  I just wanted to clarify that the profanity

10   was in the music; correct?

11   A.   Yes.

12   Q.   Now, if I could show you Government's Exhibit 11-2.

13        MS. BECKER:  If we could turn to page 3 of that

14   exhibit, please.

15   BY MS. BECKER:

16   Q.   Now, Mr. Moore asked you about this contract.  This is a

17   short-term loan agreement that you signed with RBL; correct?

18   A.   Yes.

19   Q.   Okay.  And if we could look at the date, you agree that the

20   date of this contract is October 13th of 2022; right?

21   A.   Yes.

22   Q.   Okay.  And Mr. Moore asked if you received payment on that

23   contract and you said no; correct?

24   A.   Yes.

25   Q.   Okay.  Now, let's just go over that for a moment.  All

1    right.

2        You agree that the maturity date of this contract was six

3    months after you signed it; right?

4    A.   Yes.

5    Q.   Okay.  So that would make it mature on April 13th of 2022;

6    correct?

7    A.   Yes, ma'am.

8    Q.   Okay.  Now, you testified that you didn't receive payment

9    on this contract, but do you recall that you actually rolled

10   over this investment into a new contract with RBL?

11   A.   Yes, I did.

12   Q.   Okay.  So give me just one moment.

13       So, Mr. Apagwu, the loan that we're talking about here

14   in --

15          MS. BECKER:  You can put that back up.

16   BY MS. BECKER:

17   Q.   -- in Government's Exhibit 11-2, you said would have

18   matured in April of 2023; correct?

19   A.   Yes.

20   Q.   Okay.  Now, you agree that before the date that that loan

21   matured, you reached out to RBL to ask them to roll over the

22   funds into a new investment; right?

23   A.   Yes.

24   Q.   Okay.  And they agreed with your request; correct?

25   A.   Yes, they did because they already have the money.

```
 1  Q.  Now, you agree that $50,000 of what you would have received

 2  was rolled over into a new investment; correct?

 3  A.  Yes.

 4  Q.  Okay.  And because -- well, let's do this:  Under the terms

 5  of this contract, you were to receive interest in the amount of

 6  $13,200; is that right?

 7  A.  Yes.

 8  Q.  Okay.  Now, you just testified that $50,000 of this money

 9  was actually rolled over into a new investment contract;

10  correct?

11  A.  Yes, ma'am.

12  Q.  Okay.

13      MS. BECKER:  And if we could just take a look at

14  Government's Exhibit 11-5.

15  BY MS. BECKER:

16  Q.  Do you see that exhibit, sir?

17  A.  Yes, I do.

18  Q.  And the date of this agreement is April 13th of 2023;

19  correct?

20  A.  Yes.

21  Q.  And the amount of this contract is $50,000; correct?

22  A.  Yes.

23  Q.  Those were the $50,000 that were rolled over from the

24  contract that we were looking at before, Government's

25  Exhibit 11-2; right?
```

1  A.  Yes.  That two contracts because I sent an amount of money,

2  one was for 45,000, and this one says they have the money

3  already.  Then it was rolled over in a new contract.

4  Q.  Just taking this one, $50,000 from the previous contract

5  was applied towards this contract; correct?

6  A.  Yes.

7  Q.  Okay.  And that would leave some balance of money that you

8  needed to be paid out from the 11-2, right, the previous

9  contract?

10  A.  Yes.

11  Q.  Okay.  And you were, in fact, paid that money; correct?

12  A.  Yes.  What happened was when it was rolled out --

13  Q.  Sir --

14  A.  -- I have to add the money in order to invest in that one.

15  Q.  All right.

16      MS. BECKER:  Now, if I could have the screen just for

17  the witness for a moment, please.

18  BY MS. BECKER:

19  Q.  And if I could show you, sir, what's marked for

20  identification Defense Exhibit O-6.  If we could turn to

21  page -- well if we -- sir, do you see the first page of that

22  document?

23  A.  Yes.

24  Q.  Do you recognize that?

25  A.  That's from PNC Bank.

```
 1    Q.   What is this?

 2    A.   I assume that's when I opened -- that's when that I opened

 3    the business account with PCN [sic].

 4    Q.   Okay.  Sir, is this a copy of your business bank statement

 5    for April of 2023?

 6    A.   May I put my glasses on?

 7    Q.   Absolutely.

 8    A.   April 1st, 2023.

 9    Q.   Okay.  And this is for your business; correct?

10    A.   Yes, ma'am.

11    Q.   Okay.  KeKee and Coo is the name of business that you

12    opened?

13    A.   Yes, it's still open.

14    Q.   Okay.  And you kept copies of your bank statements as part

15    of the regular course of your business; correct?

16    A.   Normally I did it online, so I get email notification that

17    the balance for the month is available, so I can go in and

18    check it.

19    Q.   Okay.  And you maintain copies of that, either

20    electronically or in hard copy?

21    A.   Electronic copies, yes.  I can get them from the bank.

22    Q.   Okay.

23         MS. BECKER:  At this time, I would move into evidence

24    Defense Exhibit O-6.

25         THE COURT:  Any objection?
```

1          MR. MOORE:  No objection.

2          THE COURT:  O-6 is received.

3       (Defendant's No. O-6, Document, was received in

4       Evidence.)

5          MS. BECKER:  If we could publish to the jury.

6          THE COURT:  Yes.

7          MS. BECKER:  If we could turn to page 2 of this

8    document.

9    BY MS. BECKER:

10   Q.  Sir, do you see on page 2, a credit to your -- I'm sorry, a

11   deposit to your account in the amount of $18,200 from Royal

12   Bengal Logistics on April 24th?

13   A.  Yes, I see the 18,200.

14   Q.  Okay.  And we can agree that that amount was the difference

15   between the total that you expected to be paid out on that

16   short-term contract and the amount that you rolled over into

17   the new investment contract; correct?

18   A.  Yes, which was invested back into Royal Bengal.

19   Q.  Okay.  So when you testified on direct that you did not

20   receive payment on Government's Exhibit -- I'll put the

21   contract back up for you -- 11-2, I just want to be clear, the

22   amount that you expected to receive, part of that was rolled

23   over into a new investment contract; right?

24   A.  The amount -- yes, that's what I said.  I did not, you

25   know, receive that amount because it was rolled over into the

```
 1    business.
 2    Q.   Okay.  So part of it was rolled over and part of it you
 3    received directly to your bank account; correct?
 4    A.   Yes.  It came to that account, then it was rolled over into
 5    the business.
 6    Q.   Okay.
 7              MS. BECKER:  Nothing further, thank you.
 8              THE COURT:  Redirect.
 9              MR. MOORE:  Just briefly, Your Honor.
10                          REDIRECT EXAMINATION
11    BY MR. MOORE:
12    Q.   Did you ever receive your two trucks from Royal Bengal
13    Logistics?
14    A.   Excuse me?
15    Q.   Did you ever receive your two trucks from Royal Bengal
16    Logistics?
17    A.   No.
18    Q.   The questions that you were just asked about this contract,
19    Government's Exhibit 11-2, does it change the fact that you
20    were still out of over $200,000?
21              MS. BECKER:  Objection, Your Honor.
22              THE COURT:  Sustained.
23              MR. MOORE:  I'll withdraw the question.
24              No further questions for this witness, Your Honor.
25              THE COURT:  Okay.
```

1          Mr. Apagwu, thanks for coming in, sir.  You are

2     excused.  You may step down.

3          THE WITNESS:  Thank you.

4          THE COURT:  Next witness.  You have about 15 to 20 more

5     minutes.  Ms. Apagwu, Caitlin Apagwu.

6          Ladies and gentlemen of the jury, while they're getting

7     the next witness, let me assure we're stretching beyond

8     5:30 p.m. not because I have any disdain or contempt for you.

9     It's quite the opposite.  This is a good use of our time.  I

10    told you earlier in the case that we may do this.  I can assure

11    you, this is an efficient use of your time.

12         Ma'am, if you can please step forward.

13    Thereupon,

14                         CAITLIN APAGWU,

15    having been first duly sworn or affirmed, was examined and

16    testified as follows:

17         THE COURTROOM DEPUTY:  Please state your full name and

18    spell your last name into the microphone.  You may be seated.

19         THE WITNESS:  My name is Caitlin Apagwu, A-P-A-G-W-U.

20         THE COURT:  Mrs. Apagwu, if you would please make

21    yourself comfortable in the chair and try your best to keep the

22    microphone close to where you speak when you give answers, that

23    way you can be heard the whole time.

24         Mr. Moore, your witness.

25                         DIRECT EXAMINATION

```
 1   BY MR. MOORE:

 2   Q.   Mrs. Apagwu, where are you from?

 3   A.   I'm from Haiti.

 4   Q.   And how long have you lived in South Florida?

 5   A.   For a short period of time from -- 1990 to 1992.

 6   Q.   From 1990 to 1992.  Is this the first place that you moved

 7   after you relocated from Haiti?

 8   A.   Yes.

 9   Q.   If you could pull that microphone and speak into it?

10   A.   Yes.

11   Q.   Are you nervous, Ms. Apagwu?

12   A.   Kind of.

13   Q.   That's fine.

14          THE COURT:  Try your best.  It's finicky.

15          THE WITNESS:  Yes.

16   BY MR. MOORE:

17   Q.   So does your family live here?

18   A.   Yes.  My mom lives here, my sisters.  My brother lives here

19   too.

20   Q.   Where do you currently physically reside?

21   A.   In Maryland.

22   Q.   Who do you reside in Maryland with?

23   A.   My husband and my three children.

24   Q.   What are your children's ages?

25          MS. BECKER:  Objection.
```

```
 1              THE COURT:  Sustained.  Sustained as to their ages.
 2              THE WITNESS:  Okay.
 3    BY MR. MOORE:
 4    Q.   Do your children live at home?
 5    A.   Two live at home.  My son lives in Colorado.
 6    Q.   And what do you do for a living?
 7    A.   I'm a registered nurse.
 8    Q.   What about your husband?
 9    A.   My husband work -- my husband did IT.  He's a network
10    engineer or something.
11    Q.   And does he still work?
12    A.   No.
13    Q.   What does he do now?
14    A.   Practically nothing.  He's retired.
15    Q.   And do you visit South Florida often?
16    A.   Yeah, my mom lives here.
17    Q.   And what types of things do you visit South Florida for?
18    A.   To see my family.
19              MS. BECKER:  Objection.  401, 403.
20              THE COURT:  Sustained.
21              You can move on.
22    BY MR. MOORE:
23    Q.   Did you visit South Florida in 2022 for a cruise?
24    A.   Yes, I did.
25    Q.   And did you learn about Royal Bengal Logistics during your
```

1   trip to South Florida?

2   A.   Yes.

3   Q.   Explain to the ladies and gentlemen of the jury how you

4   heard about Royal Bengal Logistics during that trip.

5   A.   Okay.  After I get off from my trip, I have a friend of

6   mine who lives in Miami where I always visited him -- or

7   whenever I come see her, I go to her house.  This is my best

8   friend, we grew up together.

9        While we were having dinner and he was explaining -- she

10  was explaining to me there a business and she is involved to,

11  if I want to take a look.  I said why not, it doesn't hurt, and

12  we went -- she went over the business.  She gave me the phone

13  number, the information that I needed.  She said if I'm

14  interested, I can call them when I get back home, then we

15  can -- I can learn more about the business.

16  Q.   Did you eventually make that phone call to Royal Bengal

17  Logistics?

18  A.   Yes, I did.

19  Q.   Who did you speak to when you called Royal Bengal

20  Logistics?

21  A.   I spoke to Laine, Laine D'Orvillier.

22  Q.   And what, if anything, did she tell you about the business?

23  A.   First of all, when I spoke to her she sent me email about

24  the business, sent me fliers, different prices, and what's

25  going to happen.  But the first time I spoke to her, the

```
 1   business was in recession she said, and they will come -- they
 2   will open up sometime in July.  And I waited until July and
 3   I called her back.
 4   Q.  And you used the word "recession."  Does that mean you were
 5   not allowed to enter into a truck contract at that time?
 6   A.  That means that they were closed and not getting contracts
 7   at this time.
 8   Q.  And what, if any, material were you sent that you were able
 9   to watch during this time period?
10   A.  Yes.  They had a big Zoom meeting that Mr. Sanjay was
11   the -- she was the speaker for that meeting.  We were
12   introduced to many members, many members of the business.  We
13   were introduced to the person who is doing maintenance on the
14   truck, to get the truck, we had to see the truck, whatever the
15   person needed -- whatever this person is doing and the other
16   one taking care of money.  They also said the bank that the
17   money was coming in and out to and every person that was
18   involved in the business was introduced to us.
19   Q.  And what, if any, statements were made about how the
20   business, the trucking business was doing?
21   A.  He was very convincing that the business was doing great
22   and we don't have anything to worry about and there's nothing
23   in -- we got everything that was -- we can see what's going on.
24   We see the people, we see, they talk and they introduce
25   themselves and they told us what -- how the business is doing.
```

1    We are -- they are moving, we doing great, and there is nothing

2    to worry about.  And we were doing -- they were doing great.

3    As he always said, business is doing great.

4    Q.   And based off of the information that was being given to

5    you, what actions did you decide to take?

6    A.   I decided to invest.

7    Q.   I'm going to show you --

8            MR. MOORE:  If I could have the ELMO.

9            THE COURT:  Is this in evidence, sir?

10           MR. MOORE:  Yes.  Your Honor, I believe we have a

11   stipulation as to Government's Exhibit 12, 12-1, 12-2, 12-3,

12   12-4, and 12-5.

13           THE COURT:  Any objection?

14           MS. BECKER:  No objection, Your Honor.

15           THE COURT:  Those received are received.  You may

16   publish.

17       (Government's No. 12, 12-1, 12-2, 12-3, 12-4, and 12-5. ,

18       Documents, were received in Evidence.)

19   BY MR. MOORE:

20   Q.   I'm showing you Government's Exhibit 12 and 12-5.  What are

21   the dates on these two agreements?

22   A.   Eleven -- can I get my glasses, please?

23   Q.   Sure.

24   A.   2nd of 11, 2022.

25   Q.   If I could -- we'll start with Government's Exhibit 12.

1    And if I can draw your attention to the top.  What type of

2    agreement is this?

3    A.   Short-term loan agreement.

4    Q.   And what is the date on there?

5    A.   August 22nd, 2022.

6    Q.   And what was the loan amount that I'm drawing your

7    attention to?

8    A.   The loan amount was $25,000.

9    Q.   And how much was the return supposed to be?

10   A.   The revenue was supposed to be 32,000.

11   Q.   Okay.  And when was it supposed to pay out?

12   A.   November 2nd, 2022.

13   Q.   And why did you decide to do this loan agreement?

14   A.   I decided to do the loan agreement because based on what

15   Mr. Singh presented to us.  And I said let me take a shot.

16   Because he said things are doing great and we're going to

17   receive our money, and I decided to invest.

18   Q.   And what was your understanding, based on the material you

19   reviewed, that the short-term loan agreement was supposed to be

20   used for?

21   A.   The short-term agreement supposed to be used on the truck,

22   because my first -- my first impression was we're doing the

23   truck and every money that's sent to short term, long term,

24   they are all going to the trucks, the trucks business.

25   Q.   And I'll show you Government's Exhibit 12-5, and what type

1   of agreement is this?

2   A.   This is for equipment and operating lease agreement.

3   Q.   And what were you supposed to receive with this contract?

4   A.   This contract, I believe it's a truck agreement.

5   Q.   Did you ever receive the truck that was promised in this

6   agreement?

7   A.   No, I never received any truck, any truck at all.

8   Q.   Do you recall how many trucks, in total, you contracted

9   for?

10  A.   Three.

11  Q.   I'm going to show you what is marked as Government's

12  Exhibit 12-2.  What is 12-2?  If you start at the top, what

13  kind of contract is this?

14  A.   Investment and equipment operating lease agreement.

15  Q.   And what's the date?

16  A.   It was October 17, 2022.

17  Q.   And what were you supposed to receive with this?

18  A.   A truck.

19  Q.   Did you ever receive this truck?

20  A.   No.

21  Q.   I'm showing you what's marked as Government's Exhibit 12-3.

22  What is this?

23  A.   Investment and Equipment Operating Lease Agreement.

24  Q.   What were you supposed to receive with this?

25  A.   A truck.

1    Q.   Did you ever receive this truck?

2    A.   No.

3    Q.   And is that three truck contracts that I just showed you?

4         MS. BECKER:  Objection.  Asked and answered.

5         THE COURT:  Sustained.

6    BY MR. MOORE:

7    Q.   Why didn't get a single truck?

8         MS. BECKER:  Objection.  Calls for speculation.  Lack

9    of personal knowledge.

10        THE COURT:  Well, if she knows, Mr. Moore.

11   A.   I know because they told us -- two times.  The first time

12   they sent us paper to fill out for financial -- for -- to

13   finance the truck, which they asked every papers that they sent

14   to us that was going -- that were needed to for the financing

15   of the truck.  I sent the paper to them.

16        After a while, I receive -- I haven't getting anything.

17   I called them back.  I said, you know, I have been waiting to

18   see what -- what the next step.  And they said it takes a

19   little while, just don't worry.  It takes a little while.  A

20   few months passed.

21        They said, again, there was a mistake.  I sent you back the

22   paper fill it out again.  And I filled them out and send them

23   again and I have been waiting.  And I'm still waiting.

24   BY MR. MOORE:

25   Q.   And when was the last time that you sent them that

1    paperwork back?

2    A.   It was a few months before I heard that.

3         MR. MOORE:  Permission to lead?

4         THE COURT:  Yes.

5    BY MR. MOORE:

6    Q.   Was it a few months before the new manager took over?

7    A.   The new manager take over, yes.

8    Q.   I'll show you what's marked as 12-4.  What is 12-4?

9    A.   That's a short-term loan agreement contingent to operating

10   commercial lease agreement.

11   Q.   Who pitched you on this particular loan agreement?

12   A.   They have -- I think they have another meeting, and we

13   received papers that advertised that $50,000 agreement for that

14   loan, how it's going to work, how long it's going to work and

15   stuff like that.

16   Q.   And how was it supposed to work?

17   A.   We were supposed -- we were supposed to give 50,000.  In

18   six months, we were supposed to receive back the sixty -- the

19   50,000.  And after we received the 50,000 that we invested, we

20   were going to be -- after two months, we were going to receive

21   $2,500 for five years -- for five years like the truck

22   business.

23   Q.   And would you receive a truck with this contract or just

24   your money, as you --

25   A.   I haven't received anything.  I haven't getting any money

1    yet.  The investment never give me a penny.  It was up to six

2    months because a new management took over, and I have not

3    received anything from them.

4    Q.  And during the time that you were engaging in all these

5    contracts, what, if any, information were you receiving from

6    Royal Bengal about how the company was doing?

7    A.  They had -- the last meeting they had, it was a great

8    meeting that we have everybody was exciting.  So Sanjay said

9    we're moving forward, and we're investing in other things.

10   They were going to Georgia.  They were going to -- they have

11   investors in Georgia.  They have investors in Rhode Island.

12   They have new truck coming to Texas.

13       And the guy that is taking care of truck was there to --

14   elaborated about the group thing that's what going on in the

15   company and I said, okay, that's -- then it was also talking

16   about aircraft, which was for certain people, selected people,

17   that supposed to be involved on the aircraft investment.  It

18   wasn't for everybody.  And based on that I said -- I invested

19   that $50,000.

20   Q.  How many Zoom meetings did you watch?

21   A.  At least three.

22   Q.  I'm going to show you what's already in evidence as

23   Government's Exhibit 12-1.  What is 12-1?

24   A.  12-1 is a short-term loan agreement.  This loan agreement

25   is a short-term agreement for 35,000 for three months.  The

```
 1    total interest we should be receiving -- I should be receiving

 2    for $45,500 in three months, plus the 35,000 investment.

 3    Q.   Did you ever receive a payout on this short-term loan?

 4    A.   No, sir.

 5    Q.   How many people did you tell about Royal Bengal Logistics

 6    after you invested?

 7              MS. BECKER:  Objection.  401, 403.

 8              THE COURT:  Overruled.  She can tell you.

 9    A.   I can answer, yes.  My sisters, my brother, and my husband

10    and that's it.

11    BY MR. MOORE:

12    Q.   Did all of these people invest in Royal Bengal Logistics?

13    A.   That's correct.

14              MR. VAN DYKE:  Objection.  Hearsay.

15              THE COURT:  Overruled she can answer.

16    A.   Yes.

17    BY MR. MOORE:

18    Q.   Ms. Apagwu, how much money did you lose from your

19    investments with Royal Bengal Logistics?

20              MS. BECKER:  Objection.  401, 403.

21              THE COURT:  Overruled.

22    A.   I lost $220,000, just make for myself.  I'm an -- I was --

23    I was in school for nursing, for nurse practitioner.

24              MS. BECKER:  Objection.

25              THE COURT:  Ma'am, I'm going to stop you there.
```

```
 1            THE WITNESS:  Okay.
 2            THE COURT:  The jury can consider the first three
 3   words.  After $220,000, the answer is stricken, and the jury
 4   shall disregard.
 5            THE WITNESS:  Okay.
 6            MR. MOORE:  With the Court's brief indulgence.
 7   BY MR. MOORE:
 8   Q.  I'm showing you what's in evidence as by agreement as
 9   Government's Exhibit 119-9.
10       Ms. Apagwu, if I could draw your attention to the middle of
11   the page.  What is --
12            MR. MOORE:  This is in by stipulation, 119-9.
13            THE COURT:  No objection?
14            MS. BECKER:  No objection.
15            THE COURT:  That's received.
16       (Government's No. 119-9, Document, was received in
17       Evidence.)
18   BY MR. MOORE:
19   Q.  What does this show, 119-9?
20   A.  That's a wire -- that's the wire I sent to them.  That's
21   the money that I sent to them.
22   Q.  And where were you when you sent that wire?
23   A.  I was in Maryland.
24   Q.  And who did you send that wire to?
25   A.  To Laine.
```

```
 1   Q.   And all of the other payments that you made to Royal Bengal
 2   Logistics, how did you send those payments?
 3   A.   To -- I send all wire all the money, and I sent them to
 4   RBL, and Laine was the one that's taking care of the payment.
 5   Q.   Where were you when you wired this money to Royal Bengal
 6   Logistics?
 7   A.   In Maryland.
 8   Q.   And where is Royal Bengal Logistics located?
 9   A.   The bank for the Royal Bengal Logistics, their bank?
10   Q.   Where is their company located?
11   A.   In Fort Lauderdale.
12        MR. MOORE:  With the Court's brief indulgence,
13   Your Honor.
14        THE COURT:  Yes.
15        MR. MOORE:  Government tenders the witness.
16        THE COURT:  Cross-examination.
17        MS. BECKER:  No, thank you, Your Honor.
18        THE COURT:  Ms. Apagwu, thank you for coming in.  You
19   are excused.  You may step down.  Have a nice evening.
20        THE WITNESS:  Thank you, sir.
21        MR. CRUZ:  Brief sidebar, Your Honor.
22        THE COURT:  Brief sidebar.
23        Hang in there.
24     (The preceding proceedings were had before the Court and
25        out of the hearing of the jury.)
```

```
 1              MR. CRUZ:  As promised, we have good news for you.  We
 2     would like to rest, but we have the exhibits that we need to --
 3              THE COURT:  So you won't rest right now?
 4              MR. CRUZ:  Yes.
 5              THE COURT:  I send them home and give everybody a
 6     chance to tee everything up tomorrow.
 7              MR. CRUZ:  If you would like, we have no more
 8     witnesses.
 9              THE COURT:  Will tell them tomorrow.  Thanks very much.
10     I'll --
11              MR. CRUZ:  Yes, sir.
12              THE COURT:  -- say a whole bunch of things, and we'll
13     just talk, just us.
14              MR. CRUZ:  Thank you.
15              MS. BECKER:  Thank you.
16       (The preceding proceedings were had before the Court and
17         out of the hearing of the venire.)
18              THE COURT:  Ladies and gentlemen, great news, we're
19     going to let you go home for the evening.  A few things.
20              First, you're reminded that you're not to discuss the
21     case and anyone or permit anyone to discuss with it you.  Don't
22     deliberate along the way.  You still have not heard everything
23     in the case.  No outside research.  Don't read about the case.
24     Don't look on the internet about the case.
25              It's extremely tempting at this point to look up the
```

1   judge and confirm how wonderful he is, but you haven't done the

2   for the whole case, so don't do it now.  No contact with the

3   attorneys.  No contact with the witnesses.  Don't form any

4   opinion about the case.  You still haven't heard everything.

5        Tomorrow, it's a very important day in the life of all

6   American citizens.  People die to vote, so that we all can have

7   the right to vote.  We're going to give everybody a chance so

8   that they can -- if they haven't done so already, vote.

9        We're going to start the day tomorrow at 11:00 a.m.

10  Okay.  And my understanding is that in Broward and other

11  counties around, the polling places, that gives you three hours

12  to vote in the morning, if not more, so you can take advantage

13  of that.

14        We'll see everyone at 10:59 a.m. tomorrow, and I want

15  to thank the jury for a very long day and their attention and

16  their punctuality.

17        All rise for the jury.

18        (Jury exits at 6:14 PM.)

19        THE COURT:  I'll get my things out of the way.  I'm

20  sure that the parties are already anticipating what I'm about

21  to say.

22        My understanding is, is that the Government has no more

23  witnesses and is prepared to rest after certain exhibits are

24  redacted or stipulated to.  Is that right?

25        MR. CRUZ:  Yes, Your Honor.  We also have a written

1   stipulation with the defense that we're finalizing and we feel

2   that we'll have that done with signatures for Your Honor

3   tomorrow, Judge.

4         THE COURT:  Okay.  So tomorrow at 11:00 a.m., when they

5   come back in, you will put in whatever exhibits are

6   appropriately redacted and stipulated to, and then publish

7   those, if you see fit, and then the Government will rest.

8         Probably right after that, I will actually excuse them

9   to do the Rule 29.

10        And I think it's proper at this time, given that

11   preview, to ask the defense first if their witness list has

12   sharpened up or stayed the same or otherwise changed.

13        MS. BECKER:  Your Honor, I would just request the

14   opportunity to consult with Mr. Singh before we advise the

15   Court.

16        THE COURT:  I'm not talking as to him.

17        MS. BECKER:  I understand.

18        THE COURT:  You mean on the defense case more

19   generally?

20        MS. BECKER:  Yes.

21        THE COURT:  That's fine.  You want to take a -- how

22   long do you need to do that?  Not as to him, but as to the

23   other -- rest of the defense case.

24        MS. BECKER:  If I could have five minutes.

25        THE COURT:  Yes.  I'm going to give Trish a break for

```
 1    five minutes, and then we'll come back on the record.

 2             Thank you very much.

 3             MR. CRUZ:  Can we leave some of our items in the

 4    courtroom in anticipation for tomorrow, Judge?

 5             THE COURT:  You can leave anything that's not evidence.

 6             MR. CRUZ:  Of course.

 7        (Off the record from 6:16 PM to 6:20 PM, after which the

 8        following proceedings were had:)

 9             THE COURT:  We're going to go back on the record.

10    Ms. Becker.

11             MS. BECKER:  Thank you, Judge.  We have whittled it

12    down.  I think, at most, we will call two or three witnesses.

13             THE COURT:  Two to three, and can you name them?

14             MS. BECKER:  Richard Carr, Leobarto Calderon and

15    Chayton Cahvon (phonetic).

16             THE COURT:  Okay.  So we will do that.

17             Do you have any sense of how long the directs are for

18    each of those, being conservative?

19             MS. BECKER:  Being conservative, I think if we called

20    all three, I think the directs will probably be two and a half

21    to three hours.

22             THE COURT:  Total?

23             MS. BECKER:  Total cumulatively.

24             THE COURT:  That's great.  Thank you for the estimate.

25             MR. CRUZ:  Judge, you didn't ask, but I can approximate
```

```
 1    our crosses will be short on these.

 2            THE COURT:  Thank you, Mr. Cruz.

 3            You can sit, Mr. Singh.  Make yourself comfortable.

 4            I'm going to do some of this again tomorrow with

 5    Mr. Singh, but at this time I would ask that a microphone be

 6    placed before him because I'm going to start my colloquy with

 7    Mr. Singh since the Government is about to rest.

 8            Mr. Singh, can you hear me okay, sir?

 9            THE DEFENDANT:  Yes, Your Honor.

10            THE COURT:  Good evening.  I have seen throughout the

11    trial that you have been conferring with your attorneys and

12    I noticed, of course, that you just conferred with your

13    attorneys about Ms. Becker's representations about your defense

14    case, which you are not obligated to put on a single witness at

15    all, the burden always remains with the Government.

16            Do you understand that, sir?

17            THE DEFENDANT:  Yes, Your Honor.

18            THE COURT:  Are you satisfied with the defense case,

19    the number of witnesses and the names of the witnesses that

20    Ms. Becker just set out for the Court that she intends to call

21    on your behalf?  Are you satisfied with that?

22            THE DEFENDANT:  Yes, Your Honor.

23            THE COURT:  Are there any other witnesses that you want

24    her to call, other than those witnesses?

25            THE DEFENDANT:  Right now, I have conferred with her,
```

1    and if something comes up to me between now and tomorrow

2    morning, I will advise her.

3         THE COURT:  You will advise her.  But as of now, there

4    is no other witness that you desire her to call; of course,

5    reserving your right to think about it, see the rest of your

6    case, and then confer with her again.  Is that fair to say?

7         THE DEFENDANT:  Yes, Your Honor.

8         THE COURT:  Okay.  I want to talk to you about

9    something that I will ask you in some detail tomorrow but I

10   want to start the conversation today.  Do you understand, sir,

11   that you have the absolute right to decide to testify in your

12   own defense in this case?

13        THE DEFENDANT:  I understand that, Your Honor.

14        THE COURT:  Good.  And do you understand that you

15   should confer with your excellent attorneys, and you have been,

16   I'm sure, in making that decision, in deciding whether to

17   testify or not to testify, but do you understand that the

18   ultimate decision is entirely yours?  Do you understand that?

19        THE DEFENDANT:  Absolutely, Your Honor.

20        THE COURT:  Do you understand also that you have the

21   right not to testify?  Do you understand that?

22        THE DEFENDANT:  Absolutely, Your Honor.

23        THE COURT:  And if you decide, after conferring with

24   counsel, not to testify, do you understand that I would

25   instruct the jury that your decision not to testify could not

```
 1    be used against you in any way?  Do you understand that?

 2             THE DEFENDANT:  Yes, Your Honor.

 3             THE COURT:  Okay.  And I know you will continue to

 4    confer with your excellent attorneys about that decision of

 5    whether to testify or not testify, and I want you to know that

 6    all of your conferring with your attorneys about your defense

 7    case, including whether or not you will testify, based on

 8    Ms. Becker's estimate that she just gave me, I very well may be

 9    asking you to make a final decision about that tomorrow

10    afternoon.  Do you understand that?

11             THE DEFENDANT:  Absolutely, Your Honor.

12             THE COURT:  And I'm saying that because I want to make

13    sure that if there's any other conversations and conferences

14    and private advice that you want to have with your attorneys,

15    to make sure to do that between now and tomorrow afternoon.

16    Okay?

17             THE DEFENDANT:  Absolutely.

18             THE COURT:  But I will do this again with you tomorrow

19    when the time comes and ask you similar questions as well and

20    you don't have to -- you are not and you don't have to make any

21    decision about that right now.  Okay?

22             THE DEFENDANT:  Yes, Your Honor, but by tomorrow

23    morning we will --

24             THE COURT:  It's okay.  You have all day.  You can look

25    at the case.  You can confer with your excellent attorneys, and
```

1    only when I ask you to make a final decision, that is the

2    moment when it is final, not before.  Okay?

3              THE DEFENDANT:  Absolutely, Your Honor.

4              THE COURT:  Very briefly, I want to just make sure.

5    Has anyone outside of the courtroom in any way coerced you or

6    threatened you to testify or not to testify in the case?  Has

7    anyone in any way coerced you or threatened you in a way that

8    would affect your decision to testify or not testify?

9              THE DEFENDANT:  No, Your Honor.

10             THE COURT:  Thank you very much.  Mr. Singh, we will

11   talk again and your attorneys have a lot of work to do to put

12   on the defense case tomorrow.  And I'm sure you will confer

13   with them again.  Okay.

14             So to counsel, after the Government rests, after the

15   Rule 29, after the defense case, and after the defense finally

16   rests, depending or not on whether Mr. Singh testifies or not,

17   tomorrow night we have a charge conference.  Saying all that

18   because I think it's fair to say that optimism is in order,

19   which means, in fairness to the excellent attorneys, if it goes

20   that way, we will have closing arguments on Wednesday morning

21   first thing, if it goes that way.

22             And as I said, we're going to do them all in kind of

23   one package; 60 minutes, 90 minutes, 30 minutes.  And then I'll

24   charge the jury before or after lunch as the case may be, and

25   they get the case.  I'm not saying it has to go that way.  I'm

1    saying in all -- with all respect to counsel, we're going to

2    keep putting our foot on the gas if it goes that way tomorrow

3    as they have laid out.  Okay?

4         So I've kind of said my piece.  I'll be ready for the

5    charge conference tomorrow after I read the last pieces that I

6    think came in either last night or this morning.

7         Anything else anyone wishes to do?

8         MR. CRUZ:  Just if you don't mind me asking, Judge,

9    approximately how much time do you anticipate the Rule 29

10   conference?  I'll ask so that we can get an idea of when the

11   defense begins.

12        THE COURT:  It depends what they say but I don't think

13   it will take -- I'm guessing at what they'll say, but I plan,

14   based on what they say -- look, if they have a specific Rule 29

15   motion to a specific count, that it's not a global Rule 29, you

16   know, I want to hear what the defense has to say.  But I don't

17   think it will take long.  I have been paying very close

18   attention.  I have been tracking the counts.  I just need to

19   hear what the defense's precise Rule 29 motion is.

20        MR. CRUZ:  Regarding the charge, I'm sure Your Honor

21   noticed over the weekend there were some filings as to Takhalov

22   mainly, and I just wanted to make sure Your Honor is aware of

23   some of the filings.

24        THE COURT:  I've read your filings.  I've read their

25   filings.  I'm going to have some questions at the charge

conference tomorrow about it.  I think the Waters case and the

Bell case and I think these excellent defense attorneys are

doing their level best to suggest that a good faith instruction

should have some Takhalov language in it.  I need to consider

it all.  But I have been keeping up.

Anything else?

MR. CRUZ:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Thanks, everybody.  I'll see you

tomorrow.  Just to be clear, for the attorneys who vote, we

need to be here and everything -- oh, I'm sorry, last thing.

Tonight, in light of everything that was said, please

make sure that the evidentiary exhibits that have been admitted

into evidence are reviewed, that they are reviewed with defense

counsel, because as soon as Wednesday lunch, I could be asking

for the clean laptop and the all exhibits to be wheeled back

there.  So I think given that we're starting a little late

tomorrow, I'm going to count on counsel to make sure they're

conferring to make sure that we're not wasting time with the

jury if they get the case midday Wednesday.  So I'll leave it

there.  And go vote.  And I will see you tomorrow at 10:30 a.m.

Thank you.

MS. BECKER:  Thank you, Your Honor.

MR. CRUZ:  Thank you.

MR. VAN DYKE:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  All rise.

1          (Jury Trial was adjourned at 6:30 PM.)

1        C E R T I F I C A T E

2

3

4   I hereby certify that the foregoing is an

5 accurate transcription of the proceedings in the

6 above-entitled matter.

7

8

DATE:  11/4/2024   /s/Patricia Bailey-Entin

9          PATRICIA BAILEY-ENTIN, FPR, RPR
          Official Court Reporter

10         United States District Court
          Southern District of Florida

11         U.S. Federal Courthouse
          299 East Broward Boulevard

12         Fort Lauderdale, Florida 33301

13

14

15

16

17

18

19

20

21

22

23

24

25